**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| M.P., a minor, by and through, Jennifer Pinckney, as Parent, Natural Guardian, and Next Friend, | No.    2:22-cv-3830-RMG |
| *Plaintiff* | |
| *v.* | **Complaint** |
| Meta Platforms, Inc. (f/k/a Facebook, Inc., a Delaware corporation; Facebook Holding, LLC; Facebook Payments, Inc; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc; Internet Research Agency, LLC (a/k/a Mediasintez LLC a/k/a Glavset LLC a/k/a Mixinfo LLC A/K/A Azimut LLC a/k/a Novinfo LLC); Concord Management and Consulting LLC; Concord Catering, & Yevgeniy Viktorovich Prigozhin | *Jury Trial Demanded* |
| *Defendants* | |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 2

PARTIES ............................................................................................................................... 10

JURISDICTION AND VENUE ............................................................................................ 15

FACTUAL ALLEGATIONS ................................................................................................ 16

    A.    Facebook's Defective Design and Architecture ............................................................ 33

    B.    Facebook Prioritizes Hate Speech and Misinformation to Increase User Engagement . 35

    C.    Facebook Promotes Extremist Group Content and Weaponizes It Against Users ......... 44

    D.    Exploitation by Extremists and Facebook's Success in Radicalizing Its Users ............ 46

    E.    The Russian Defendants Use of Facebook .................................................................... 49

    F.   Dylann Roof's Radicalization on Facebook .................................................................. 53

    G.    Plaintiff Minor Person Pinckney ................................................................................... 58

CAUSES OF ACTION .......................................................................................................... 59

COUNT I – STRICT PRODUCT LIABILITY – DESIGN DEFECT ..................................... 59

COUNT II – NEGLIGENCE ................................................................................. 61

COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS .......................... 62

COUNT IV – CIVIL CONSPIRACY IN VIOLATION OF THE KU KLUX KLAN ACT ..... 63

TIMELINESS & TOLLING ..................................................................................... 66

PRAYER FOR RELIEF ......................................................................................... 67

Jennifer Pinckney (hereinafter by name or "Plaintiff"), as Parent, Natural Guardian, and Next Friend of M.P. (a minor), complaining of the Defendants alleges as follows:

## INTRODUCTION

1.      On June 17, 2015, Dylann Roof stepped inside Emanuel AME Church in Charleston, South Carolina ("Mother Emanuel"), joining a group bible study that was in session. As the study concluded, Roof stood up, pulled a handgun, and carried out the most vicious hate crime in modern American history.

2.      Roof shot and killed nine people: Reverend Clementa Pinckney and eight parishioners:  the Rev. Sharonda Coleman-Singleton, the Rev. DePayne Middleton-Doctor, the Rev. Daniel Simmons, Cynthia Hurd, Susie Jackson, Myra Thompson, Ethel Lance, and Tywanza Sanders. Each one of them suffered a horrific, violent death.

3.      Clementa Pinckney, a South Carolina State Senator and Senior Pastor at Mother Emanuel, was Jennifer Pinckney's husband and MP's father. Reverend Pinckney was a strong advocate for civil rights and served as a leader in his community. While leading bible study at Mother Emanuel, he saw Roof enter the Church and invited Roof to join the group.

4.      Jennifer Pinckney and her minor daughter hid under the desk in Reverend Pinckney's office. Just on the other side of the door, they listened as Clementa and the parishioners

suffered violent deaths in the name of white supremacy. They were murdered merely because of the color of their skin.

5.     Extensive study of Dylann Roof has shown that his formative years and familial environment did not include instruction as to white supremacist ideology.  Rather, research shows that Roof was radicalized online by white supremacist propaganda that was directed to him by the Defendants.

6.     Through repetitious exposure to online white supremacist propaganda, Roof learned how to hate and grew obsessed with white replacement theory. He was aided by the Defendants who conspired together to target individuals like Roof who would be susceptible to online engagement with the kind of white supremacist propaganda and ideology that leads to offline violence, including the white replacement theory. Roof ultimately concluded that he needed to trigger a racially motivated civil war.

7.     By design, Roof was shown so much white supremacist propaganda that he believed the heinous act he ultimately committed at Mother Emanual was necessary to spark a race war and save the white race. Roof's online radicalization led directly to unspeakable offline violence. And it was all entirely foreseeable to Defendants.

8.     The story of how this happened, however, begins years earlier and thousands of miles away in a hostile foreign country. Hostile foreign actors were looking for new opportunities to cause civil unrest in the United States via social media and an increasingly influential online environment. Indeed, highly sophisticated foreign actors deliberately caused civil unrest in the United States by exploiting defective algorithms in social media platforms, that, combined with negligent social media product design, created an efficient form of influence over social media users that inherently drives an ever more extreme and emotional response in the individual, often

leading to extreme (and sometimes violent) offline action. That is the story of Dylann Roof (and so many others).

9.    The Russian Defendants had purposeful malicious intent to carry out this clandestine operation to incite racial hate and racial violence in the United States. They were aided by the Meta Defendants' defective products, unfettered use of social media, which they used, unrestricted by the Meta Defendants, in a new way of communicating and influencing individuals (at scale) with racial narratives and misinformation. The repercussions of this attack on the social fabric of the United States were dramatic and have caused unimaginable pain and suffering. The ability to influence the minds of hundreds of millions of American citizens through social media platforms was an opportunity that was not available historically.

10.    On June 17, 2015, Dylann Roof squeezed the trigger on the handgun that murdered those nine innocent churchgoers during a routine Wednesday night bible study class. But we now know that online radicalization was a substantial factor in influencing Roof to carry out that horrendous crime. This was a premeditated political attack that was launched on the social fabric of the United States by corporations and individuals closely linked to a hostile Russian government, which was seeking to gain some geopolitical advantage by inciting a race war in the United States. Their weapon of choice was social media infiltration and exploitation, and their strategy was very successful because of a social media industry led by META, which had complete disregard for the health and safety of its users. META exposed those users to a defective product that caused psychological injury and substantially increased the risk both of online radicalization and of offline violence resulting from it.

11.    The Russian Internet Research Agency along with the CONCORD Defendants and PRIGOZHIN worked toward a common strategic goal to sow division among the racial and ethnic

groups in the United States; to cause discord and upset the U.S. political system; and to undermine faith in U.S. democratic institutions, including by inflaming social and political polarization. The intent of these foreign actors was to fan the flames of white supremacy and violate the civil rights of African Americans in the United States. The scheme was elaborate and included the promotion of racial hate and racism through fictitious U.S. personas on social media platforms and other Internet-based media. Members of the conspiracy posed as U.S. persons, operating fictitious social media personas, pages, and groups, designed for purposes of attracting U.S. audiences and causing racial polarization and enhancing hate between the races. Yevgeny Prigozhin's goal was to "destabilize the internal situation in the U.S.," by deliberately inflaming racial tensions by spreading false rumors and incendiary stories to and/or about African Americans via social media. Prigozhin and his company, the Internet Research Agency, a St. Petersburg-based troll farm, were intent on splitting America along racial lines and eroding trust in our institutions. The Internet Research Agency specifically targeted seven southern states including South Carolina. This was an attempt to create racial chaos in the United States via a social media infiltration.

12.     Social media platforms like Facebook and Instagram are still largely unregulated and the largest players in the market are voraciously profit-driven corporations and private enterprises. Facebook had to make decisions along the way as it grew to become the dominant social media platform. Besides what the Meta Defendants are now well known for (their unyielding "buy or kill" strategy towards any competition whatsoever), their profit-before-safety growth strategy also involved weighing what was "best practices" for the general wellbeing of their users and society versus the need and desire to positively drive the companies' profit margins. Safety was spurned in favor of growth and market share. Decisions were made at the highest executive level within Facebook to develop social media products that would maximize user

engagement, promoting and encouraging time spent on the platform, without regard for the mental health and wellbeing of the users. The simple fact is that the companies' business models (where the advertisers are the customers and the users are the product) depend on keeping people glued to their screens so these companies can sell advertisements, and provocative content helps to accomplish this goal. Once the Meta Defendants learned this through their own internal research, they exploited it heavily and fired or ignored anyone along the way who raised moral or ethical questions. Those decisions should not be without consequence.

13.    Behavioral scientists have now ascertained the interaction of young impressionable adolescents and young adults with social media causes online radicalization to occur. The online radicalization of Roof is well documented and directly led to his decision to carry out offline mass violence. Roof even confessed that he committed the shooting in hopes of igniting a race war.  Roof had a Facebook page and just three weeks prior to the racially motivated attack the 21-year-old changed his Facebook profile photo to one featuring him in a wooded scene wearing a jacket with multiple patches, including ones with neo-Nazi references and one which appears to be the flag of Apartheid-era South Africa/Rhodesia along with neo-Nazi references.

14.    Meta operates the largest group of social networks in both the United States and the world. The network encompasses billions of users (including hundreds of millions of Americans) that view and share content through mobile phones and computers every day.  Meta had an ability to also share certain data with Google in joint efforts to harvest and monetize the personal data of millions of Americans. Through their platforms, the Meta Defendants can facilitate and guide the ways people seek and share information, engage in debate, and participate in society. These platforms have become the public square on a massive scale. Meta's platforms are underpinned by algorithmic systems that process huge volumes of data to infer and develop detailed profiles of

individual users and then use this mined data and artificial intelligence to shape and individually tailor each user's online experience in a way best designed to modify that user's behavior.

15.     Plaintiff brings claims for product liability based on the Meta Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary users in general and adolescents and young adults in particular. It is possible to develop a social media product that will not cause online radicalization and would substantially decrease the risk, incidence, and magnitude of offline violence. It is foreseeable that when such social media products are negligently designed, they can and do result in online radicalization that leads to offline violence. And it was entirely foreseeable to Defendants that maximizing engagement without regard to health and safety would cause both online radicalization and offline harm. The Meta Defendants' conscious decision to ignore the foreseeable harm that their product would foreseeably cause in favor of profits was reckless at best and intentional at worst.

16.     Plaintiff also brings claims for product liability based on the Meta Defendants' failure to provide adequate warnings to adolescents and young adult users of the danger of mental, physical, and emotional harms, including online radicalization and offline violence, arising from the foreseeable use of their social media products. The various social media and internet search companies were all collectively reinforcing the risks of online radicalization by failing to adequately protect adolescents and young adult users from psychological manipulation.

17.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful and causing online radicalization in a significant percentage of their adolescent and young adult users. Defendants failed to design their products to ameliorate these

harms or warn adolescents and young adults and their parents of dangers arising out of the foreseeable use of their products. The Meta Defendants' conduct, alternatively and/or concurrently, was intentional, knowing, willful, wanton and/or reckless. The Meta Defendants intentionally created an algorithm that provided a product focused heavily toward inflammatory negative perspectives on issues deemed to be of interest to users. The Meta Defendants simultaneously (and intentionally) failed to provide adequate balance to their algorithm and rejected any safeguards from the harmful effects they knew were occurring, including online radicalization and racially motivated incitement of violence. We now know from the release of the "Facebook Papers" by former-Facebook-employee-turned-whistleblower Frances Haugen that the Meta Defendants understood their platforms, algorithms, and products can and do cause significant psychological and behavioral harm to their users.

18.    Plaintiff also brings civil rights claims against the Defendants under the Ku Klux Klan Act of 1871 (also referred to as the Civil Right Act of 1871) and § Sections 1983 and 1985 of Title 42 of the United States Code. The Ku Klux Klan Act with 42 U.S. Code and § 1985 (3) prohibits persons and corporations from conspiring to deny "either directly or indirectly, any person or class of persons of the equal protection of the laws." It reads:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any

act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

19.    The Russian Defendants were actively and purposefully seeking to cause an increase in racial tension to cause civil unrest and did so with the knowledge that violence against African Americans more probably than not would occur based solely on their race. The Meta Defendants had a responsibility under civil law to not use their social media platforms to violate the civil rights of African Americans. The Meta Defendants knew or should have known when it sold advertisements to the Russian Defendants that the latter were actively and purposefully causing online radicalization of susceptible users. Both the Russian Defendants and the Meta Defendants bear civil liability for the online radicalization of Dylann Roof that led to the targeting and murder of nine innocent people in a place of sanctuary. The targeting of the oldest African Episcopal Methodist Church in the Southern United States (founded in 1817) was meant to send a chill throughout the African American community in our country that not even in their churches would they be safe.  It is that attempt to cause widespread fear, intimidation, and intentional emotional distress that makes this violence an attack on all Americans.

20.    Both Democratic and Republican administrations have failed to successfully hold accountable those foreign actors who sought to damage race relations and increase racial divides in our country by infiltrating our social media platforms and using them to stoke anti-Black fear, violence, sentiment, and otherization, placing African Americans in South Carolina in fear and making it unsafe for them to live their lives in peace and prosperity including attending normal church services. This assault on a protected class of Americans based solely on their race violates our U.S. civil law. Jennifer Pinckney and her teenage daughter bring this action to obtain some

degree of justice from these Defendants and to reassure all African Americans living in the United States that they are entitled to the constitutional protections afforded to all of our citizens regardless of race, religion, or ethnicity.

## PARTIES

21.     M.P. is the minor child of Senator Clementa Pinckney and his wife Jennifer Pinckney (hereinafter "Plaintiff," or "Mrs. Pinckney"). Jennifer Pinckney brings all actions for her child as her Next Friend. Both Plaintiff and M.P. were citizens and residents of Walterboro, South Carolina at the time of the events complained of herein.

22.     Meta Platforms, Inc. ("Meta" or "Facebook") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1 Hacker Way, Menlo Park, California 94025. Until October 2021, Meta was known as Facebook, Inc. and is referred to by its better-known moniker, "Facebook," herein. Facebook does business in this Country, the State of South Carolina, and across the Unites States.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

24.    Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25.    Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012 and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26.    Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.    Facebook Technologies, LLC ("Facebook 4") was incorporated organized in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28.    Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated re-organized the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

30.     Defendant INTERNET RESEARCH AGENCY LLC (Агентство Интернет Исследований) ("ORGANIZATION") is a Russian organization engaged in electoral interference operations. In or around July 2013, the ORGANIZATION registered with the Russian government as a Russian corporate entity. Beginning in or around June 2014, the ORGANIZATION obscured its conduct by operating through a number of Russian entities, including Internet Research LLC, MediaSintez LLC, GlavSet LLC, MixInfo LLC, Azimut LLC, and NovInfo LLC.

31.     Starting in or around 2014, the ORGANIZATION occupied an office at 55 Savushkina Street in St. Petersburg, Russia. That location became one of the ORGANIZATION's operational hubs from which the Russian Defendants and other co-conspirators carried out their activities to interfere in the U.S. political system, including the direct attempt to incite racially motivated violence in the United States by infiltrating social media platforms such as Facebook and Instagram.

32.     The ORGANIZATION employed hundreds of individuals for its online operations, ranging from creators of fictitious personas to technical and administrative support. The ORGANIZATION's annual budget totaled the equivalent of millions of U.S. dollars. The ORGANIZATION was headed by a management group and was organized into numerous departments including graphics, data analysis, search engine optimization (SEO), and an information-technology (IT) department to maintain an elaborate and highly sophisticated digital infrastructure used in the ORGANIZATION's nefarious operations targeting racial hate in the United States.

33.    The ORGANIZATION also maintained a finance department to budget and allocate funding. The ORGANIZATION sought to conduct what it labeled as "information warfare against the United States of America" through numerous fictitious U.S. personas on social media platforms and other Internet-based media.

34.    Sometime around April 2014, the ORGANIZATION formed a special department that was referred to as the "translator project.". This project focused on the U.S. population and conducted special planned operations to increase racial hate and animosity via social media platforms such as Facebook, Instagram, YouTube, and Twitter. The ORGANIZATION's goal, or at least a large part thereof, was to spread fear and distrust among the races in an effort to increase political unrest in the United States.

35.    Defendants CONCORD MANAGEMENT AND CONSULTING LLC and CONCORD CATERING (the "CONCORD entities") are related Russian entities with various Russian governmental contracts and relationships. The CONCORD entities were the ORGANIZATION's principal source of funding for its nefarious attacks on the societal fabric of the United States. The CONCORD entities controlled funding, recommended personnel, and oversaw the ORGANIZATION's activities through reporting and interaction with ORGANIZATION management.

36.    Defendant YEVGENIY VIKTOROVICH PRIGOZHIN (PRIGOZHIN) is a Russian national who controlled the Concord entities. PRIGOZHIN approved and supported the operations of the ORGANIZATION to cause racial chaos in the United States. PRIGOZHIN directed the generation of content used to incite racially motivated violence in the United States. PRIGOZHIN has close ties to the Russian Government and has been sanctioned by the Office of Foreign Assets Control of the U.S. Department of Treasury for his role or complicity in, or having

directly or indirectly engaged or attempted to engage in, election interference and political destabilization activity in a U.S. or other foreign election for or on behalf of, or for the benefit of, directly or indirectly, the Government of Russia.

37.    PRIGOZHIN, since at least 2014, has been part of a broader Russian effort known as "Project Lakhta," which was an attempt on behalf of Russian Government proxies to engage in political and electoral interference operations targeting other countries including the U.S., EU members, and Ukraine.  The U.S. Treasury has taken action against Mr. Prigozhin for being the financier of the Internet Research Agency and for attempting to subvert U.S. Democracy.[1]

38.    Prigozhin has used a complex network of shell and front companies to evade U.S. sanctions and to obscure his ownership.  Current U.S. Treasury sanctions have resulted in the freezing of Prigozhin and his various shell companies' assets including properties and bank accounts and U.S. persons are prohibited from engaging in any business transactions with Prigozhin. (Prigozhin has been designated pursuant to Executive Orders [EO's] 13848, 13694, as amended, 13661, and 14024) The U.S. Treasury Department, through its Office of Foreign Assets Control (OFAC) and with assistance from the U.S. State Department and Commerce Department, has blocked and frozen over $30 Billion dollars in Russian Oligarch sanctioned property and funds including those of Prigozhin.

---

[1] For further detail regarding the Russian Defendants' actions and support for the allegations contained in Paragraphs 30-37 above, *see U.S. v. Internet Research Agency LLC, et al.*, Docket # 1:18-cr-00032-DLF, Doc. 1 (D.C. 2/16/18); "Report on the Investigation into Russian Interference in the 2016 Presidential Election," Vol. I, U.S. DOJ, Special Counsel Robert S. Mueller, III (March 2019) (the "Mueller Report"), available at:
https://www.justice.gov/archives/sco/file/1373816/download; and Report of the U.S. Senate Select Committee on Intelligence on "Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Vol. 2: Russia's Use of Social Media with Additional Views" (Nov. 2020), available at:
 https://www.intelligence.senate.gov/publications/report-select-committee-intelligence-united-states-senate-russian-active-measures.

39.     Prigozhin also recently admitted he founded the "Wagner Group" in 2014. This shadowy private military company has supported the Kremlin's military campaigns in Africa and the Middle East, occasionally doing battle against U.S. military forces. In a September 26, 2022 statement from Prigozhin posted by the press service for his company Concord Management and Consulting, Prigozhin admitted his role in forming and implementing the Wagner Group.

## JURISDICTION AND VENUE

40.     Venue is proper in this Court in that a substantial part of the acts and/or omissions forming the basis of these claims occurred in the District of South Carolina, Charleston Division.

41.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) as complete diversity exists between Plaintiff, a South Carolina domiciliary and resident, and Defendants, who are Russian corporations and individual(s) (non-U.S. entities and non-citizens residing abroad are considered diverse from Plaintiff for purposes of this Court's jurisdiction) and numerous Delaware corporations having their principal places of business in California.

42.     Jurisdiction over the Russian Defendants is proper due to their actions directed at or intended to produce tortious harm and/or civil-rights-violation consequences, and which did produce such harm or consequences, in the State of South Carolina, by and through which the Russian Defendants have purposefully availed themselves of the jurisdiction and laws of South Carolina. These deliberate actions and/or intended consequences gave rise to and are the subject of this Complaint and its detailed facts below such that specific personal jurisdiction over the Russian Defendants is proper in this case. Collectively all the Defendants were active in commerce in South Carolina. The ORGANIZATION actually sent agents into the United States, interfaced with a significant percentage of the population of the State of South Carolina, and purposefully availed itself of the benefits of transacting business here. Prigozhin and the Organization specifically targeted seven Southern States including South Carolina  for their racial discord. The

exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

43.    Jurisdiction over the Meta Defendants is proper due to their actions directed at or intended to produce tortious civil harm and/or the violation of civil rights, and which did produce such harm, in the State of South Carolina, by and through which the Meta Defendants have purposefully availed themselves of the jurisdiction and laws of South Carolina. These actions and/or intended consequences gave rise to and are the subject of this Complaint and its detailed facts below such that specific personal jurisdiction over the Meta Defendants is proper in this case. The Meta Defendants advertise extensively in South Carolina, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile phones prior to sale. The Meta Defendants have earned millions of dollars in annual revenue from their South Carolina-related activities over the last several years arising from their defective and inherently dangerous social media products, including those that promote race-based hate and violence.

44.    This Court also has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1331 because claims in this case arises under the laws of the United States. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

45.    The Russian Defendants, posing as U.S. persons and creating false U.S. personas, operated social media pages and groups designed to attract U.S. audiences. These groups and pages, which addressed divisive U.S. political and social issues, falsely claimed to be controlled by U.S. activists. Defendants also used the stolen identities of real U.S. persons to post on

ORGANIZATION-controlled social media accounts. Over time, these social media accounts became Defendants' means to reach significant numbers of Americans in 2014 and 2015 for purposes of causing racially based provocation and unrest with the goal of interfering with the U.S. political system, including leading to the presidential election of 2016.

46.     Certain Defendants traveled to the United States under false pretenses for the purpose of collecting intelligence to inform Defendants' operations. Defendants also procured and used computer infrastructure, based partly in the United States, to hide the Russian origin of their activities and to avoid detection by U.S. regulators and law enforcement. Accordingly, this action seeks the award of compensatory damages to redress the harm to the Plaintiff caused by the Defendants' use of hate, vitriol, intimidation, and threats of violence to interfere with the civil rights and basic human rights of people based on their skin color and punitive damages to punish Defendants for the purposeful, reckless, and malicious manner in which they conspired and acted and to forever enjoin and deter a recurrence of this unlawful conduct.

47.     The attack on Reverend Pinckney and his parishioners was a direct, intended, and foreseeable result of the Russian Defendants' unlawful conspiracy. It was instigated by a common plan they had to cause increased hostility, distrust and violence among the races. As part of their plan, these Defendants acted in concert to cause this distrust among the races for the purpose of inciting racism and violence. They promoted white supremacist theories and planted hundreds of hate propaganda messages online meant to inspire and grow the white supremacy movement.[2]

48.     It is not a serious matter of dispute that the sophisticated social media company, Facebook/Meta knew at least by 2014 that online radicalization leads to offline violence. Although

---

[2] For further detail regarding the Russian Defendants' actions and support for the allegations contained in Paragraphs 45-47 above, see materials cited in fn. 1, *supra*. Throughout this Complaint, these materials are heavily relied upon for the allegations concerning the conduct and actions of the Russian Defendants.

no single item of extremist propaganda is guaranteed to transform someone into a violent radical or terrorist, online radicalization is expected when individuals engage with extremist content for extended periods of time. The effect is amplified by repeated exposure to inflammatory graphic images and video resulting in emotional desensitization. Some participants—like Roof—become so worked up that they carry out violent acts offline.

49.     Facebook's algorithms are very successful in doing exactly what they are programmed to do: create a system in which the self-affirmation of its users continues to grow and magnify. The goal is behavioral modification. And the algorithms in question have enjoyed unprecedented success in this arena, with many who have studied them deeming them perhaps the most sophisticated and advanced mind control devices the world has ever known. This becomes even more problematic as individuals turn to the Internet and social media as their main source of news. But the most fundamental problem with these behavioral modification devices here is how white supremacists have used them to spread lies, violence, and hate freely and very effectively. Foreign governments have also sought to spread hate and discord along racial lines through false Facebook accounts and staged content.

50.     The Russian Defendants knowingly and intentionally caused racial unrest and racial violence in the United States to destabilize any semblance of racial reconciliation in the United States for strategic political purposes.

51.     The Meta Defendants conspired with the Russian Defendants to deprive African Americans of their fundamental right to vote and equal protections of the law, knowingly and recklessly producing racial animus, distrust, and hate. The Defendants worked together to use Facebook's algorithms to proliferate race-based hate and amplify lies promoting violence against African Americans and discouraging them from voting.

52.     The Meta Defendants knowingly conspired with the Russians to sow discord by using online radicalization to deprive African Americans of their fundamental right to vote and equal protection of the law. Meta, familiar with the individual interests of its users, knowingly exploited the users through highly engineered, algorithm-driven behavioral and psychological manipulation. Meta exploited the users for its own profit-driven motives as a result of its goal to maximize engagement (and, *ipso facto*, profits).

53.     The Russian Defendants and the Meta Defendants worked together to violate the civil rights of Plaintiff and her family including by depriving them of due process and equal protection of the law.

54.     Plaintiff expressly disclaims all claims seeking to hold the Meta Defendants liable as the publisher or speaker of any content provided, posted, or created by third parties.

55.     No extremist groups conspired with Roof to carry out this vicious hate crime. Instead, Roof consumed evil propaganda via the Facebook, Google, and YouTube platforms, which had all the inflammatory racially disparate white-power propaganda that he needed to motivate himself to carry out mass carnage against innocent Blacks. Roof was able to complete the process, striking viciously without detection by law enforcement.

56.     He was a classic lone wolf. A violent actor disconnected from traditional hate or terrorist groups. These radicalized lone wolf assailants are tougher to predict and are more capable of unrestrained violence because they don't have a group of peers to hold them accountable. Law enforcement described Roof as "a person drifting through life who had access to a computer, a classic lone wolf." Lone-wolf attackers are often people with stress and instability in their lives. Many lone wolves have some previous criminal behavior; few close personal relationships; and a tendency to let anger fester over perceived affronts, even if they were not directed personally to

them. Brian Levin, Director of the Center for the Study of Hate and Extremism at Cal State San Bernadino studied Roof and noted that "the lone wolf, often times, is really living in a world of his own pain and doing, and feels that he's not understood, and wants power and control."

57.     Roof chose the Emanuel AME Church because it is a prominent symbol among African Americans. Emanuel AME's congregation dates to 1818 when it was founded as the first African Methodist Episcopal church in the South. It remains the oldest.

58.     Carson Cowles, Roof's uncle, said in an interview that "there wasn't anyone in my family that did this, made him this way."

59.     Far-right domestic extremist groups have glorified the concept of leaderless resistance. This concept was first defined by white supremacist Louis Beam and gained traction in the white supremacy movement in the early 1990s. Jeffrey D. Simon, author of "Lone Wolf Terrorism: Understanding the Growing Threat," noted "we find lone wolves across the entire political or religious spectrum." Roof had no school, no friends, no clique with which to associate.

60.     Roof complained about Blacks taking over and ruining the country. The 2012 shooting death of Trayvon Martin became his triggering point in obsessing over racial issues. He looked to Google in search of answers for "black on white crime." He was directed to a website run by a White nationalist group called the Council of Conservative Citizens (CCC).[3] He joined extremist groups on Facebook. Ultimately, Dylann Roof reached a conclusion after being involved

---

[3] Notably, Facebook/Meta took direct part in increasing the visibility of the Council of Conservative Citizens' website on the internet and web presence generally—Facebook/Meta actually auto-generated CCC's Facebook page (one way in which Facebook does, despite its legal arguments to the contrary, aid in development or creation of user ("third party") content. *See* Tech Transparency Project, *White Supremacist Groups are Thriving on Facebook* (May 2020) at p. 6, avail. at: https://www.techtransparencyproject.org/sites/default/files/Facebook-White-Supremacy-Report.pdf ("One of the auto-generated hate group Pages with the most 'likes' in TTP's analysis was for the Council of Conservative Citizens, an SPLC-designated white nationalist group. The group made headlines in 2015 after an online manifesto linked to white supremacist Dylann Roof referenced the organization …. **Facebook's auto-generated Page for the Council of Conservative Citizens included a description of the group's white supremacist affiliations, complete with direct link to their website.**")

on the Internet and Facebook that no one was really doing anything but talking and that "Well, someone has to have the bravery to take it to the real world, and I guess that has to be me."

61.     When Roof met Facebook, the platform was already many generations along in its design and sophistication—a design meant to learn Roof (like it does all of its users) and drive his engagement by addicting him to the content it delivers.

62.     Roof radicalized online, and Facebook was a factor in that process. At the time Roof radicalized, moreover, Facebook was helping promote racism and hate in the United States. First by allowing white supremacy groups essentially unrestricted access to spread hate and introduce a whole new generation of impressionable young people to ideologies based on hate and racial divide. Facebook also allowed Russian intrusion into our race relations within the United States by allowing numerous fraudulent campaigns on Facebook to incite racial discord and polarization.

63.     Stoking racial tensions and promoting tribalism proved, quite distressingly, to fall more in line with Facebook's profit motives (its mission statement of inclusivity and community notwithstanding). Facebook facilitated, via its platform, a repugnant and fraudulent propaganda attack on African Americans and their role within the fabric of the United States. It did so with knowledge that many third-party advertisings and postings that it sold and disseminated to millions of Americans were false and that identities and associations were being misrepresented by these third parties. It also knew these third parties were purchasing the advertisements to promote racism, division, chaos, and distrust among American citizens.

64.     Many of these ads and posts were purchased by foreign governments working through shell companies, such as the Russian-based Internet Research Agency. These ads were purchased deliberately to discredit, shame, dishonor, and demean African Americans and

particularly high-profile individuals like State Senator/Reverend Pinckney. The ads blatantly inflamed racial tensions, divided Americans, sought to decrease African American voter turnout and perverted the truth about crime involving African Americans. Facebook directly enabled and allowed white supremacy groups and foreign governments to target Americans with messages and video content meant to sow racial discord, tortuously affect race relations, and decrease the African American vote. Facebook also deliberately created the inherently racially biased tool chest that made it possible.

65.    There exists compelling evidence, through the work of Special Counsel Robert Mueller and the Reports of the U.S. Senate Select Committee on Intelligence on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, showing the method and degree of this criminal and civil conspiracy. In March 2019, Special Counsel Mueller and the Department of Justice ("DOJ") published a "Report On The Investigation Into Russian Interference In The 2016 Presidential Election" charging 13 Russian Nationals and three businesses (including the Internet Research Agency) with conspiracy, identity theft, failure to register as foreign agents, and violations of laws that limit the use of foreign money in American elections.  In 2015 the defendant Internet Research Agency produced hundreds of graphic and fractious social-media messages meant for distribution on Facebook. These messages were racially incendiary, submitted to Facebook, and were then published as if they were posted by American citizens. Many of these postings were made to both discourage communities of color from voting and to promote the importance of voting to other groups.

66.    Online radicalization involves a systematic progression toward more extreme content. Heavily impacting the progression is Facebook's Ad recommendation algorithm. This algorithm is typically responsible for more than 70 percent of all time spent on the site. Facebook

algorithms created a business model that rewarded provocative content with exposure and advertising dollars while those algorithms also guided users down personalized paths meant to keep them coming back for more. In 2014-2017, the company leaders were obsessed with increasing user engagement and rarely considered whether the algorithms were fueling the spread of extreme and hateful content.

67.     The Russia Defendants have embraced modern technology. Extremist groups also use electronic communications to further spread and effectuate racially discriminatory and violent agendas. They are masters of camouflage, appearing harmless and inconspicuous on discussion boards. They often mask their true intentions by appearing to share general knowledge and information while actually peddling racist rhetoric. This includes challenging historically common knowledge about prior racially discriminatory and violent periods such as the Holocaust, the Civil Rights Movement, and the legal institution of slavery in the United States.

68.     As the problem of online radicalization became more widespread, parents like Joanna Shroeder, a mother of three, sent out a strong call of action to other white parents regarding the insidious nature of violent white supremacist and alt-right web sites. Homophobia, anti-Semitism, and racism were invoked to indoctrinate young white men into the world of violent far-right extremism and white supremacy.

69.     Roof's criminal defense attorney argued to the jury that "[t]here is hatred all right, and certainly racism, but it goes a lot further than that" and that "every bit of {Dylann's} motivation came from things he saw on the Internet. That's it. ... 'He is simply regurgitating, in whole paragraphs, slogans and facts –bits and pieces of facts that he downloaded from the Internet directly into his brain.'"

70.     In the past, Facebook has taken the position that it is not a media company and therefore is not responsible for the content, posting, and actions of third parties on its platform. Facebook, while perhaps not a content provider of the individual ads themselves under the Communications Decency Act (the "CDA"; 47 U.S.C. § 230(c)(1)), still bears separate and distinct responsibility for its racially biased platforms and algorithms and its own independent civil rights violations. Facebook's lawyers have carried this "CDA shield" like a get-out-jail-for-free card for Facebook. But as recent decisions have shown, the CDA does not provide blanket immunity to Facebook, especially not where other federal laws have been violated or where liability hinges on defects in the defendants' own product (not third-party content). Further, in prior cases where this shield was used successfully, the issues did not involve the suppression of Constitutional or federal statutory rights like the right to vote and/or other civil rights violations and the targeting of a civil rights movement.

71.     Former Facebook employees and investors, including Roger McNamee, have shown that Facebook knew that some of the content it disseminated was false and involved foreign manipulation of domestic messaging. In fact, it has been reported that Facebook purposefully removed certain filtering and/or monitoring it previously had in place to boost advertising revenue. That is, Facebook chose to allow this wrongful activity for profit, recklessly disregarding the harm to those like Reverend Pinckney such activity was causing.

72.     The evidence showing the nefarious activities of the Russian-based Internet Research Agency (IRA) has been documented by numerous reports. See, e.g., DiResta, et al., The Tactics and Tropes of the Internet Research Agency, New Knowledge (Nov. 8, 2018); and Howard, et al., The IRA, Social Media and Political Polarization in the United States, 2012-2018,

Computational Propaganda Research Project, Univ. of Oxford (Jan. 23, 2019); *see also* materials cited in fn. 1, *supra*. These actions led to more racial polarization and distrust.

73.      Former United States Attorney General Loretta Lynch indicted Roof on federal hate crime charges for attacking Pastor Pinckney and the other church members "because of their race and in order to interfere with their exercise of their religion." Federal prosecutors noted that the media Roof consumed online "are consistent with the adoption of a white supremacy extremist ideology, including a belief in the need to use violence to achieve white supremacy."

74.      After his brutal attack, officials found a manifesto online belonging to Roof that was filled with racist characterizations of black people and others. Prosecutors noted that the evidence strongly indicates Roof's sentiments toward racially motivated hate grew in the months before the attack.

75.      Dr. Heidi Beirich, Director of the Southern Poverty Law Center's Intelligence Project and an expert in white-supremacist extremism writes:

> Dylann is quite unique from most White supremacist killers. For one, he's far younger. The truth is that most White supremacist killers are in their late 30s, early 40s, and some are even as old as in their 70s in their 80s. That is different than radical Islamic killers who are a little bit more like Dylann Roof. They're younger. That's because most White supremacists go through a much longer indoctrination period that involves usually being involved in particular organizations in the real world. As far as we know, Dylann Roof didn't do that and that makes him very different. In fact, if he's like anything, he's like ISIS people. Young people who look at ISIS Twitter accounts, get sucked into that ideology, and then go join the fight in Syria or commit domestic terrorist attacks. He's actually rather unlike your typical White supremacist killer. This complete online radicalization over the maybe two and a half years he was in his room is very atypical.

76.      Long ago, as has been widely reported as well as testified to (including by the recent whistleblower, Frances Haugen), Facebook learned that negative-emotion-inducing content more effectively fostered user engagement and addiction, thereby generating massive profits.

77.    So, Facebook, albeit publicly holding itself out as a platform to bring people together, did exactly the opposite. Facebook created echo chambers; Facebook targeted and took advantage of peoples' worst impulses and negative emotions; Facebook molded and shaped extremists through manipulation and addiction; Facebook caused people to find and fit in "in groups" and grossly "otherize" "out groups" leading to or exacerbating tribalism and extremism; and Facebook did so knowing it was tearing the fabric of society apart for profit, was amplifying and giving credibility to misinformation and dangerous rhetoric, and was turning those on the fringes of society into – in some cases, most notably Roof – violent powder kegs.

78.    Facebook has long been aware that hateful, outraged, and politically extreme content is oxygen to the company's blood. The more horrendous the content, the more it generates *engagement* (a measure of user interaction with content on the system – "likes," "shares," comments, etc.). As Facebook has determined through years of study and analysis: hate and toxicity fuel its growth far more effectively than updates about a user's favorite type of latte.

79.    Rather than using what it has learned to change its practices, Facebook made a corporate decision to exploit the hate. The Meta Defendants designed algorithms to proactively exploit this opportunity, prioritizing divisive and polarizing content, including hate speech and misinformation about racial groups/minorities, especially when delivering content to users and recommending that users make new connections or join new groups.

80.    Facebook, knowing the toxic potential of such content, including hate speech and misinformation, nonetheless promoted its dissemination to those most likely to engage with it and most likely to be influenced by it. By ensuring that more users see and respond—in the form of likes, shares, and comments—to such toxic content, Facebook's algorithms train users to post more hate speech and misinformation to garner more attention online. Effectively, Facebook engages in

a form of mind control, not just enforcing already-held views of users but actually modifying, molding, and evolving those views both qualitatively and quantitatively (*i.e.*, making already-held ideas more extreme and developing new ideas in users they would not have otherwise developed).

81.    "Even though [Facebook executives] don't have any animus toward people of color, their actions are on the side of racists," said Tatenda Musapatike, a former Facebook manager working on political ads and CEO of the Voter Formation Project. The reality has been that Facebook's decisions in the name of being neutral and race-blind in fact come at the expense of minorities and particularly people of color.  Many of the business decisions made by Facebook in favor of sales led to instituting half-measures which left minorities more likely to encounter derogatory and racist language on Facebook and reinforced racial divides. Civil rights groups have long claimed that Facebook's algorithms and policies had a disproportional negative impact on minorities, and particularly black users.

82.    The business practices of Facebook in 2014 and 2015 prior to the death of Reverend Pinckney violated the Civil Rights of African Americans including those souls who died in the Church. Facebook executives knew this but withheld disclosure to civil rights leaders. Even the independent civil rights auditors Facebook leadership hired in 2018 to conduct a major study of racial issues on its platform revealed that they were not informed of the internal research showing the company's algorithms disproportionally harmed minorities. Laura Murphy, president of Laura Murphy and Associates, who led the civil rights audit process, said Facebook told her that "the company does not capture data as to the protected group(s) against whom the hate speech was directed."  "I am not asserting nefarious intent, but it is deeply concerning that metrics that showed the disproportionate impact of hate directed at Black, Jewish, Muslim, Arab and LGBTQIA users were not shared with the auditors," Murphy said in a statement. "Clearly, they have collected some

27

data along these lines." The final report on the audit concluded that Facebook's policy decisions were a "tremendous setback" for civil rights.

83.    This growth-at-all-costs view of Facebook's business is not speculative, nor, for that matter, inconsistent with Facebook's view of itself. Facebook's Borg-like march toward further growth was best captured by one of its highest-ranking executives, Andrew Bosworth, in an internal memo circulated after a shooting death in Chicago was stunningly live-streamed on Facebook. It stated, in part:

> We connect people. That can be good if they make it positive. Maybe someone finds love. Maybe it even saves the life of someone on the brink of suicide. So we connect more people. That can be bad if they make it negative. Maybe it costs a life by exposing someone to bullies. Maybe someone dies in a terrorist attack coordinated on our tools. And still we connect people. The ugly truth is that we believe in connecting people so deeply that anything that allows us to connect more people more often is *de facto* good… That's why all the work we do in growth is justified. All the questionable contact importing practices. All the subtle language that helps people stay searchable by friends. All of the work we do to bring more communication in. The work we will likely have to do in China some day. All of it. The natural state of the world is not connected. It is not unified. It is fragmented by borders, languages, and increasingly by different products. The best products don't win. The ones everyone use win. In almost all of our work, we have to answer hard questions about what we believe. We have to justify the metrics and make sure they aren't losing out on a bigger picture. But connecting people. That's our imperative. Because that's what we do. We connect people.[4]

84.    In other words, at best, Facebook sees itself as an amoral actor on the world stage, with the sole objective of growth under the guise of connecting people regardless of the impact to users or the world more generally. Facebook's history, that around its role in the proliferation of white supremacist and anti-black racist content (despite the mounting evidence and knowledge

---

[4] Ryan Mac, *Growth At Any Cost: Top Facebook Executive Defended Data Collection In 2016 Memo — And Warned That Facebook Could Get People Killed*, BUZZFEED https://www.buzzfeednews.com/article/ryanmac/growth-at-any-cost-top-facebook-executive-defended-data.

that Facebook was directly fostering real world hate crimes and violence), have made it abundantly clear that Facebook's path to promote the very worst of humanity was not the result of a bug, but rather a carefully designed feature.[5]

85.     Facebook has jealously hidden information about internal studies it has conducted, about the inner workings of its algorithms and how they are designed (and for what purposes they are designed), and about its knowledge of the harm it has caused or contributed to for the sake of profit. But in part through revelations from whistleblowers, we now know Facebook has consciously disregarded evidence that the design of its platform and its overall business strategy has directly fostered and enhanced real world harm of all shapes and sizes: from genocide and unrest in foreign countries (and domestically) and enhancement of government propaganda efforts, to human trafficking and child abuse and predation, to white supremacist violence, and to a wide variety of mental health issues in our most vulnerable populations (the youth, particularly vulnerable teenage girls).

86.     Disturbingly, whistleblower Frances Haugen established that Facebook's own internal research showed that the more teenagers had negative thoughts and emotions, the more they used the app, so it did nothing to protect the millions of children viewing its content daily. Facebook's blind eye to the proliferation of white supremacist hate on its site has been similarly ignored, knowingly, for the sake of profit.

87.     The clear underlying message of the Bosworth memo above, as well as these examples in the preceding paragraph, is one of sacrifice for the sole purpose of Facebook's growth:

---

[5] Mr. Bosworth was not terminated for the bald and bold revelation Facebook has long prioritized and will continue to prioritize growth and profits over safety (i.e., for saying the secret part out loud), but has rather since been placed in charge of (and is a chief spokesman for) arguably the company's largest and most aggressive expansion ever: the "Metaverse." *See* Kurt Wagner, *Who's Building Facebook's Metaverse? Meet CTO Andrew Bosworth*, BLOOMBERG (Oct. 27, 2021), https://www.bloomberg.com/news/articles/2021-10-27/facebook-fb-new-cto-andrew-bosworth-is-the-man-building-the-metaverse.

sacrifice of the victims of terrorist attacks and genocide; sacrifice of innocent children who take their own lives because of bullying and depression cultivated in large part on Facebook; sacrifice of the sexually vulnerable to predators; sacrifice of the mental and physical health of both children and adults alike; and, as described here, sacrifice of civil rights, freedoms, and security of racial minority communities.

88.    Because the algorithms recommend that susceptible users join extremist groups, where users are conditioned to post even more inflammatory and divisive content, Facebook is naturally open to exploitation by white supremacist groups and racial hate-mongers.

89.    Roof did not just find but was directed by Facebook, based on its algorithms' knowledge of Roof's engagement on the internet (both on and off of Facebook), to groups or communities in which his views were cultivated, developed and made more extreme, ultimately taking Roof off of the internet and into the real world to commit violence (an eminently foreseeable result from Facebook's perspective, just one Facebook was willing to tolerate/risk).

90.    It was clearly foreseeable, and indeed known to Facebook, that, by prioritizing and rewarding users for posting dangerous and harmful content online—as well as by recommending extremist groups to those perceived susceptible to such messaging—Facebook would radicalize users like Roof, causing them to support or engage in dangerous or harmful conduct in the offline world. Furthermore, many Facebook users obtain their news from Facebook rather than the traditional sources on television or radio.  The news content that the user sees on Facebook then tends to reaffirm harmful content while not balancing that content with differing views due to the algorithm's preference for continuously reengaging the user with more divisive content.

91.    Despite having been repeatedly alerted to its own role in the proliferation of white supremacist content, misinformation, and hate speech on its system, and despite the violent

manifestations that have occurred across the U.S. and abroad, Facebook has done little to adequately address the problem or change its business model. At bottom, Facebook has consciously embraced these results because, good or bad, they drive the bottom line.

92.    In one functionally similar situation (Facebook's role in the Rohingya genocide in Burma), Facebook has even now admitted, albeit meekly, seemingly without any resulting action taken and in quite too-little-too-late fashion, "we weren't doing enough to help prevent our platform from being used to foment division and incite offline violence. We agree that we can and should do more."[6] Plaintiff agrees, both from a moral standpoint and from the standpoint of Facebook's legal duty to prevent and/or warn about the foreseeable risk of harm knowingly created by its product.

93.    We have heard "[Facebook] can and should do more" so often now that it can and should be considered an unofficial Facebook slogan. Unfortunately, these are empty words. Facebook's actions speak far louder than its rhetoric. The actions show Facebook has never desisted from its relentless growth-at-all-costs strategy. For instance, "doing more" apparently has centered around the launch of the virtual reality centric "Metaverse" to further force Facebook into the lives of billions. As noted by prominent political commentator Dan Pfeiffer: "Facebook is one of the least liked, least trusted companies on the planet. They are in the middle of a massive scandal about their involvement in genocide, human trafficking, and disinformation. And their next move is to say: 'What if you could live inside Facebook?'"[7]

---

[6] *See* Alex Warotka, *An Independent Assessment of the Human Rights Impact of Facebook in Myanmar*, FACEBOOK NEWSROOM (Nov. 5, 2018), https://about.fb.com/news/2018/11/myanmar-hria/.
[7] *See* @DanPfeiffer, TWITTER (Oct. 28, 2021, 3:24 PM), https://twitter.com/danpfeiffer/status/1453819894487674899.

94.    Ms. Haugen testified indictingly "[t]he company's leadership knows how to make Facebook and Instagram safer but won't make the necessary changes because they have put their astronomical profits before people."[8] For our purposes, the subtext of this stunning statement is Facebook's design and very business strategy is responsible, in whole or in part, for the harm. *I.e.* Facebook is not just a passive conduit of third-party content that sometimes results in harm. Facebook is the harm. Facebook knows how to fix the product yet it consciously decides not to.

95.    The hate Facebook fuels abroad as a byproduct of its business[9] is no different from the hate it fuels in the U.S. Megalomaniacally, despite already being cemented as one of the richest, most powerful entities in the world, Facebook has proven willing to trade social and racial harmony in the U.S. for more money/market control. There seems to be one constant whenever hatred online boils over into real world violence: Facebook engagement as a starting or turning point.

96.    Emboldened by the so-called liability shield of the Communications Decency Act's ill-applied Section 230, and despite knowledge of and the tools to stop or curtail the proliferation of white supremacist hate on its platform and violence offline, Facebook has never altered course. That is because Facebook, from the moment its monetization strategy was established onward, has had blinders on to any real calculation of the benefits to itself compared to the negative impacts it has on anyone else. Facebook is like a robot programmed with a singular mission: to grow. And the undeniable reality is Facebook's growth is fueled by the very hate, division and misinformation

---

[8] Abram Brown, *Facebook 'Puts Astronomical Profits Over People,' Whistle-Blower Tells Congress*, FORBES (Oct. 5, 2021), https://www.forbes.com/sites/abrambrown/2021/10/05/facebook-will-likely-resume-work-on-instagram-for-kids-whistleblower-tells-congress/?sh=7385d0f74cda.

[9] As noted, Facebook essentially admitted negligence at least with respect to its role in the Rohingya genocide, but true to form, per Haugen, Facebook is right back at it in Ethiopia, where acts of ethnic violence are being carried out against the Tigrayan minority amidst a raging civil war, again with the help of Facebook-fueled misinformation and hate speech. *Facebook is under new scrutiny for it's role in Ethiopia's conflict*, NPR (10/11/21), https://www.npr.org/2021/10/11/1045084676/facebook-is-under-new-scrutiny-for-its-role-in-ethiopias-conflict; *see also* Mark Scott, *Facebook did little to moderate posts in the world's most violent countries*, POLITICO (Oct. 25, 2021), https://www.politico.com/news/2021/10/25/facebook-moderate-posts-violent-countries-517050.

that caused Roof to, so they say, "self-radicalize" online. Plaintiff contends this term mischaracterizes what happens when disaffected and impressionable youth and Facebook mix.

97.     Facebook is not alone—other tech companies employ similar algorithms and the self-same obviously harmful monetization strategy (selling ads by addicting users to content and how it is delivered). These companies also share data and learn from each other about their mutual users causing the perfect storm for user data mining and manipulation for profit. Users, like Roof, find groups on Facebook who lead them to sites, ads, videos, search engines (or vice versa) that all reinforce one another and, in so doing, deepen the target user's beliefs and drive the target user to ever more extreme levels. This is all by design, product design to be exact.

## A.  Facebook's Defective Design and Architecture

98.     Facebook's design is defective in that its goal is to maximize *engagement*, a metric reflecting the amount of time a user spends and the amount of interaction the user has with any given content. For Facebook, engagement determines advertising revenue, which determines profits. "The prime directive of engagement … is driven by monetization. It befits a corporation aiming to accelerate growth, stimulate ad revenue, and generate profits for its shareholders."[10]

99.     In its SEC Form 10-K for the year ended December 31, 2012, Facebook warned:

> [I]f our users decrease their level of engagement with Facebook, our revenue, financial results, and business may be significantly harmed. The size of our user base and our users' level of engagement are critical to our success…. [O]ur business performance will become increasingly dependent on our ability to increase levels of user engagement and monetization…. Any decrease in user retention, growth, or engagement could render Facebook less attractive to developers and marketers, which may have a material and adverse impact on our revenue, business, financial condition, and results of operations. … Our advertising revenue could be adversely

---

[10] Luke Munn, *Angry by design: toxic communication and technical architectures*, HUMANIT SOC SCI COMMUN 7 (July 30, 2020), https://www.nature.com/articales/s41599-020-00550-7.

affected by a number of … factors, including: decreases in user engagement, including time spent on Facebook[.][11]

100.    Facebook intentionally incorporated engagement-based ranking of content into its system/algorithms. The News Feed—the first thing users see when opening the app/site and "the center of the Facebook experience"—is driven by engagement. Posts with higher engagement scores are included/prioritized, while posts with lower scores are buried/excluded. "[T]he Feed's… logics can be understood through a design decision to elevate and amplify 'engaging' content.… [T]he core logic of engagement remains baked into the design of the Feed at a deep level."[12]

101.    Facebook engineers and data scientists meet regularly to assess the billions of likes, comments, and clicks Facebook users make every day to "divine ways to make us like, comment and click more," so users will keep coming back and seeing more ads from the company's 2 million advertisers. Engineers are continually running experiments with a small share of Facebook users to boost engagement.[13] Thus, Facebook's design was the "result of particular decisions made over time.… Every area has undergone meticulous scrutiny… by teams of developers and designers.… [Facebook] has evolved through conscious decisions in response to a particular set of priorities."[14]

---

[11] U.S. Sec. and Exchange Commission Form 10-K, Facebook, Inc. (fiscal year ended Dec. 31, 2012) ("Facebook 2012 10-K") at 13, 14, https://www.sec.gov/Archives/edgar/data/1326801/000132680113000003/fb-12312012x10k.htm#s5D6A63A4BB6B6A7AD01CD7A5A25638E4.

[12] Munn, *Angry by design* (*see* fn. 10, *supra*).

[13] Victor Luckerson, *Here's How Facebook's News Feed Actually Works*, TIME (July 9, 2015), https://time.com/collection-post/3950525/facebook-news-feed-algorithm/.

[14] Munn, *Angry by design* (*see* fn. 10, *supra*).

102.    Facebook has consistently promoted and rewarded employees who contribute to growth through a relentless focus on increase of Facebook's user base; employees who raise ethical and safety concerns tend to be ignored and marginalized and eventually leave the company.[15]

**B. Facebook Prioritizes Hate Speech and Misinformation to Increase User Engagement**

103.    Facebook knows that the most negative emotions—fear, anger, hate—are the most engaging. Facebook employs psychologists and social scientists as "user researchers" to analyze its users' behavior in response to online content. An internal Facebook presentation by one such researcher, leaked in May 2020, warned: "Our algorithms exploit the human brain's attraction to divisiveness. … If left unchecked, … [Facebook would feed users] more and more divisive content in an effort to gain user attention [and] increase time on the platform."[16]

104.    To maximize engagement, Facebook does not merely fill users' News Feeds with disproportionate amounts of hate speech and misinformation. It employs a system of social rewards that manipulate and train users to create such content. When users post content, other users who are shown that content are prompted to "like," "comment" on, or "share" it. Under each piece of content, users can see how many times others have done so and can read the comments.

---

[15] Katie Canales, *'Increasingly gaslit': See the messages concerned Facebook employees wrote as they left the company*, BUSINESS INSIDER (Oct. 28, 2021), https://www.businessinsider.com/facebook-papers-employees-departure-badge-post-gaslit-burned-out-2021-10 ("[t]he employee said Facebook's infamous growth-first approach leads to rolling out 'risky features.' If employees propose reversing that risk, they're seen as being 'growth-negative,' and veto'd by decision makers on those grounds,' they said. They also said it's difficult to establish 'win/wins,' or to roll out features that promote both safety and growth").

[16] Horwitz, Seetharaman, *Facebook Execs Shut Down Efforts to Make the Site Less Divisive*, WSJ (May 26, 2020), https://www.wsj.com/articles/facebook-knows-it-encourages-division-top-executives-nixed-solutions-11590507499

105.    A study published in February 2021 confirmed: "[i]n online social media platforms, feedback on one's behavior often comes in the form of a 'like'—a signal of approval from another user regarding one's post" and tested the assumption that likes "function as a social reward."[17]

106.    Roger McNamee, an early investor in Facebook and advisor to Mark Zuckerberg, wrote in his New York Times bestseller, "Zucked: Waking Up to the Facebook Catastrophe":

> Getting a user outraged, anxious, or afraid is a powerful way to increase engagement. Anxious and fearful users check the site more frequently. Outraged users share more content to let other people know what they should also be outraged about. Best of all from Facebook's perspective, outraged or fearful users in an emotionally hijacked state become more reactive to further emotionally charged content. It is easy to imagine how inflammatory content would accelerate the heart rate and trigger dopamine hits.[18]

107.    A Nature article published in 2020 further explained:

> [I]ncendiary, polarizing posts consistently achieve high engagement…. This content is meant to draw engagement, to provide a reaction….
>
> This divisive material often has a strong moral charge. It takes a controversial topic and establishes two sharply opposed camps, championing one group while condemning the other. These are the headlines and imagery that leap out at a user as they scroll past, forcing them to come to a halt. This offensive material hits a nerve, inducing a feeling of disgust or outrage. "Emotional reactions like outrage are strong indicators of engagement…. [T]his kind of divisive content will be shown first, because it captures more attention than other types of content." …
>
> The design of Facebook means that … forwarding and redistribution is only a few clicks away…. Moreover, the networked nature of social media amplifies this single response, distributing it to hundreds of friends and acquaintances. They too receive this incendiary content and they too share, inducing … "outrage cascades— viral explosions of moral judgment and disgust." Outrage does not just remain constrained to a single user, but proliferates, spilling out to provoke other users and appear in other online environments.[19]

---

[17] Björn Lindström *et al.*, *A computational reward learning account of social media engagement*, NATURE COMMUNICATIONS 12, Art. No. 1311 (Feb. 26, 2021), https://www.nature.com/articles/s41467-020-19607-x#:~:text=%20A%20computational%20reward%20learning%20account%20of%20social,our%20hypothesis%20that%20online%20social%20behavior%2C...%20more%20.

[18] Roger McNamee, *Zucked: Waking Up to the Facebook Catastrophe*, at 88 (Penguin 2020 ed.).

[19] Munn, *Angry by design* (*see* fn. 10, *supra*).

108.    Facebook knew it could increase engagement and the length of time users spend on its websites (and thus increase its revenue) by adjusting its algorithms to manipulate users' News Feeds and show them more negative content, particularly tailored based on the user's tendencies (no two users' News Feeds are the same), thus causing "massive-scale emotional contagion."

109.    In 2014, Adam Kramer, a member of Facebook's "Core Data Science Team," co-authored an article about one of the experiments Facebook conducted on its own users, stating:

> [W]e test whether emotional contagion occurs outside of in-person interaction between individuals by reducing the amount of emotional content in the News Feed … Which content is shown or omitted in the News Feed is determined via a ranking algorithm that Facebook continually develops and tests in the interest of showing viewers the content they will find most relevant and engaging. One such test is reported…: A test of whether posts with emotional content are more engaging.
>
> * * *
>
> The results show emotional contagion…. [F]or people who had positive content reduced in their News Feed, a larger percentage of words in people's status updates were negative and a smaller percentage were positive … These results indicate that emotions expressed by others on Facebook influence our own emotions, constituting experimental evidence for massive-scale contagion via social networks.[20]

110.    Independent research unequivocally confirms that fake content thrives on Facebook over reliable and trustworthy sources. In September 2021, the Washington *Post* reported on a "forthcoming peer-reviewed study by researchers at New York University and the Université Grenoble Alpes in France [which] found that from August 2020 to January 2021, news publishers known for putting out misinformation got six times the amount of likes, shares, and interactions on the [Facebook] platform as did trustworthy news sources …"[21]

---

[20] Adam D.I. Kramer et al., *Experimental evidence of massive-scale emotional contagion through social networks*, 111 PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES, no. 29 (June 17, 2014), https://www.pnas.org/cgi/doi/10.1073/pnas.1320040111.

[21] Elizabeth Dwoskin, *Misinformation on Facebook got six times more clicks than factual news during the 2020 election, study says*, WASHINGTON POST (Sept. 4, 2021), https://www.washingtonpost.com/technology/2021/09/03/facebook-misinformation-nyu-study/.

111.    In testimony before Congress in September 2020, Tim Kendall, Facebook's first Director of Monetization—likening Facebook's business model to that of Big Tobacco—explained how such content makes Facebook addictive:

> At Facebook, I believe we sought to mine as much human attention as possible and turn it into historically unprecedented profits. To do this, we didn't simply create something useful and fun; we took a page from Big Tobacco's playbook, working to make our offering addictive at the outset….
>
> The next page in Big Tobacco's playbook was to add bronchodilators to cigarettes. This allowed the smoke to get in contact with more surface area of the lungs. Allowing for misinformation, conspiracy theories, and fake news to flourish were Facebook's bronchodilators.
>
> But that incendiary content wasn't enough. Tobacco companies then added ammonia to cigarettes to increase the speed with which nicotine traveled to the brain. Facebook's ability to deliver this incendiary content to the right person, at the right time, in the exact right way—through their algorithms—that is their ammonia. And we now know it fosters tribalism and division. Social media preys on the most primal parts of your brain; it provokes, it shocks, and it enrages….
> Facebook and their cohorts worship at the altar of engagement and cast other concerns aside, raising the voices of division, anger, hate, and misinformation to drown out the voices of truth, justice, morality, and peace.[22]

112.    Content attacking opposing groups is particularly engaging. Zeynep Tufekci, a sociologist at the University of North Carolina, has written:

> [T]he new, algorithmic gatekeepers aren't merely (as they like to believe) neutral conduits for both truth and falsehood. They make their money by keeping people on their sites and apps; that aligns their incentives closely with those who stoke outrage, spread misinformation, and appeal to people's existing biases and preferences.
>
> [T]he problem is that when we encounter opposing views in the age and context of social media, it's not like reading them in a newspaper while sitting alone. It's like hearing them from the opposing team while sitting with our fellow fans in a football stadium. Online, we're connected with our communities, and we seek approval from our like-minded peers. We bond with our team by yelling at the fans of the other one. In sociology terms, we strengthen our feeling of "in-group" belonging by increasing our distance from and tension with the "out-group"—us versus

---

[22] *Mainstreaming Extremism: Social Media's Role in Radicalizing America: Hearing before the House Subcommittee on Consumer Protection and Commerce*, 116th Congress (Sept. 24, 2020) (statement of Timothy Kendall).

them…. This is why the various projects for fact-checking claims in the news, while valuable, don't convince people. Belonging is stronger than facts.[23]

113.    A study published in June 2021 showed that posts attacking "others" (the "out-group") are particularly effective at generating social rewards, such as likes, shares, and comments, and that those reactions consist largely of expressions of anger:

> We investigated whether out-group animosity was particularly successful at generating engagement on two of the largest social media platforms: Facebook and Twitter. Analyzing posts from news media accounts and US congressional members (n = 2,730,215), we found that posts about the political out-group were shared or retweeted about twice as often as posts about the in- group…. Out-group language consistently emerged as the strongest predictor of shares and retweets…. Language about the out-group was a very strong predictor of "angry" reactions (the most popular reactions across all datasets)…. In sum, out-group language is the strongest predictor of social media engagement across all relevant predictors measured, suggesting that social media may be creating perverse incentives for content expressing out-group animosity.[24]

114.    It is all too apparent to Facebook users in the United States that Facebook exploits the black-white racial divide in this Country relentlessly; and it is all too common for such users to deactivate or delete Facebook from time to time because of feelings of negativity and anger from the constant barrage of such content they experience. But, as Facebook well knows, the addiction Facebook fosters usually brings them back at some point.

115.    Another study, published in August 2021, analyzed how "quantifiable social feedback (in the form of 'likes' and 'shares')" affected the amount of "moral outrage" expressed in subsequent posts. It "found that daily outrage expression was significantly and positively associated with the amount of social feedback received for the previous day's outrage expression." The amount of social feedback is, in turn, determined by the underlying algorithms:

---

[23] Tufekci, *How social media took us from Tahrir Square to Donald Trump*, MIT TECH REVIEW (Aug. 14, 2018), https://technologyreview.com/2018/08/14/240325/how-social-media-took-us-from-tahrir-square-to-donald-trump

[24] Steve Rathje et al, *Out-group animosity drives engagement on social media*, 118 PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES 26 (June 29, 2021), https://doi.org/10.1073/pnas.2024292118.

Social media newsfeed algorithms can directly affect how much social feedback a given post receives by determining how many other users are exposed to that post. Because we show here that social feedback affects users' outrage expressions over time, this suggests that newsfeed algorithms can influence users' moral behaviors by exploiting their natural tendencies for reinforcement learning…. [D]esign choices aimed at … profit maximization via user engagement can indirectly affect moral behavior because outrage-provoking content draws high engagement….[25]

116.    In other words, if a user makes two posts—one containing hateful, outraged, and divisive content and one without—Facebook's algorithms will show the hateful, outraged, and divisive post to more users. Consequently, the hateful, outraged, and divisive post is rewarded with more likes, shares, and comments. The user quickly learns that to obtain a reaction to his or her posts, he or she should incorporate as much hateful, outraged, and divisive content as possible.

117.    On October 5, 2021, Whistleblower Haugen testified before Congress:

The dangers of engagement-based ranking are that Facebook knows that content that elicits an extreme reaction from you is more likely to get a click, a comment or reshare. And it's interesting because those clicks and comments and reshares aren't even necessarily for your benefit, it's because they know that other people will produce more content if they get the likes and comments and reshares. They prioritize content in your feed so that you will give little hits of dopamine to your friends, so they will create more content. And they have run experiments on people, producer side experiments, where they have confirmed this.[26]

118.    Recently leaked documents confirmed Facebook's ability to determine the type of content users post through its algorithms. After modifying its algorithms to boost engagement in 2018, "[t]he most divisive content that publishers produced was going viral on the platform … creating an incentive to produce more of it…. Company researchers discovered that publishers and political parties were reorienting their posts toward outrage and sensationalism. That tactic

---

[25] William J. Brady et al., *How social learning amplifies moral outrage expression in online social networks*, 7 SCIENCE ADVANCES, no. 33 (Aug. 13, 2021), https://www.science.org/doi/10.1126/sciadv.abe5641. Posts were classified as either containing moral outrage or not by using machine learning.

[26] *Facebook Whistleblower Frances Haugen Testifies on Children & Social Media Use: Full Senate Hearing Transcript*, REV (Oct. 5, 2021), https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript.

produced high levels of comments and reactions that translated into success on Facebook." Facebook researchers further discovered "the new algorithm's heavy weighting of reshared material in its News Feed made the angry voices louder. 'Misinformation, toxicity, and violent content are inordinately prevalent among reshares,' researchers noted in internal memos." Facebook data scientists suggested "a number of potential changes to curb the tendency of the overhauled algorithm to reward outrage and lies" but "Mr. Zuckerberg resisted some of the proposed fixes, the documents show, because he was worried, they might hurt the company's other objective—making users engage more with Facebook."[27]

119.    In October 2021, NBC News, based on internal documents leaked by Haugen, described an experiment in which an account created by Facebook researchers experienced "a barrage of extreme, conspiratorial, and graphic content" even though the fictitious user had never expressed interest in such content. For years, Facebook "researchers had been running [similar] experiments… to gauge the platform's hand in radicalizing users," and among Haugen's disclosures are "research, reports and internal posts that suggest Facebook has long known its algorithms and recommendation systems push some users to extremes."[28]

120.    It is not surprising that the true nature of Facebook's algorithms has become fully apparent only through leaked documents and whistleblower testimony, since Facebook goes to great lengths to hinder outside academic research regarding the design of its algorithms. In a congressional hearing entitled "The Disinformation Black Box: Researching Social Media Data"

---

[27] Keach Hagey, Jeff Horwitz, *Facebook Tried to Make Its Platform a Healthier Place. It Got Angrier Instead*, WSJ (Sept. 15, 2021), https://www.wsj.com/articles/facebook-algorithm-change-zuckerberg-11631654215.

[28] Brandy Zadrozny, *"Carol's Journey": What Facebook knew about how it radicalizes users*, NBC NEWS (Oct. 22, 2021), https://www.nbcnews.com/tech/tech-news/facebook-knew-radicalized-users-rcna3581.

on September 28, 2021, three social media researchers testified about Facebook's attempts to block

their access to the data they needed:

- Laura Edelson of New York University testified: "this summer, Facebook cut off my team's access to their data. We used that very data to support the finding in our recent study that posts from misinformation sources on Facebook got six times more engagement than factual news during the 2020 elections, to identify multiple security and privacy vulnerabilities that we have reported to Facebook, and to audit Facebook's own, public-facing Ad Library for political ads."[29]

- Alan Mislove, a Professor of Computer Sciences at Northeastern University, testified: "Facebook recently criticized a study on misinformation by saying it focused on who engages with content and not who sees it—but that's only true because Facebook does not make such impression data available to researchers."[30]

- Kevin T. Leicht, a Professor of Sociology at University of Illinois Urbana-Champaign testified: "there are limited amounts of social media data available due to company restrictions placed on that data. Many researchers fear litigation that may result from analyzing and publishing results from these data."[31]

121.    On October 5, 2021, Haugen also testified before Congress:

[N]o one truly understands the destructive choices made by Facebook except Facebook….

A company with such frightening influence over so many people, over their deepest thoughts, feelings, and behavior, needs real oversight. But Facebook's closed design means it has no real oversight. Only Facebook knows how it personalizes your Feed for you.

At other large tech companies like Google, any independent researcher can download from the Internet the company's search results and write papers about

---

[29] *Hearing on The Disinformation Black Box: Researching Social Media Data before the Subcomm. on Oversight*, 117th Cong. (2021) (testimony of Laura Edelson, NYU Cybersecurity for Democracy), https://www.congress.gov/117/meeting/house/114064/witnesses/HHRG-117-SY21-Wstate-EdelsonL-20210928.pdf.

[30] *Id.* (testimony of Alan Mislove, Professor of Computer Sciences at Northeastern University), https://www.congress.gov/117/meeting/house/114064/witnesses/HHRG-117-SY21-Wstate-MisloveA-20210928.pdf.

[31] *Id.* (testimony of Kevin T. Leicht, Professor of Sociology at University of Illinois Urbana-Champaign), https://www.congress.gov/117/meeting/house/114064/witnesses/HHRG-117-SY21-Wstate-LeichtK-20210928.pdf.

what they find. And they do. But Facebook hides behind walls that keeps researchers and regulators from understanding the true dynamics of their system….[32]

122.    Until recently, "Section 230" has been widely held to preclude one form of oversight – tort action. But thanks to whistleblowers like Ms. Haugen, we now know that Section 230 has no application to a suit such as this one. This suit (and others like it) does not seek to hold Facebook liable for third-party content. Instead, this action is directed to Facebook's own internal decisions about product design that it has made despite its acute knowledge of the unreasonable risks of harm that its decisions were causing. Because of Ms. Haugen and other whistleblowers and former Facebook employees, Plaintiff can allege that Facebook made conscious design decisions highly probable to drive users like Roof to racial violence.

123.    It is now clear that, by modifying the design of its algorithms and system, Facebook can and does influence and manipulate the quantity, substance, and emotional tone of the content its users produce. Through its dopamine-based incentive structure of social rewards and cues, as well as its algorithmic promotion of hate speech and misinformation, Facebook contributes to and participates in the development and creation of outraged, extreme, and divisive content.

124.    Alternatively, Facebook's design and architecture is a completely independent cause of harm from the content itself. The content could not possibly have the catastrophic real-world impact it does without Facebook's manipulation-by-design of users, as described herein.

125.    It's obviously not in Facebook's favor—especially its bottom line—to curb the spread of negative content and adjust its algorithm to promote positive content. One designer and technologist proposed four different interventions to address the "problems of polarization, dehumanization, and outrage, three of the most dangerous byproducts" of tools such as Facebook.

---

[32] *See* fn. 26, *supra*.

The four interventions described include "Give Humanizing Prompts," "Picking out unhealthy content with better metrics," "Filter unhealthy content by default," and "Give users feed control." Facebook has not implemented any such interventions, undoubtedly because, as the author noted, the interventions "will all likely result in short-term reductions in engagement and ad revenue."[33]

126.    Facebook has options for moderating its algorithms' tendency to promote hate speech and misinformation (*i.e.*, alternative safer design options), but it rejects those options because the production of more engaging content takes precedence. In a September 2021 article, based on recently leaked internal documents, the Wall Street Journal described how Facebook had modified its News Feed algorithm "to reverse [a] decline in comments, and other forms of engagement, and to encourage more original posting" by users.[34]

127.    It is clear—based largely on admissions from former Facebook executives—that Facebook's algorithms are not *neutral*. The algorithms do not merely recommend content based on users' previously expressed interests. Rather, to maximize engagement, they are heavily biased toward promoting content that will enrage, polarize, and radicalize users. Facebook does not simply "connect" people with similar interests; it exploits tribalism by actively herding people into groups that define themselves through their violent opposition to "other" people—often identified by race, religion, or political ideology.

### C.  Facebook Promotes Extremist Group Content and Weaponizes It Against Users

91.    Facebook's algorithms curate and promote content that attracts new members to extremist groups. A presentation by a researcher employed at Facebook, which was leaked in 2020, showed that Facebook's algorithms were responsible for the growth of German extremist groups

---

[33] Tobias Rose-Stockwell, *Facebook's problems can be solved with design*, QUARTZ (Apr. 30, 2018) (emphases in original), https://qz.com/1264547/facebooks-problems-can-be-solved-with-design/.

[34] *See* Hagey, Horwitz, *Facebook Tried to Make Its Platform a Healthier Place …* (fn. 27, *supra*).

on the website: "The 2016 presentation states that '64% of all extremist group joins are due to our recommendation tools' and that most of the activity came from the platform's 'Groups You Should Join' and 'Discover' algorithms. 'Our recommendation systems grow the problem.'" Ultimately, however, because "combating polarization might come at the cost of lower engagement … Mr. Zuckerberg and other senior executives largely shelved the basic research … and weakened or blocked efforts to apply its conclusions to Facebook products."[35]

92.    Roger McNamee gave this example:

> [I]f I am active in a Facebook Group associated with a conspiracy theory and then stop using the platform for a time, Facebook will do something surprising when I return. It may suggest other conspiracy theory Groups to join…. And because conspiracy theory Groups are highly engaging, they are very likely to encourage reengagement with the platform. If you join the Group, the choice appears to be yours, but the reality is that Facebook planted the seed. It does so not because conspiracy theories are good for you but because conspiracy theories are good for them.[36]

128.    McNamee described how, in 2016, he had raised his concerns with Mark Zuckerberg and Sheryl Sandberg, to no avail.[37]

129.    In the August 2021 study discussed above, the authors stated: "[U]sers conform to the expressive norms of their social network, expressing more outrage when they are embedded in ideologically extreme networks where outrage expressions are more widespread…. Such norm learning processes, combined with social reinforcement learning, might encourage more moderate users to become less moderate over time, as they are repeatedly reinforced by their peers for expressing outrage."[38]

---

[35] Horwitz, Seetharaman, *Facebook Executives Shut Down Efforts* … (fn. 16, *supra*).

[36] McNamee, *Zucked* (fn. 18, *supra*) at 94-95.

[37] *Id*. at 4-7.

[38] *Brady* et al. (fn. 25, *supra*).

130.    Indeed, the positive feedback loop created by Facebook in the form of likes, comments, and shares drives user engagement with extremist content and rewards user participation in creating such content. Together with algorithms promoting hate speech, misinformation, and conspiracy theories, Facebook has steered users to extremist groups and trained those users to express more outrage.

### D. Exploitation by Extremists and Facebook's Success in Radicalizing Its Users

131.    Facebook has proven all too susceptible to exploitation by despotic governments and regimes abroad. But Facebook has also proven to be quite exploitable for white supremacists and extremists here in the U.S. (same architecture, just different bad actors). As McNamee wrote:

> Facebook's culture, design goals, and business priorities made the platform an easy target for bad actors, which Facebook aggravated with algorithms and moderation policies that amplified extreme voices. The architecture and business model that make Facebook successful also make it dangerous. Economics drive the company to align—often unconsciously—with extremists and authoritarians to the detriment of democracy around the world.[39]

132.    By prioritizing hate speech and misinformation in users' News Feeds, maximizing engagement, training users to produce ever more extreme and outraged content, recommending extremist groups, and allowing its product to be exploited by extremist groups, Facebook radicalizes users and incites them to violence.

133.    As Chamath Palihapitiya, Facebook's former vice president for user growth, told an audience at Stanford Business School: "I think we have created tools that are ripping apart the social fabric of how society works … [t]he short-term, dopamine-driven feedback loops we've

---

[39] McNamee, *Zucked* (fn. 18, *supra*) at 232-33.

created are destroying how society works … No civil discourse, no cooperation[,] misinformation, mistruth. And it's not [just] an American problem…"[40]

134.    McNamee likewise explained how the design of Facebook's algorithms and system lead to real-world violence: "The design of Facebook trained users to unlock their emotions, to react without critical thought…. at Facebook's scale it enables emotional contagion, where emotions overwhelm reason…. Left unchecked, hate speech leads to violence, disinformation undermines democracy."[41]

135.    As former Facebook privacy expert Dipayan Ghosh noted, "[w]e have set ethical red lines in society, but when you have a machine that prioritizes engagement, it will always be incentivized to cross those lines."[42]

136.    Facebook's tendency to cause real-world violence by radicalizing users online has been demonstrated time and time again. Beyond Dylann Roof's case, a couple more recent examples of real-world white nationalist violence incubated on Facebook include:

- In March 2019, a gunman killed 51 people at two mosques in Christchurch, New Zealand, while live-streaming the event on Facebook.[43] For two years prior to the shooting, the gunman had been active on the Facebook group of the Lads Society, an Australian extremist white nationalist group.[44]

---

[40] James Vincent, *Former Facebook exec says social media is ripping apart society*, THE VERGE (Dec. 11, 2017), https://www.theverge.com/2017/12/11/16761016/former-facebook-exec-ripping-apart-society.

[41] McNamee, *Zucked* (fn. 18, *supra*) at 98, 233.

[42] Frenkel & Kang, *An Ugly Truth: Inside Facebook's Battle for Domination*, at 185 (HarperCollins 2021).

[43] Charlotte Grahan-McLay, Austin Ramzy, and Daniel Victor, *Christchurch Mosque Shootings Were Partly Streamed on Facebook*, NEW YORK TIMES (Mar. 14, 2019), https://www.nytimes.com/2019/03/14/world/asia/christchurch-shooting-new-zealand.html.

[44] *Royal Commission of Inquiry into the Terrorist Attack on Christchurch Mosques on 15 March 2019* § 4.6, https://christchurchattack.royalcommission.nz/the-report/firearms-licensing/general-life-in-new-zealand/; Michael McGowan, *Australian white nationalists reveal plans to recruit 'disgruntled, white male population'*, THE GUARDIAN (Nov. 11, 2019), https://www.theguardian.com/australia-news/2019/nov/12/australian-white-nationalists-reveal-plans-to-recruit-disgruntled-white-male-population.

- In August 2020, "[h]ours before a 17-year-old white man allegedly killed two people and injured a third at protests over a police shooting in Kenosha, Wisconsin, a local militia group posted a call on Facebook: 'Any patriots willing to take up arms and defend our city tonight from evil thugs?'"[45] Later, Mark Zuckerberg said that "the social media giant made a mistake by not removing a page and event that urged people in Kenosha … to carry weapons amid protests."[46]

- In May 2022, inspired by the same ideology and thinking that Roof was introduced to online ("Great Replacement Theory", "White Genocide", etc.), "an 18-year-old white male drove from his home in Conklin, NY, to a Tops Friendly Market on Buffalo's East Side, with the intention of 'killing as many blacks as possible.'" The New York Attorney General's Office investigated his online radicalization, focusing on Reddit, Discord, 4chan, 8kun as his main extreme/polarizing-content sources, but also referring to his use of Facebook, Instagram and YouTube. Moreover, the shooter himself cited the Christchurch shooter as his primary inspiration, thus, at the very least, the Buffalo shooter was a downstream effect of Facebook's role in radicalizing the Christchurch shooter.[47]

137. Facebook well knew, long before Roof, that its platform was an incredibly effective disinformation and propaganda tool for extremist groups and bad actors across the spectrum, but most notably (for purposes of this case) white supremacists/nationalists and Russian state operatives. And Facebook well knew the design of its machinery aided and abetted these evil actors in their brainwashing and radicalizing of users, which would not be possible but for the ecosystem Facebook allows them to create and/or operate within.

---

[45] Adam Mahoney, Lois Beckett, Julia Carrie Wong, Victoria Bekiempis, *Armed white men patrolling Kenosha protests organized on Facebook*, THE GUARDIAN (Aug. 26, 2020), https://www.theguardian.com/us-news/2020/aug/26/kenosha-militia-protest-shooting-facebook.

[46] Carlisle, *Mark Zuckerberg Says Facebook's Decision to Not Take Down Kenosha Militia Page Was a Mistake*, TIME (Aug. 29, 2020), https://time.com/5884804/mark-zuckerberg-facebook-kenosha-shooting-jacob-blake/.

[47] Office of the NYAG, *Investigative Report on the role of online platforms in the tragic mass shooting in Buffalo on May 14, 2022* (Oct. 18, 2022), available at https://ag.ny.gov/sites/default/files/buffaloshooting-onlineplatformsreport.pdf.

### E. The Russian Defendants Use of Facebook[48]

138.    In addition to providing the tools for white supremacists to spread hate and radicalize, again by its very design, Facebook turned out to be the perfect tool for the Russian Defendants to exploit racial divisions in the United States for purposes of sowing discord, affecting U.S. elections, and violating the civil rights of Black Americans, among other protected classes. The amplification and propagation of hateful, extremist, and polarizing messages and the radicalization of users like Roof are inevitable results of the algorithms that Facebook intentionally and meticulously built into its system. The extremists and the Russian Defendants, among others, saw the incredible potential to do harm that Facebook provided.

139.    The ORGANIZATION employed Sergey Pavlovich Polozov from April 2014 through October 2016. Polozov served as the manager of the IT department. In his role he oversaw the procurement of U.S. servers and other computer infrastructure that masked the ORGANIZATION's Russian location when conducting operations within the U.S. Anna Vladislavovna Bogacheva served on the "translator" project and oversaw the project's data analysis group. She traveled to the U.S. to collect intelligence for the ORGANIZATION under false pretenses.

140.    The ORGANIZATION, starting in or around 2014, began an intelligence gathering program to inform U.S. Operations. The Russian Defendants and their co-conspirators began to track and study groups on U.S. social media sites dedicated to U.S. Politics and social issues. This was a sophisticated analysis that studied metrics like the group's size, the frequency of content placed by the group, the level of audience engagement with that content (likes, comments, shares,

---

[48] As noted above, the allegations in this section are largely supported by the materials cited in fns. 1 & 2, *supra*.

etc.). Defendants created hundreds of social media accounts and used them to develop certain fictitious U.S. personas and promoted them as leaders of public opinion in the U.S.

141.    This was a highly organized effort that included numerous employees labeled as specialists that were tasked to create social media accounts that appeared to be genuine U.S. persons. There was a day-shift team and a night-shift team so that posts could be made during the daytime in the U.S.  The work of the specialists was directed at creating divisiveness targeting on racial issues and oppositional social movements.   The Russian Defendants and their co-conspirators created thematic group pages on social media sites focusing on Facebook and Instagram. Main issues focused on the Black Lives Matter movement with a prolific group named "Blacktivist" and on immigration issues with groups such as "Secured Borders."

142.    Starting in early 2015, the Russian Defendants and their co-conspirators purchased advertisements on online social media sites to promote their plan to cause social and racial unrest in the U.S.  They tracked the impact and the performance of their online social media operations. They continuously evaluated the content posted by their specialists to ensure they appeared authentic to U.S. social media users. To disguise their Russian identities the ORGANIZATION's IT department purchased space on servers located inside the U.S. to establish virtual private networks. This allowed unfettered access to online social media accounts and communication with real U.S. persons while masking the Russian origin and control of the activity.

143.    Russia essentially launched a covert influence campaign against the U.S. in 2014. This was done *via* the Russian Defendants but had clear ties to Russian Intelligence. "Covert influence campaigns don't create divisions on the ground, they amplify divisions on the ground," said Michael Hayden, who ran the NSA under Presidents Bill Clinton and George W. Bush and then became Director of the CIA. John Sipher, who ran the CIA's Russia desk during George W.

Bush's first term, noted "before the Soviets would plant information in Indian papers and hope it would get picked up by our papers," but "now, because of the technology, you can jump right in."

144.    Russian interference in U.S. race relations goes all the way back to 1932 and the Scottsboro Boys, nine teenagers who were falsely accused of raping two white women in Alabama and were then wrongly convicted repeatedly by all-white Southern juries. A famous Russian propaganda poster artist, Dmitri Moor, created a poster that cried out "Freedom to the prisoners of Scottsboro." The Communist party in Russia had a plan calling for recruitment of Southern Blacks and working toward establishing a separate Black State in the South as a way of introducing Communist revolution into the United States. This Soviet objective was to disrupt the United States by causing social unrest around racial tensions and to negatively affect U.S. international relations and to diminish U.S. power in the world while undermining the appeal of American democracy.

145.    After the death of Treyvon Martin in 2012 and the Ferguson unrest after the fatal shooting of Michael Brown in August of 2014, the Russian Intelligence services via these Russian Defendants saw an opportunity to cause discord by using American Social Media companies as a way to amplify and grow the racial unrest. Russian operatives released posts supporting law enforcement and criticizing young African American males and other posts denouncing the Black Lives Matter Movement and belittling social justice reforms.  Some posts were even more extreme supporting White nationalist groups and calling for violence. This was a deliberate and well executed social media campaign designed to promote racial tensions and to undermine the social fabric of the United States.

146.    The actions of the Russian Defendants were that of a sophisticated information operation taken on behalf of the Russian Government through these non-state actors to implant in the minds of Americans certain prejudices, beliefs, and convictions in order to destabilize the

social fabric of the country. Let there be no mistake, this was a deliberate and planned attack on the citizens of the United States in an effort to further destabilize our country by turning its people of different races against each other and by setting race relations on fire.

147.    The Civil Laws in the United States include human rights law that prohibit racial discrimination as well as incitement of violence based on race. The actions of these Defendants have implicated several human rights norms including freedom of thought, the right to hold opinions without interference, to take part in the conduct of public affairs, and to participate freely in the electoral process.

148.    Facebook CEO Mark Zuckerberg has noted that social media offers a form of communication "where resonant messages get amplified many times." In an era where social media offers a simple, direct, and instant method for reaching hundreds of millions of Americans, the implications of the actions of these Defendants to violate the Civil Rights of Reverend Pinckney and the other American citizens murdered in their church cannot be left unpunished. Technological advances heighten this threat, and social media companies have responsibilities not to violate the Civil Rights of the citizens of the United States.

149.    Facebook's defective algorithms, through their design, purposefully exploited hate and racial issues because such matters are strong drivers of user engagement. Facebook had some knowledge of these fraudulent accounts but did little to control, limit, or prevent the nefarious activities of the Russian Defendants. It was not until September of 2017 that Facebook publicly reported that they had identified Russian expenditures on their platforms to fund social and political advertisements. The initial disclosure from Facebook on September 6th, 2017 included a statement that Facebook had "shared [its} findings with US authorities investigating these issues." Facebook had prior knowledge and knew that there were fake accounts that were coordinating

activity among inauthentic and connected accounts in an effort to manipulate public opinion. Facebook describes this process as "false amplification." The large majority of the Facebook ads purchased by the Russian Defendants addressed race (55%).

150.    It is clear the Russian Defendants' social media campaign was designed to promote racial divisions in the U.S. Many Facebook and Instagram messages were drafted and disseminated with reference to race and were explicit in their focus on race. When all aspects of the Russian Defendants' social media campaign are analyzed, it clearly violates the prohibitions against racial discrimination and intimidation. This campaign was specifically designed to "aggravate the conflict between minorities and the rest of the population" as disclosed in the Affidavit in Support of a Criminal Complaint in the United States of America v. Elena Alekseevna Khusyaynova.

## F.    Dylann Roof's Radicalization on Facebook

151.    As noted, Facebook's algorithms control what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Facebook concluded "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting "[t]his is an increasing liability." In other internal memos, Facebook concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent."

152.    Also as noted above, other documents show that Facebook employees also discussed Facebook's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Facebook's bottom line. Facebook found that the inflammatory content the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Facebook sell more of the digital ads that generate most of its revenue.

153.    All told, Facebook's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.  To put it in simple terms, for several years Meta's algorithms sought to provide more violent and angry racially based content to those users the algorithm deemed likely to engage with race-related content. At Facebook, "[t]here was this soul-searching period after 2016 that seemed to me this period of really sincere, 'Oh man, what if we really did mess up the world?'" said Eli Pariser, co-director of Civic Signals, a project that aims to build healthier digital spaces, and who has spoken to Facebook officials about polarization.

154.    But fixing the algorithm polarization problem would have required Facebook to rethink some of its core products. Most notably Facebook would have to change its algorithm regarding how it prioritized "user engagement" that includes metrics involving time spent, likes, shares and comments that have always been the lodestar of its system.

155.    In 2016 Facebook researcher and sociologist Monica Lee found extremist content thriving in more than one-third of large German political groups on the platform. There was an abundant amount of racist, white supremacist conspiracy-minded and pro-Russian content.

156.    Analysis showed these Facebook groups were disproportionally influenced by a subset of hyperactive users that were mostly private or secret.

157.    Facebook itself realized in 2016 that its algorithms were responsible for the growth of extremism.  Further analysis by Facebook showed that "64% of all extremist group joins are due to our recommendation tools." This included Facebook's "groups you should join" and "Discover" algorithms.

158.    In an effort to correct these product defects in its algorithms, engineers and researchers at Facebook were assigned to a cross-jurisdictional task force referred to as "Common Ground" and Facebook created new "Integrity Teams" embedded in all aspects of the company.

159.    One of the product defects with the algorithms that these teams worked on in 2017 and 2018 was how to limit the disproportionate influence on the algorithms from a small pool of hyperpartisan users. Under Facebook's engagement-based metrics, a hyperactive user who likes, shares or comments on 1,500 pieces of content has more influence on the platform and its algorithms than another user that interacts with just 15 posts.

160.    This allowed the Russian Defendants to achieve incredible social media presence by developing hyperactive users working in long shifts. This combined with the fact that Facebook developed its algorithms to target users with content precisely tailored to their interests resulted in very precise targeting (at scale) by the Russian Defendants of those that would engage with and/or act on their content.

161.    This was done in a way to enhance user engagement. Joachin Quinonero Candela, the former director of Artificial Intelligence (AI) at Facebook, was able to enhance algorithm performance by incorporating AI and Machine-learned algorithms. These algorithms could be trained to predict what posts a Facebook user would like to see on their personal news feed.

162.    Quinonero developed a new model-development platform called FDLearner Flow which allowed for the expansion of algorithms that would psychologically hook users. Algorithms were enabled to analyze every user interaction, to create faster more personalized feedback loops with the assistance of AI, and to even better tailor the user's News Feed to promote engagement.

163.    Facebook researchers also found that users with a tendency to post or engage with melancholy content could easily spiral into consuming increasingly negative material that risked further worsening their mental health.

164.    Facebook was founded in 2004 by Mark Zuckerberg and rapidly became the number one online social media platform in the world. It includes four critical platforms: Facebook, Instagram, Messenger, and WhatsApp.  These platforms are used by 3.59 billion people every month.  Meta had total revenues of $118 billion dollars in 2021, an increase of 66% from just two years earlier. Meta has a market capitalization of $364 billion dollars and is regarded as one of the top five companies in market capitalization in the world.  Meta has previously disclosed it "generates substantially all of [its] revenues from advertising" (Meta Platforms, Inc. Form 10-K at 15 (Jan. 28, 2022)). The Company must maintain and grow its user base and keep those users engaged to continue to generate these levels of advertising revenue. Facebook has repeatedly rejected fixes to its algorithm meant to curb such things as proliferation and exacerbation of hate and extremism because of concerns those fixes would reduce user traffic and thus reduce revenue. Facebook has declined to "trade off" traffic to improve the Platform's social and economic impact. Whistleblower Frances Haugen stated Meta's algorithm optimizes for content that generates engagement, including more content that is angry, divisive, and polarizing, because "they'll get more views."  Ms. Haugen reported "Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click less ads, [and] they'll make less money."

165.    Social media has been a welcoming place for racist influencers whose mission is to reestablish white supremacy through the use of hate speech, microaggressions, coordinated harassment, and weaponization of emojis, GIFS and memes. Social media has the power to connect people who were once loners with their ideological partners, and it speeds how quickly white

supremacist ideology can spread, thus encouraging and emboldening copycats. Dylann Roof was only 21 when he announced to attendees of a Bible study that he was there "to kill Black people" and fatally wounded nine people at Mother Emanuel AME Church in Charleston, South Carolina in 2015. Patrick Wood Crusius, a 21-year-old from Allen, Texas, drove 650 miles to an El Paso Walmart, where he killed 23 people and injured 23 others. He set out to kill Mexicans because he claimed they were invading America.

166.     Roof began the radicalization process performing a Google search for "black on white crime" which took him to the website of a South Carolina-based hate group named the Council of Conservative Citizens (formerly the White Citizens' Council). Roof wrote a manifesto that was heavy in white supremacist lies and mischaracterization of African Americans in the United States. Roof's Facebook profile photo he posted in the months prior to the murderous massacre in Charleston was thick with symbolism. The photo shows Roof with the scowling face of an angry white man and wearing a jacket adorned with two flags: one from apartheid-era South Africa and the other from white-ruled Rhodesia (now Zimbabwe). These are symbols that have been adopted by modern-day white supremacy groups.

167.     The growth and influence of white supremacy groups on social media platforms like Facebook shows the dangers of allowing hate groups and racism to go unchecked. The ability to reach disillusioned young white males and fill their heads with racist hate while using social media platforms like Facebook as a sort of "Trojan horse" to psychologically alter the mindset of these vulnerable young men has allowed a proliferation of racial animosity and hate that has caused significant harm to minorities and specially to Blacks in the United States. Facebook will argue that Dylann Roof did not spend that much time on Facebook and was not particularly active with posting.  They fail to understand that the time spent on Facebook served as an affirmation of beliefs

and thoughts that first entered Roof's mind via a Google search for "black on white crime." The proliferation of racially based hate on Facebook, which was accelerated by the Russian defendant's social media campaign, created the environment that nurtured, encouraged, and ultimately served to solidify and affirm the violent white supremacist rhetoric found in Roof's manifesto.

168.    Ultimately, the question the jury will have to answer is whether Facebook should be held accountable for creating an algorithm that fed increasingly violent and provocative content to its users with the intent to psychologically influence those users to spend more time engaged with Facebook for the purpose of increasing ad revenue. The jury will also have to decide whether Facebook should be liable for its leadership's decisions (whether they sought to increase or decrease the risk of violence and violations of the civil rights of African Americans or simply ignored the problem) once leadership was alerted to the potential negative effects of proliferating hate against African American communities and other minorities caused and/or contributed to by Facebook's defective algorithms.

### G.  Plaintiff Minor Person Pinckney

169.    When the attack on her father and the other parishioners began, MP Pinckney was in Pastor Pinckney's office with her mother. Only a door separated them from the main hall were the shooting and killing was taking place. Jennifer Pinckney locked the door and hid under her husband's desk with her daughter once the shooting began. They were able to hear the many gun shots along with the anguishing voices of the victims. MP Pinckney heard the violence and mayhem and saw her mother gripped with fear. MP Pinckney heard Roof try to open the door into the office in which she was hiding with her mother. MP Pinckney Heard her mother call 911 for help. During this entire time, Plaintiff MP Pinckney reasonably feared for her physical safety. While trapped under her father's desk, Plaintiff MP Pinckney feared for her life and for the lives of her mother and father and worried she might never see her family again.

## CAUSES OF ACTION

## COUNT I – STRICT PRODUCT LIABILITY – DESIGN DEFECT

170.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

171.    Facebook makes its social media product widely available to users around the world.

172.    Facebook designed its system and that system's underlying algorithms in a manner that rewarded users for posting, and thereby encouraged and trained them to post, increasingly extreme and outrageous hate speech, misinformation, and conspiracy theories attacking particular groups. Likewise, Facebook was designed to addict and influence the behavior of individuals like Roof by pushing them down rabbit holes just like what is described hereinabove.

173.    The design of Facebook's algorithms and product resulted in the proliferation and intensification of hate speech, misinformation, and conspiracy theories against African Americans in the United States, radicalizing users, and caused injury to Plaintiff.

174.    Through the design of its algorithms and product, Facebook (1) contributed to the development and creation of such hate speech and misinformation and (2) radicalized users, causing them to tolerate, support, and even carry out offline racial violence.

175.    Facebook was repeatedly warned that hate speech and misinformation on the social network, and in the manner it was delivered to users to drive engagement, was likely to result in offline violence.

176.    Facebook knew and had reason to expect that the level of white supremacist propaganda directed to its users, including those like Roof, would motivate some users like Roof to commit violence and thereby result in offline violence.

177.    Moreover, the kind of harm resulting from the offline violence committed by Roof (and so many others) is precisely the kind of harm that could have been reasonably expected from

Facebook's propagation and prioritization of engagement with white supremacist propaganda and hate speech and misinformation on its system—e.g., homicide, wrongful death, personal injury, pain and suffering, emotional distress, and property loss.

178.    The dangers inherent in the design of Facebook's product outweigh the benefits, if any, afforded by the design. Moreover, alternative design capabilities were well within Facebook's grasp, as affirmed by its former Director of Monetization, Tim Kendall, who described the algorithms' ability to cause emotional contagion as a simple matter of dialing up or dialing down the type of emotional response you wanted to produce as if this was as simple as turning up or down the volume on a stereo.[49]

179.    The product, as designed, was in in a defective condition unreasonably dangerous to the user when it left the control of the defendant and the defect caused Plaintiff's injuries, as set forth herein.

180.    A manufacturer of a product made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the product or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.

181.    Reverend Pinckney is dead, and Plaintiff M.P. witnessed the shooting and killing of nine people, including the Reverend, Plaintiff M.P.'s father.

182.    Plaintiff M.P. sustained physical injuries and endured, and will in the future endure, pain and suffering, mental shock, emotional trauma, mental anguish, and other injuries.

---

[49] This statement by Tim Kendall, along with many other terrifying accounts from other former industry insiders and whistleblowers regarding the harms of social media and how they are a direct result of design decisions made by social media entities to drive profits, can be found in the acclaimed 2020 Netflix documentary, "The Social Dilemma."

183.    Due to this event, Plaintiff M.P. has suffered permanent disability and will be required to expend sums of monies for treatment in addition to suffering a loss of enjoyment of life, deprived of the love and companionship of his or her father, and otherwise damaged.

184.    As a direct, proximate, and foreseeable result of the negligent, careless, grossly negligent, and reckless, knowing and/or intentional acts of the Defendants set out above, Reverend Pinckney is dead, and Plaintiff M.P. has suffered severe and permanent injury.

185.    As a result of the emotional distress caused by witnessing the murder of her father, M.P. suffered physical symptoms capable of objective diagnosis.

186.    M.P. has also suffered severe and permanent injury as a result of the Defendant's (and/or their/its divisions, agents, and/or employees) negligent infliction of emotional distress for which, Plaintiff, on behalf of M.P. is entitled to recover an amount of actual, special, and consequential damages to be determined by a jury at the trial of this action.

## COUNT II – NEGLIGENCE

187.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

188.    The product, as designed, was in in a defective condition unreasonably dangerous to the user when it left the control of the defendant and the defect caused Plaintiff's injuries, as set forth herein.

189.    A manufacturer of a product made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the product or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.

190.    As a direct, proximate, and foreseeable result of the negligence, carelessness, gross negligence, recklessness, and departures from duties by Defendant as noted above, M.P. has suffered harms and losses.

191.    M.P.'s harms and losses, suffered due to the close proximity to the shooting, the witnessing of mass murder including the killing of her father, and fear of being injured or killed herself, include, but are not limited to:

    a.   personal injury;

    b.   pain and suffering;

    c.   mental anguish;

    d.   loss of enjoyment of life;

    e.   medical expenses;

    f.   permanent impairment;

    g.   lost wages; and

    h.   loss of earnings capacity

192.    Due to the foregoing, Plaintiff is entitled to recover actual, special, and consequential damages in an amount to be determined by a jury at the trial of this action.

193.    WHEREFORE, Plaintiff respectfully prays for judgment against Defendant for all actual and compensatory damages for each specific occurrence of negligence pled in this Complaint to be determined by the jury at the trial of this action, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

**COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

194.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

195.    The product, as designed, was in in a defective condition unreasonably dangerous to the user when it left the control of the defendant and the defect caused Plaintiff's injuries, as set forth herein.

196.    A manufacturer of a product made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to

use the product or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.

197. As a direct, proximate, and foreseeable result of the negligence, carelessness, gross negligence, recklessness, and departures from duties by Defendant as noted above, M.P. has suffered harms and losses.

198. The negligence of the Defendants was a substantial factor in radicalizing Roof, contributing to the mass violence he carried out. The negligence of the Defendants actually and proximately caused and/or was a substantial factor in causing Reverend Pinckney's death.

199. Plaintiff M.P., a bystander, was in close proximity to her father when he was murdered in cold blood by Roof and was herself within the zone of danger of this heinous crime.

200. Plaintiff M.P. and the victim, Clementa Pinckney, are closely related.

201. Plaintiff M.P. contemporaneously perceived the accident.

202. Plaintiff M.P. has suffered severe emotional distress which has manifested itself by physical symptoms capable of objective diagnosis that can be established by expert testimony.

203. WHEREFORE, Plaintiff respectfully prays for judgment against Defendant for all actual and compensatory damages for each specific occurrence of negligence pled in this Complaint to be determined by the jury at the trial of this action, the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

**COUNT IV – CIVIL CONSPIRACY IN VIOLATION OF THE KU KLUX KLAN ACT**

204. Plaintiff incorporates herein by reference the allegations contained in all proceeding paragraphs.

205. Under the Ku Klux Klan Act, 42 U.S.C. § 1985(3) if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or

privilege of a citizen of the United States, the party so injured or deprived may have an action for recovery of damages occasioned by such injury or deprivation, against any one or more conspirators.

206.    Here the Russian Defendants plotted, coordinated, and executed a common plan through and/or with social media platforms, most notably those of the Meta Defendants, to cause racial unrest and to promote violence in the United States.

207.    In furtherance of this conspiracy, the Meta Defendants, through the use of defective algorithms, added in a material way to the psychological messaging and effect of the hate and racism and violence promoted by the Russian Defendants. Upon information and belief, the Meta Defendants participated in the conspiracy insofar as they had direct knowledge of and/or wilfully blinded themselves to clear evidence of rampant and fraudulent misuse of their products by Russian and other foreign actors for the purpose interfering in U.S. elections, including interfering with the right of African Americans to vote and/or otherwise depriving African Americans of their civil rights.

208.    The activities alleged above were undertaken with purpose by all Russian Defendants as co-conspirators for the purpose of causing racial unrest and violence in the United States, including the very kind of offline violence carried out by lone wolves like Roof.

209.    The Conspirators carried out a clandestine operation for the purpose of depriving, either directly or indirectly, African Americans of the equal protection of the laws, or of equal privileges and immunities under the laws.

210.    The Conspirators carried out acts in furtherance of the conspiracy to deprive African Americans of the rights or privileges and immunities, including but not limited to:

a. Purchasing advertising space on Facebook to disseminate white supremacist propaganda, ideology, and hate speech and discourage African Americans from voting (Russian and Meta Defendants)

b. Designing the social media product to maximize user engagement and prioritize profits over safety even in cases of unprotected hate speech and propaganda (Meta)

c. Creating and allowing fictitious social media accounts to stoke racial tensions and disseminate white supremacist propaganda, ideology, and hate speech (Russian & Meta Defendants)

d. Breaching the state election infrastructure in at least 39 states in America and using voter data to target African Americans and discourage them from voting (Russian Defendants)

e. Hacking state election boards, the DNC, the RNC, secretaries of several states, and the 2016 Clinton campaign, including data analytics and voter-turnout models to target African Americans with false and misleading information, wrongfully interfering with their right to vote (Russian Defendants)

f. Using stolen voter data to bombard African Americans with negative information about exercising their right to vote (Russian Defendants)

g. Attempting to suppress African American votes and cause racial discord by engaging minority groups and others on social media in a manner intended to deepen social and political divisions within the United States and negatively influence African American voter turnout (Russian Defendants)

h. Creating at least 25 social media pages drawing at least 1.4 million followers to arouse the American political right and promote white supremacist ideology and propaganda, causing online radicalization (Russian and Meta Defendants)

i. Creating false and misleading extremist content and spreading it on social media, including memes that exploited social attitudes about people of color and promoted white supremacist propaganda, including the white-replacement theory (Russian and Meta Defendants)

j. Breaching state election infrastructure and scanning databases for vulnerabilities, attempted intrusions, and in some cases successfully penetrating voter registration databases. This activity was part of a larger campaign to prepare to undermine confidence in the voting process including decreasing African American turnout and increasing white conservative turnout. (Russian Defendants)

k. Undertaking a wide variety of intelligence-related activities targeting the U.S. voting process. These activities began at least as early as 2014, continued through Election Day 2016, and included traditional information gathering efforts as well as operations meant to discredit the integrity of the U.S. voting process and election results. (Russian Defendants)

211.    Reverend Pinckney is dead, and Plaintiff M.P. witnessed the shooting and killing of nine people, including the Reverend, Plaintiff M.P.'s father.

212.    Plaintiff M.P. sustained physical injuries and endured, and will in the future endure, pain and suffering, mental shock, emotional trauma, mental anguish, and other injuries.   Plaintiff M.P. was made to feel unsafe even in her Church which has always been a place of sanctuary.

213.    Due to this event, Plaintiff M.P. has suffered permanent disability and will be required to expend sums of monies for treatment in addition to suffering a loss of enjoyment of life, deprived of the love and companionship of her father, and otherwise damaged.

214.    As a direct, proximate, and foreseeable result of the negligent, careless, grossly negligent, and reckless, knowing and/or intentional acts of the Defendants set out above, Reverend Pinckney is dead, and Plaintiff M.P. has suffered severe and permanent injury.

215.    As a result of the emotional distress caused by witnessing the murder of her father, M.P. suffered physical symptoms capable of objective diagnosis.

216.    M.P. has also suffered severe and permanent injury as a result of the Defendant's (and/or their its divisions, agents, and/or employees) negligent infliction of emotional distress for which, Plaintiff, on behalf of M.P. is entitled to recover an amount of actual, special, and consequential damages to be determined by a jury at the trial of this action.

### TIMELINESS & TOLLING

217.    Under South Carolina Code of Laws, Section 15-3-40(1), the personal injury claims of a minor are tolled until one year after the minor reaches age 18. Plaintiff M.P. falls within this exception to the general statute of limitations as she has not reached the age of 18.

218.    Therefore, this action is timely under § 15-3-40(1).

219.    Concurrently and/or in the alternative, with respect to the claims alleged herein based on Federal statutory law, until the public release of the Mueller Report in April 2019,

Plaintiff could not have reasonably known the injuries and damages complained of herein were directly and causally linked to covert Russian election interference activities, including but not limited to deliberate attempts to cause racial unrest and racial violence in the United States and South Carolina through manipulation of individuals like Roof on social media, and thus the statute of limitations on any claims related thereto did not begin to run until, at the earliest, April 2019, such that Plaintiff's claims are timely.

220.     Also concurrently and/or in the alternative, the Russian Defendants and the Meta Defendants took careful steps to conceal and did conceal their involvement in the harm alleged herein, such that any and all claims related thereto (including, of course, those asserted herein) were not known or knowable by Plaintiff or, more broadly, the American citizenry prior to April 2019 (at the earliest). Such fraudulent concealment acts to toll any applicable statute of limitations such that Plaintiff's claims are timely pled.

### PRAYER FOR RELIEF

221.     Plaintiff prays for the following relief:

a. That process issue and the Defendants be served in accordance with the Federal Rules of Civil Procedure;

b. That Plaintiff be awarded compensatory damages, including medical expenses, subrogation expenses, lost wages, loss of earning capacity, loss of enjoyment of life, future economic damages, general noneconomic damages, pain and suffering, and for personal injury in an amount to be determined by the enlightened conscience of a jury;

c. That Plaintiff be allowed to amend this Complaint in accordance with the Federal Rules of Civil Procedure;

d. That the Plaintiff be awarded punitive damages;

e. That Plaintiff have a trial by jury as to all issues; and

f. That Plaintiff be awarded such other relief as this Court may deem just and proper.

Submitted:     October 31, 2022

s/ François M. Blaudeau
*Application for Pro Hac Vice to be submitted*
François M. Blaudeau (ASB-7722-D32F)
Evan T. Rosemore (ASB-3760-N10B)
Marc J. Mandich ( )
SOUTHERN MED LAW
2762 B M Montgomery St, Suite 101
Homewood, AL 35209
Office: 205.564.2741
Fax: 205.649.6386
francois@southernmedlaw.com
evan@southernmedlaw.com
marc@southernmedlaw.com

Lead Counsel for the Plaintiff


s/T. Ryan Langley
Ryan Langley
SC Federal Bar No.: 10047
Hodge & Langley Law Firm, P.C.
229 Magnolia St.(29306)
PO Bix 2765
Spartanburg, SC 29304
rlangley@hodgelawfirm.com

*Co-Counsel for the Plaintiff*

Gerald Malloy
Malloy Law Firm
108 Cargill Way
Hartsville, SC 29550
gmalloy@bellsouth.net

*Co-Counsel for the Plaintiff*