# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| M.P., a minor, by and through, Jennifer Pinckney, as Parent, Natural Guardian, and Next Friend, <br><br> *Plaintiff*, <br><br> v. <br><br> Meta Platforms, Inc. (f/k/a Facebook, Inc.), a Delaware Corporation; Facebook Holding, LLC; Facebook Payments, Inc.; Facebook Technologies LLC; Instagram, LLC; Siculus, Inc.; Internet Research Agency, LLC (a/k/a Mediasintez LLC a/k/a Glavset LLC a/k/a Mixinfo LLC a/k/a Azimut LLC a/k/a Novinfo LLC); Concord Management and Consulting LLC; Concord Catering; and Yevgeniy Viktorovich Prigozhin, <br><br> *Defendants*. | Civil Action No. 2:22-cv-03830-RMG |

**MEMORANDUM OF META PLATFORMS, INC.; FACEBOOK HOLDING, LLC; FACEBOOK PAYMENTS, INC.; FACEBOOK TECHNOLOGIES LLC; INSTAGRAM, LLC; AND SICULUS, INC. IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

# TABLE OF CONTENTS

<u>Page</u>

I.     INTRODUCTION ........................................................................................................1

II.    ALLEGATIONS OF THE COMPLAINT ...................................................................3

III.   LEGAL STANDARD...................................................................................................7

IV.   ARGUMENT ...............................................................................................................7

       A.     The Complaint Fails to State a Claim ..............................................................7

             1.     The Complaint Does Not Plausibly Allege Causation.............................7

             2.     The Complaint Does Not Plead Other Essential Elements of Its Products Liability Claims .......................................................................12

             3.     Plaintiff Does Not and Cannot Allege Duty ...........................................18

             4.     Plaintiff Does Not Allege a Conspiracy Under 42 U.S.C. § 1985............22

       B.     Section 230 Bars All of Plaintiff's Claims.......................................................25

             1.     The Claims Arise from Third-Party Content ...........................................26

              2.     The Complaint Seeks to Treat Meta As a Publisher ...............................28

CONCLUSION.........................................................................................................................31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A Soc'y Without a Name v. Virginia,*
655 F.3d 342 (4th Cir. 2011) ............................................................................................23

*Anderson v. N.Y. Tel. Co.,*
320 N.E.2d 647 (N.Y. 1974) ............................................................................................17

*Anderson v. Owens-Corning Fiberglas Corp.,*
53 Cal. 3d 987 (1991) ......................................................................................................16

*Anderson v. TikTok, Inc.,*
--- F. Supp. 3d ---, 2022 WL 14742788 (E.D. Pa. Oct. 25, 2022) ...................................30

*Arnold v. Int'l Bus. Machs. Corp.,*
637 F.2d 1350 (9th Cir. 1981) .......................................................................................7, 8

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................................7, 9, 23

*Estate of B.H. v. Netflix, Inc.,*
2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ....................................................................14

*Ball v. Joy Techs., Inc.,*
958 F.2d 36 (4th Cir. 1991) ..............................................................................................22

*Barnes v. Yahoo!, Inc.,*
570 F.3d 1096 (9th Cir. 2009) ..........................................................................................30

*Baughman v. Gen. Motors Corp.,*
627 F. Supp. 871 (D.S.C. 1985) .......................................................................................12

*Baughman v. Gen. Motors Corp.,*
780 F.2d 1131 (4th Cir. 1986) ..........................................................................................12

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ..............................................................................................7, 15, 24

*Big Red Box, LLC v. Square, Inc.,*
2020 WL 465928 (D.S.C. Jan. 22, 2020) .........................................................................20

*Bishop v. S.C. Dep't of Mental Health,*
502 S.E.2d 78 (S.C. 1998) ...............................................................................7, 8, 10, 11

*In re Blackbaud, Inc., Customer Data Breach Litig.,*
567 F. Supp. 3d 667 (D.S.C. 2021) ..................................................................................19

## TABLE OF AUTHORITIES (Cont'd.)

Page(s)

*Bragg v. Hi-Ranger, Inc.*,
    462 S.E.2d 321 (S.C. Ct. App. 1995) ............................................................ 13, 14

*Bray v. Marathon Corp.*,
    588 S.E.2d 93 (S.C. 2003) ........................................................................... 7, 18

*In re Breast Implant Prod. Liab. Litig.*,
    503 S.E.2d 445 (S.C. 1998) ......................................................................... 15, 16

*Brooks v. Medtronic, Inc.*,
    750 F.2d 1227 (4th Cir. 1984) ....................................................................... 2, 17

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ............................................................................. 13

*Madison ex rel. Bryant v. Babcock Ctr., Inc.*,
    638 S.E.2d 650 (S.C. 2006) ............................................................................... 20

*Burris Chem., Inc. v. USX Corp.*,
    10 F.3d 243 (4th Cir. 1993) ............................................................................... 13

*Chukwurah v. Google, LLC*,
    2020 WL 510158 (D. Md. Jan. 31, 2020) .......................................................... 29

*Cohen v. Facebook, Inc.*,
    252 F. Supp. 3d 140 (E.D.N.Y. 2017) ............................................................... 30

*Colonial Penn Ins. Co. v. Coil*,
    887 F.2d 1236 (4th Cir. 1989) ............................................................................. 9

*Cox v. Twitter, Inc.*,
    2019 WL 2513963 (D.S.C. Feb. 8, 2019) .......................................................... 31

*Delaney v. United States*,
    260 F. Supp. 3d 505 (D.S.C. 2017) ................................................................... 22

*DeLoach v. Whitney*,
    273 S.E.2d 768 (S.C. 1981) ............................................................................... 15

*Doe 2 v. Citadel*,
    805 S.E.2d 578 (S.C. Ct. App. 2017) ................................................................ 20

*Doe v. Facebook, Inc.*,
    No. 2019-16262 (151st Dist. Ct., Harris County, Tex. Oct. 4, 2019) .............. 2, 15

## TABLE OF AUTHORITIES (Cont'd.)

Page(s)

*Doe v. GTE Corp.*,
    347 F.3d 655 (7th Cir. 2003) ............................................................21

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) .....................................................28, 29

*Doe v. Twitter, Inc.*,
    555 F. Supp. 3d 889 (N.D. Cal. 2021) ...............................................30

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ...........................................21, 27, 28, 29

*Edwards v. Lexington Cnty. Sheriff's Dep't*,
    688 S.E.2d 125 (S.C. 2010) .........................................................19, 20

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) (en banc) .......................................26, 28

*Fields v. J. Haynes Waters Builders, Inc.*,
    658 S.E.2d 80 (S.C. 2008) ..........................................................2, 12, 14

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ............................................................21

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal. 2016) .........................................28, 31

*Force v. Facebook, Inc.*,
    304 F. Supp. 3d 315 (E.D.N.Y. 2018) ...............................................30

*Force v. Facebook, Inc.*
    934 F.3d 53 (2d Cir. 2019) ..........................................................26, 29

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) .............................................27

*Green v. ADT, LLC*,
    2016 WL 3208483 (N.D. Cal. June 10, 2016) .....................................15

*Henderson v. Source for Pub. Data, L.P.*,
    53 F.4th 110 (4th Cir. 2022) ............................................................28

*Hendricks v. Clemson Univ.*,
    578 S.E.2d 711 (S.C. 2003) .............................................................21

# TABLE OF AUTHORITIES (Cont'd.)

Page(s)

*Hensley v. Heavrin*,
    282 S.E.2d 854 (S.C. 1981) ...................................................................................11

*Herrick v. Grindr LLC*,
    765 F. App'x 586 (2d Cir. 2019) ..........................................................................30

*Huggins v. Citibank, N.A.*,
    585 S.E.2d 275 (S.C. 2003) ................................................................. 18, 19, 21

*Igbonwa v. Facebook, Inc.*,
    2018 WL 4907632 (N.D. Cal. Oct. 9, 2018) ......................................................30

*Intellect Art Multimedia, Inc. v. Milewski*,
    2009 WL 2915273 (N.Y. Sup. Ct. Sept. 11, 2009) ............................................15

*James v. Meow Media, Inc.*,
    300 F.3d 683 (6th Cir. 2002) ...............................................................................16

*James v. Meow Media, Inc.*,
    90 F. Supp. 2d 798 (W.D. Ky. 2000) ..................................................................12

*Johnson v. Robert E. Lee Acad., Inc.*,
    737 S.E.2d 512 (S.C. Ct. App. 2012) ..................................................................22

*Jolly v. Gen. Elec. Co.*,
    869 S.E.2d 819 (S.C. Ct. App. 2021) ....................................................................7

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) .......................................................................27, 28

*Kinard v. Augusta Sash & Door Co.*,
    336 S.E.2d 465 (S.C. 1985) ...................................................................................7

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) ....................................................................21, 26

*Laurens Elec. Coop., Inc. v. Altec Indus., Inc.*,
    889 F.2d 1323 (4th Cir. 1989) ................................................................. 13, 14, 15

*Lawing v. Univar, USA, Inc.*,
    781 S.E.2d 548 (S.C. 2015) ..................................................................................18

*Marshall v. Lowe's Home Ctrs., LLC*,
    2016 WL 4208090 (D.S.C. Aug. 10, 2016) ............................................... 13, 18

## TABLE OF AUTHORITIES (Cont'd.)

Page(s)

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ................................................... 8

*Montgomery v. Nat'l Convoy & Trucking Co.*,
  195 S.E. 247 (S.C. 1938) ........................................................ 19

*Morris v. Mooney*,
  343 S.E.2d 442 (S.C. 1986) .................................................... 21

*Neitzke v. Williams*,
  490 U.S. 319 (1989) ................................................................. 7

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) ........................................ 25, 26, 28

*O'Kroley v. Fastcase, Inc.*,
  831 F.3d 352 (6th Cir. 2016) ................................................... 29

*Oliver v. S.C. Dep't of Highways & Pub. Transp.*,
  422 S.E.2d 128 (S.C. 1992) ...................................................... 7

*Oulla v. Velazques*,
  831 S.E.2d 450 (S.C. Ct. App. 2019) .................................. 18, 19

*Pierson v. Sharp Mem'l Hosp., Inc.*,
  264 Cal. Rptr. 673 (Cal. Ct. App. 1989) ............................. 16, 17

*Quinteros v. InnoGames*,
  2022 WL 898560 (W.D. Wash. Mar. 28, 2022) ....................... 15

*Doe ex rel. Roe v. Snap, Inc.*,
  2022 WL 2528615 (S.D. Tex. July 7, 2022) ............................ 30

*Sanders v. Acclaim Ent., Inc.*,
  188 F. Supp. 2d 1264 (D. Colo. 2002) .................................... 12

*Sanders v. United States*,
  2017 WL 1102612 (D.S.C. Mar. 23, 2017) .............................. 20

*Saponaro v. Grindr, LLC*,
  93 F. Supp. 3d 319 (D.N.J. 2015) ........................................... 21

*Simmons v. Poe*,
  47 F.3d 1370 (4th Cir. 1995) ............................................. 3, 23

# TABLE OF AUTHORITIES (Cont'd.)

<u>Page(s)</u>

*Springer v. Seaman,*
821 F.2d 871 (1st Cir. 1987) .................................................................................8

*Stone v. Bethea,*
161 S.E.2d 171 (S.C. 1968) ............................................................................ 8, 11

*Strickland v. United States,*
32 F.4th 311 (4th Cir. 2022)...........................................................3, 22, 23, 24, 25

*Stroman v. Town of Santee,*
2005 WL 8164996 (D.S.C. June 29, 2005) ................................................... 8, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007) ..............................................................................................9

*Unus v. Kane,*
565 F.3d 103 (4th Cir. 2009)................................................................................7

*Vitol, S.A. v. Primerose Shipping Co.,*
708 F.3d 527 (4th Cir. 2013)...............................................................................7

*Washington v. Union Carbide Corp.,*
870 F.2d 957 (4th Cir. 1989)..............................................................................13

*Way v. Boy Scouts of Am.,*
856 S.W.2d 230 (Tex. App. 1993) .....................................................................17

*Westlake Legal Grp. v. Yelp, Inc.,*
599 F. App'x 481 (4th Cir. 2015) ......................................................................29

*Winter v. G.P. Putnam's Sons,*
938 F.2d 1033 (9th Cir. 1991) ..................................................................... 13, 17

*Young v. Tide Craft, Inc.,*
242 S.E.2d 671 (S.C. 1978) .................................................................................8

*Zeran v. Am. Online, Inc.,*
129 F.3d 327 (4th Cir. 1997)..........................................................3, 25, 29, 31

*Ziencik v. Snap, Inc.,*
No. 21-cv-7292, Dkt. No. 66 (C.D. Cal. Feb. 3, 2022)......................................15

**Statutes**

42 U.S.C. § 1985..........................................................3, 5, 7, 8, 22, 23, 25

## TABLE OF AUTHORITIES (Cont'd.)

Page(s)

47 U.S.C. § 230 .......................................................................................... 3, 25, 26

S.C. Code Ann. § 15–73–10 ............................................................................. 13, 17

**Treatises**

Restatement (Second) of Torts § 402A (1965) ................................................. 13, 18

Restatement (Third) of Torts: Prods. Liab. § 19 (1998) ..................................... 14, 15

**Other Authorities**

Facebook Civil Rights Audit – Final Report (July 8, 2020), https://about.fb.com/wp-content/uploads/2020/07/Civil-Rights-Audit-Final-Report.pdf ......................................... 5, 24

JA, *United States v. Roof*, No. 17-3 (4th Cir. Jan. 28, 2020) ........................................ 9

Report on the Investigation into Russian Interference in the 2016 Presidential Election, Vol. I, U.S. Dep't of Justice, Special Counsel Robert S. Mueller, III (Mar. 2019) ............................ 6

Report of the Senate Select Committee on Intelligence, "Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Russia's Use of Social Media with Additional Views," Vol. 2 (Nov. 2020) ................................................................................................. 6

Suppl. JA, *United States v. Roof*, No. 17-3 (4th Cir. Nov. 16, 2020) ................................... 9, 10

## I.    INTRODUCTION

This case arises from the heinous murders carried out by Dylann Roof at the Emanuel AME Church in Charleston, South Carolina.  On June 17, 2015, Roof deliberately shot and killed nine people, including Plaintiff's father, the Reverend Clementa Pinckney, who were participating in a Bible study at the Church.  In this Court, Roof was convicted by a jury of nine counts of murder, 24 counts of hate crimes, and sentenced to death for his actions.

The complaint seeks to hold Meta Platforms, Inc. and five of its subsidiaries, Facebook Holding, LLC, Facebook Payments, Inc., Facebook Technologies LLC, Instagram, LLC, and Siculus, Inc. (collectively, "Meta"), along with unrelated Russian Defendants (Internet Research Agency, LLC, Concord Management and Consulting LLC, Concord Catering, and Yevgeniy Viktorovich Prigozhin), liable for Roof's perpetration of these horrific acts of hate.  ECF No. 1 ("Compl.").

Meta deplores Roof's ghastly crimes and has the utmost sympathy for his victims, but it is not responsible for the Emanuel Church tragedy—Dylann Roof is.  Meta has clear standards that prohibit hate speech, harassment, or attempts to incite violence of any kind and has made sustained investments in personnel and partnerships to combat the spread of hateful content on Facebook.  And the complaint does not allege plausibly that Meta had *anything* to do with Roof's crimes.  It does not even allege that Roof saw any particular third-party content on Facebook that purportedly led to his crimes.  For multiple reasons, the complaint should be dismissed.

On the merits, the complaint does not plausibly allege that Meta was the factual or legal cause of Plaintiff's injuries.  According to the complaint, "Roof was radicalized online."  Compl. ¶ 5.  But the complaint acknowledges that Roof found white supremacist content on *other* websites—*not on Facebook*.  It even goes so far as to concede that he spent little time on

Facebook and does not allege that he saw any particular radical posts on Facebook. Certainly, Meta could not have foreseen that Roof would commit *murder* based on the limited time he spent on Facebook. In any event, Roof's own, deliberate actions are a paradigmatic superseding cause breaking any causal chain. The failure to allege causation forecloses each of Plaintiff's claims.

The complaint's products liability theory fails for the additional reason that Facebook is not a "product" as a matter of law. In South Carolina and elsewhere, "it is firmly established" that there can be no strict products liability claim with respect to "services," as opposed to "products." *Fields v. J. Haynes Waters Builders, Inc.*, 658 S.E.2d 80, 90–91 (S.C. 2008). Facebook is an intangible communications service, not a tangible product. Courts around the country have confirmed that communications services such as Facebook cannot be sued on products liability theories. *See*, *e.g.*, Order, *Doe v. Facebook, Inc.*, No. 2019-16262 (151st Dist. Ct., Harris County, Tex. Oct. 4, 2019) (Attachment 1). To the extent the complaint's negligence claims turn on the theory that Facebook was a negligently designed product, they also fail for the same reason.

The complaint's negligence claims further fail because Meta did not owe Plaintiff a duty of care under South Carolina law. Absent a special relationship, South Carolina law does not impose a legal duty to prevent harm committed by third parties, and Plaintiff does not allege that Meta had any relationship, let alone a special relationship, with her. Moreover, only the "ultimate user who is injured by" a product can sustain a claim for products liability, *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1230 (4th Cir. 1984), and Plaintiff does not allege that she has ever used Facebook.

Plaintiff's civil conspiracy claim should be dismissed for two additional reasons. First, the complaint does not and cannot allege that Meta reached an agreement with the Russian

Defendants to violate constitutional rights. Instead, the complaint alleges that Meta was (at most) deliberately indifferent or willfully blind to the Russian Defendants' actions. The Fourth Circuit has rejected those as bases for liability under § 1985(3). *See Strickland v. United States*, 32 F.4th 311, 362 (4th Cir. 2022); *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995). Second, the complaint does not and cannot allege that Meta shared the Russian Defendants' racially discriminatory motive.

Even if the complaint stated any viable claims, Section 230 of the Communications Decency Act, 47 U.S.C. § 230, would independently bar them. As the Fourth Circuit has long held, Section 230 forecloses any claim that seeks to impose liability on interactive computer service providers such as Meta for the alleged harmful effects of third-party content. *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). And the *only* connection alleged between Meta and Roof's crimes is that "racially based hate" posted by third parties on Facebook—in direct violation of Facebook's policies—somehow "affirm[ed]" Roof's hateful "beliefs." Compl. ¶ 167. Section 230 precludes any claims premised on that theory.

Because these defects cannot be cured, the complaint should be dismissed with prejudice.

## II.     ALLEGATIONS OF THE COMPLAINT

On June 17, 2015, Dylann Roof entered the Mother Emanuel AME Church in Charleston with the intent to murder its congregants. Compl. ¶ 1. After joining a Bible study already in session, Roof, acting alone, shot and killed the Reverend Clementa Pinckney and eight other parishioners. *Id.* ¶ 2. In his own telling, Roof was motivated by white supremacist beliefs he encountered on websites (other than Facebook) after a Google search following the 2012 death of Trayvon Martin. *Id.* ¶ 60.

Plaintiff M.P. is the daughter of the Reverend Pinckney, and she was present at Mother Emanuel when Roof murdered her father. Compl. ¶¶ 1–2, 169. According to the complaint,

3

M.P. and her mother, Jennifer, "hid under the desk in Reverend Pinckney's office" during the shooting. *Id.* ¶ 4. The complaint alleges that M.P. "sustained physical injuries and endured . . . pain and suffering, mental shock, emotional trauma, mental anguish, and other injuries," as a result. *Id.* ¶¶ 182, 192. M.P. seeks compensatory and punitive damages, and any "such other relief as this Court may deem just and proper." *Id.* ¶ 221[f].

The complaint describes Roof as "a classic lone wolf," characterized by "toug[h] to predict" and "unrestrained violence," who "radicalized" online. Compl. ¶ 56. According to the complaint, Roof "began the radicalization process performing a Google search for 'black on white crime' which took him to the website of a South Carolina-based hate group named the Council of Conservative Citizens (formerly the White Citizens' Council)." *Id.* ¶ 166. With respect to Facebook, the complaint alleges merely that Roof "had a Facebook page," *id.* ¶ 13, and baldly asserts that he "joined extremist groups on Facebook" without specifying what these were, *id.* ¶ 60. Even so, the complaint acknowledges that Roof "did not spend that much time on Facebook and was not particularly active with posting." *Id.* ¶ 167. The complaint alleges that Roof changed his "profile photo" three weeks prior to the shooting. *Id.* ¶ 13. But the complaint does not describe a single racist, hateful, or extremist post, video, comment, or group that Roof ever purportedly viewed or joined *on Facebook*. And the complaint does not allege that Roof ever discussed Facebook in any of his racist "manifestos," despite detailing other sites that purportedly contributed to his radicalization. *See id.* ¶¶ 60, 166 (citing Roof's manifesto).

The complaint nonetheless alleges that Meta is liable for M.P.'s injuries, as well as a broader campaign of "race-based hate." Compl. ¶ 51. The complaint brings claims for strict products liability, *id.* ¶¶ 170–186, negligent design defect, *id.* ¶¶ 187–193, negligent infliction of

4

emotional distress, *id.* ¶¶ 194–203, and conspiracy to violate the civil rights of African Americans under 42 U.S.C. § 1985(3), *id.* ¶¶ 204–216.

The central theory of the complaint is that Facebook is designed to "maximize user engagement, promoting and encouraging time spent on the platform." Compl. ¶ 12. According to the complaint, because "provocative content"—*i.e.*, content that is "inflammatory," "negative," or "divisive"—is the most "engaging," Facebook's algorithms "promot[e]" that material. *Id.* ¶¶ 12, 17, 80, 103. And because "engaging" material is more likely to be "like[d]," "comment[ed]" on, or "share[d]," the complaint further alleges that users are thereby "encouraged" to post more divisive content. *Id.* ¶¶ 104, 123, 172. According to the complaint, "repeated exposure to [such] inflammatory [content] result[s] in emotional desensitization," while "extended" exposure to "extremist content" leads to "radicalization." *Id.* ¶ 48. Nonetheless, as noted, the complaint does not point to a *single* piece of extremist content that Roof ever saw *on Facebook*. The complaint then alleges that "[s]ome" radicalized individuals, rather than "talking" online (which, according to Roof, everyone else was "doing"), "carry out violent acts offline." *Id.* ¶¶ 48, 60.

The complaint concedes (as it must) that Meta does not "have any animus toward people of color." Compl. ¶ 81. Meta's "Community Standards," which the complaint references, *id.* ¶¶ 63, 82, "prohibit hate speech, harassment, and attempts to incite violence through the platform."[1] Nonetheless, the complaint alleges that, due to its "engagement"-based algorithmic sorting, "Facebook directly enabled and allowed white supremacy groups and foreign governments to target Americans with messages and video content meant to sow racial discord."

---

[1]   Facebook Civil Rights Audit – Final Report 42 (July 8, 2020), https://about.fb.com/wp-content/uploads/2020/07/Civil-Rights-Audit-Final-Report.pdf.

*Id.* ¶ 64. Plaintiff further alleges that the Russian government, acting through four named defendants (collectively, the "Russia Defendants"), "clandestine[ly]" used Facebook as a "tool" to "exploit racial divisions in the United States." *Id.* ¶¶ 138, 143, 209. The complaint concedes that Meta "uncovered" and reported the Russian Internet Research Agency ("IRA") on its own,[2] "precipitat[ing] audits" at a number of other social media companies. *Id.* ¶ 149.[3] And the complaint further acknowledges that Meta took steps to identify and report "Russian expenditures on their platforms," removing accounts and disrupting networks. *Id.* But the complaint nonetheless asserts that Meta "participated in a conspiracy" with the Russian Defendants to "interfer[e] with the right of African Americans to vote" and otherwise deprive them of their civil rights by "[d]esigning" Facebook to "maximize user engagement" and "allowing fictitious social media accounts to stoke racial tensions." *Id.* ¶¶ 207, 210. As a result, it alleges that "[b]oth the Russian Defendants and the Meta Defendants bear civil liability for the online radicalization of Dylann Roof." *Id.* ¶ 19.

---

[2]    According to the Senate Report addressing the actions of Russian intelligence agencies in the lead up to the 2016 election, which is cited in the complaint (Compl. ¶ 37, n.1), the IRA's social media efforts "countenanced the full spectrum of American politics, and included content and pages directed at politically right-leaning perspectives on immigration policy, the Second Amendment, and Southern culture, as well as context and pages directed at left-leaning perspectives on police brutality, race, and sexual identity." Report of the Senate Select Committee on Intelligence, "Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Russia's Use of Social Media with Additional Views," Vol. 2, at 45 (Nov. 2020); *see also* Report on the Investigation into Russian Interference in the 2016 Presidential Election, Vol. I, U.S. Dep't of Justice, Special Counsel Robert S. Mueller, III (Mar. 2019), at 24–25 (cited at Compl. ¶ 37 n.1) ("IRA Facebook groups active during the 2016 campaign covered a range of political issues and included purported conservative groups . . . purported Black social justice groups . . . LGBTQ groups . . . and religious groups.").

[3]    Report of the Senate Select Committee on Intelligence, *supra*, Vol. 2, at 76–77.

### III.     LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The plaintiff's factual allegations "must be enough to raise a right to relief above a speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Conclusory statements and bare assertions do not suffice. *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013). Claims also may be dismissed based on a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

### IV.     ARGUMENT

**A.     The Complaint Fails to State a Claim**

**1.     The Complaint Does Not Plausibly Allege Causation**

For all of her claims, Plaintiff must plausibly allege that Meta was the factual cause of her father's tragic death and thereby her injuries. *See Bray v. Marathon Corp.*, 588 S.E.2d 93, 95 (S.C. 2003) (products liability); *Jolly v. Gen. Elec. Co.*, 869 S.E.2d 819, 828 (S.C. Ct. App. 2021) (negligent product design); *Kinard v. Augusta Sash & Door Co.*, 336 S.E.2d 465, 467 (S.C. 1985) (negligent infliction of emotional distress); *Unus v. Kane*, 565 F.3d 103, 126 (4th Cir. 2009) (§ 1985). In other words, Plaintiff must plausibly allege that "the injury would not have occurred 'but for'" the defendant's alleged conduct. *Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 422 S.E.2d 128, 130 (S.C. 1992) (citation omitted); *see Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355, 1357 (9th Cir. 1981) (similar for § 1985). Here, this means that the complaint must allege that Roof would not have committed his horrific crimes had it not been for Meta's purported actions.

Separately, Plaintiff must also allege legal causation—*i.e.*, proximate cause—for each of her claims. *See Bray*, 588 S.E.2d at 95 (products liability); *Bishop v. S.C. Dep't of Mental*

*Health*, 502 S.E.2d 78, 83 (S.C. 1998) (negligence); *Arnold*, 637 F.2d at 1355 (§ 1985).  Under South Carolina law, foreseeability is the touchstone of proximate cause and is measured by the "natural and probable consequences" of an action.  *Bishop*, 502 S.E.2d at 83; *see also Arnold*, 637 F.2d at 1355 (proximate cause standard under § 1985 "closely resembles the standard 'foreseeability' formulation of proximate cause").  "[L]iability cannot rest on mere possibilities." *Young v. Tide Craft, Inc.*, 242 S.E.2d 671, 675–76 (S.C. 1978).  Nor can an actor be responsible for the "willful, malicious, and criminal act of a third person" unless that intervening act was foreseeable under the circumstances.  *Stone v. Bethea*, 161 S.E.2d 171, 173–74 (S.C. 1968); *see also Springer v. Seaman*, 821 F.2d 871, 877 (1st Cir. 1987) ("[T]raditional tort rules for determining when an intervening cause rises to the level of a superseding cause" apply under § 1985).  And if the third party's actions were "extraordinarily outrageous or appalling," the initial actor's conduct does not proximately cause the injury even if the third party's conduct "was foreseeable." *Stroman v. Town of Santee*, 2005 WL 8164996, at *6 (D.S.C. June 29, 2005).

Plaintiff's complaint does not satisfy either standard.  Far from establishing that anything Meta allegedly did was the legal or factual cause of Roof's actions, the complaint instead alleges that Roof first discovered white supremacist thinking by running a *Google* search.  Compl. ¶ 166.  This Google search allegedly led him to a website run by Council of Conservative Citizens ("CCC").  *Id.*  And in his manifesto, which the complaint incorporates by reference, *id.* ¶¶ 74, 166–67,[4] Roof said that he found on CCC's site "pages upon pages" of material on black-on-white crimes, "realized that something was very wrong," and has "never been the same

---

[4]   It is well established that the Court can consider documents incorporated by reference on a motion to dismiss.  *See, e.g.*, *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 176 (4th Cir. 2009).

since," Suppl. JA at 277, *United States v. Roof*, No. 17-3 (4th Cir. Nov. 16, 2020). The complaint itself acknowledges that "Roof did not spend that much time on Facebook." Compl. ¶ 167. It instead generally alleges that Roof underwent "online radicalization," *id.* ¶¶ 10, 13, and that Facebook was "a factor" in this radicalization and "served as an affirmation of beliefs" that originated elsewhere, *id.* ¶¶ 62, 167. But these conclusory allegations do not create a plausible inference that Roof would not have committed murder *but for* Facebook. *See Iqbal*, 556 U.S. at 678–79.

Notably, the complaint does not allege a tie between Roof and any specific information on Facebook. It does not allege that Roof saw any particular posts on Facebook, let alone extremist ones; it does not point to any particular groups he joined or was directed to, let alone extremist ones. The only specific allegation in the complaint regarding Roof's interaction with Facebook is that, a few weeks before he committed mass murder, he changed the profile picture on his Facebook page to one of himself wearing white supremacist badges. Compl. ¶ 13. But that does not support the inference that Facebook radicalized Roof.[5] As noted above, the complaint itself indicates that it was the material on the CCC site that did so. In short, nothing in

---

[5] As the Court is aware, at Roof's criminal trial, the evidence showed that he regularly visited websites such as Daily Stormer and Storm Front and listened to Michael Savage's radio show. *See* JA at 1004, 1034, 1079, 4898, 5426, *United States v. Roof*, No. 17-3 (4th Cir. Jan. 28, 2020). And only two pieces of evidence from Roof's criminal trial connect Roof and Facebook: (1) testimony that Roof sent a message asking an old classmate if he knew where Roof could meet up with other white supremacists; and (2) evidence that Roof kept 88 friends on Facebook as a reference to Hitler. *See id.* at 1003, 5296, 5308–09. The Court may take judicial notice of these prior court records in deciding the motion to dismiss. *See, e.g.*, *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("[T]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records." (citation omitted)); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts can consider "matters of which a court may take judicial notice" in resolving a motion to dismiss).

the complaint suggests that Roof would have acted any differently but for Meta's alleged conduct.

Moreover, the complaint does not plausibly allege proximate cause. It is hardly foreseeable that someone who "did not spend that much time on Facebook" would become a radicalized white supremacist as a result of Facebook browsing. Compl. ¶ 167. The complaint thus fails on its own terms—it alleges that "online radicalization is expected when individuals engage with extremist content for *extended periods of time*." *Id.* ¶ 48 (emphasis added). The complaint also alleges that Facebook only "realized in 2016"—after the events in this case— "that its algorithms" purportedly "were responsible for the growth of extremism," further undermining any claim of foreseeability. *Id.* ¶ 157.

But even if Meta could have foreseen that Roof would become a white supremacist, it still had no way to predict that Roof would become a mass murderer. "Foreseeability is determined by looking to the natural and probable consequences of the complained of act." *Bishop*, 502 S.E.2d at 89. And there is nothing in the complaint remotely suggesting that committing mass murder is a natural or probable consequence of infrequent social media usage. In his manifesto, Roof himself remarked that he decided to act because he did not "see anyone doing anything" except "talking on the internet." Suppl. JA, *United States v. Roof*, *supra*, at 277. The complaint likewise alleges that Roof committed murder because "no one was really doing anything but talking." Compl. ¶ 60. These statements confirm that Meta could not have foreseen that a person who frequently spent time online would commit a violent attack—let alone that someone like Roof, who spent little time on Facebook, would carry out mass murder.[6]

---

[6] Plaintiff's complaint cites a few instances of other offline violence committed by different perpetrators allegedly spurred by online radicalization. Compl. ¶ 36. But even assuming those

[Footnote continued on next page]

Under South Carolina law, such an improbable act was not reasonably foreseeable, meaning that Roof's own "willful, malicious, and criminal act[s]" were a superseding cause breaking any causal link to Meta's alleged conduct. *Stone*, 161 S.E.2d at 173–74; *see also, e.g.*, *Hensley v. Heavrin*, 282 S.E.2d 854, 855 (S.C. 1981) (finding no proximate cause when wife sued her doctor after he had incorrectly diagnosed her with syphilis, which led her husband to hit her in the jaw for her apparent infidelity); *Bishop*, 502 S.E.2d at 83 (rejecting grandmother's negligence claim against local mental health officials for examining and releasing her daughter, which led the grandmother to conclude it was safe to allow her daughter to spend time alone with her granddaughter, who was then abused by the daughter). Yet even if Roof's crimes were in some measure foreseeable, it is difficult to imagine conduct that could be more "extraordinarily outrageous or appalling" than the soul-shattering conduct he undertook at Emanuel Church—thereby breaking any chain of causation even for foreseeable third-party conduct. *Stroman*, 2005 WL 8164996, at *6 (emergency workers' superseding choice to preserve "a crime scene over human life and safety" was "extraordinarily outrageous or appalling"). As a result, and as a matter of law, Roof's crimes do "not proximately flow" from anything Meta did. *Id.*

Other courts have held that plaintiffs failed to plead legal cause plausibly based on allegations analogous to—or stronger than—this case. In *Crosby v. Twitter, Inc.*, the Sixth Circuit rejected the theory that social media companies proximately caused the Pulse nightclub shooting even though the shooter "viewed online content from ISIS" using the companies' services and "became 'self-radicalized.'" 921 F.3d 617, 624–25, 627 (6th Cir. 2019). The court explained that social media companies "do not proximately cause" all potential "ripples of harm"

---

[Footnote continued from previous page]
allegations could plausibly lead to a reasonable inference of foreseeability in other cases, they all took place after Roof carried out the shooting at issue in this case.

ultimately traceable to them, because those ripples could "flow far beyond [the companies']
misconduct." *Id.* at 625 (citation omitted); *see also James v. Meow Media, Inc.*, 90 F. Supp. 2d
798, 808 (W.D. Ky. 2000) (rejecting claims seeking to hold video game companies producing
violent content liable for the violent acts of their users). As in those cases, Roof's "highly
extraordinary" conduct went well beyond any "normal response to dissemination" of content
through a communications service. *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1276
(D. Colo. 2002). Plaintiff's claims therefore fail as a matter of law.

### 2. The Complaint Does Not Plead Other Essential Elements of Its Products Liability Claims

The premise of all of Plaintiff's claims is that Facebook is a "product" that, "as
designed," was "unreasonably dangerous to the user." Compl. ¶¶ 179 (Count I); 188 (Count II);
195 (Count III). But Facebook is an intangible communications service and therefore *not* a
"product" for purposes of products liability. And Plaintiff does not allege that she was injured as
a "user" of Facebook—to the contrary, she alleges that she was injured by *Roof*, who allegedly
viewed (unspecified) third-party content on Facebook. As a result, each of Plaintiff's claims
fails as a matter of law.

#### a. Facebook is Not a "Product"

Plaintiff's products liability claims fail because she has not identified any injury-causing
product. "[T]he threshold requirement of any products liability action is identification of the
injury-causing product[.]" *Baughman v. Gen. Motors Corp.*, 627 F. Supp. 871, 875 (D.S.C.
1985) (citation omitted), *aff'd*, 780 F.2d 1131 (4th Cir. 1986). As a matter of law, "it is firmly
established" that there can be no strict products liability claim (Count I) with respect to
"services," as opposed to "products." *Fields v. J. Haynes Waters Builders, Inc.*, 658 S.E.2d 80,
90–91 (S.C. 2008). And as an alternate "theor[y]" of "products liability," negligent design

(Counts II & III) also requires identification of a product; it differs from strict liability only in requiring the plaintiff to "bea[r] the additional burden of demonstrating the defendant . . . failed to exercise due care in some respect." *Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321, 326 (S.C. Ct. App. 1995); *see also Marshall v. Lowe's Home Ctrs., LLC*, 2016 WL 4208090, at *25 (D.S.C. Aug. 10, 2016) ("When pursuing a products liability claim under a negligent design theory, a plaintiff must establish the . . . elements of a strict products liability claim . . . *and* the additional element that the manufacturer or supplier failed to exercise reasonable care to adopt a safe design."). Because Facebook is *not* a product, each of Plaintiff's claims fails as a matter of law.

Well-settled law precludes federal courts sitting in diversity from extending "state law as it presently exists." *Washington v. Union Carbide Corp.*, 870 F.2d 957, 962 (4th Cir. 1989); *see Burris Chem., Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993) (collecting cases). And no South Carolina court has ever applied a products liability theory to a communications service like Facebook. This Court should not "extend [South Carolina] tort law farther than any [South Carolina] court has been willing to go." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998).

South Carolina has "embraced the doctrine of strict liability in tort in products liability cases" by codifying "§ 402A of the Restatement of Torts Second, South Carolina Code (1976) § 15–73–10." *Laurens Elec. Coop., Inc. v. Altec Indus., Inc.*, 889 F.2d 1323, 1324 (4th Cir. 1989). "In describing the scope of products liability law, the Restatement (Second) of Torts lists examples of items that are covered," *all* of which are "tangible items, such as tires, automobiles, and insecticides." *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991); *see* Restatement (Second) of Torts § 402A (1965).

Limitation of strict liability to harms stemming from physical, tangible articles recognizes that the doctrine "was born out of concern for the individual consumer in this modern world who purchases or uses appliances . . . capable of inflicting grievous bodily injury." *Laurens Elec. Coop.*, 889 F.2d at 1324. That basic rationale undergirds, for instance, the statutory requirement that the alleged injury-causing product be in "the same condition" at the time of the accident as when it left the hands of the defendant in order to sustain strict liability, *Bragg*, 462 S.E.2d at 325—a requirement that would make little sense if applied to services or intangible goods.

As an intangible communications service, Facebook cannot satisfy this definition of "product." "In determining whether" a defendant is offering "services or products," "[the South Carolina Supreme] Court has focused on [1] the character of the underlying transaction, [2] the law regarding similar transactions in other jurisdictions, and [3] the policy arguments in favor of imposing strict liability in a given situation." *Fields*, 658 S.E.2d at 91. Each of these factors favors dismissal.

*First*, as to "the character of the underlying transaction," *Fields*, 658 S.E.2d at 91, the complaint alleges that Facebook "deliver[s] content to users and recommend[s] that users make new connections or join new groups," Compl. ¶ 79. Facebook is, in other words, a communications service. The gravamen of the complaint is that Plaintiff was injured by a Facebook user—Roof—radicalized *by ideas* he saw online (and again, not even on Facebook). When an alleged injury stems from published ideas, the medium containing the information— whether a book, magazine, or social media platform—is not a product. *See* Restatement (Third) of Torts: Prods. Liab. § 19 cmt. D (1998). In short, "[t]here is no strict liability for books, movies, or other forms of media." *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022).

The complaint asserts that Facebook is a "product," Compl. ¶¶ 132, 154, 158–59, but this Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555 (citation omitted). The allegation that "[t]he design of Facebook's algorithms" is defective fares no better. Compl. ¶ 173. Facebook's algorithms are not physical "products capable of inflicting grievous bodily injury when the product is defective or misused," nor are they used to operate a physical product. *Laurens Elec. Coop.*, 889 F.2d at 1324. At bottom, Facebook is not comparable to "a product, such as a lawn-mower," and its "essence" is a "service." *In re Breast Implant Prod. Liab. Litig.*, 503 S.E.2d 445, 448–49 (S.C. 1998); *see also DeLoach v. Whitney*, 273 S.E.2d 768, 769 (S.C. 1981) (installation of tire valve stem involves provision of service, not a product).

*Second*, courts have consistently held that "[a] product is a *physical article* which results from a manufacturing process and is ultimately delivered to a consumer." *Green v. ADT, LLC*, 2016 WL 3208483, at *3 (N.D. Cal. June 10, 2016) (emphasis added) (citation omitted); *see also* Restatement (Third) of Torts: Prod. Liab. § 19(a) (a "product" subject to strict liability is "*tangible* personal property distributed commercially for use or consumption" (emphasis added)). For that reason, courts across the country have rejected efforts to apply products liability theories to websites or apps that facilitate communication and connections between users. *See*, *e.g.*, Transcript 57, *Doe v. Facebook, Inc.*, No. 2019-16262 (151st Dist. Ct., Harris County, Tex. Sept. 16, 2019) (Attachment 2) ("I'm going to rule right now that [Instagram] is not a product, period."); *Ziencik v. Snap, Inc.*, No. 21-cv-7292, Dkt. No. 66 at 6 (C.D. Cal. Feb. 3, 2022) (concluding Snapchat is not a "product" for purposes of strict liability claims and dismissing claims); *Quinteros v. InnoGames*, 2022 WL 898560, at *7 (W.D. Wash. Mar. 28, 2022) (online video game is "not a product" under Washington law); *Intellect Art Multimedia,*

15

*Inc. v. Milewski*, 2009 WL 2915273, at *7 (N.Y. Sup. Ct. Sept. 11, 2009) (a "website [that] is a forum for third-party expression" is a "'service'"); *James v. Meow Media, Inc.*, 300 F.3d 683, 687, 700–01 (6th Cir. 2002) ("video games, movies, and internet sites" are not "products").

*Finally*, the policy considerations that animate strict liability point in the same direction. Because "[a] product is a physical article which results from a manufacturing process," "[a] defect in the article even if initially latent is ultimately objectively measurable." *Pierson v. Sharp Mem'l Hosp., Inc.*, 264 Cal. Rptr. 673, 676 (Cal. Ct. App. 1989). But even for tangible products, "the concept of 'design defec[t]'" is "concededly one of the most difficult areas for precise definition." *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 995 (1991). This framework is entirely unworkable as applied to services and intangible goods. *In re Breast Implant Prod. Liab. Litig.*, 503 S.E.2d at 448–49 (sale of products involves "qualitatively different" considerations than provision of services based on "knowledge and skill"); *see also Pierson*, 264 Cal. Rptr. at 676 (services are judged by "what is reasonable under the circumstances"). There is no objectively measurable basis for determining that the Facebook service was defectively designed—meaning, as alleged, that "[t]he dangers inherent in the design of Faceboo[k] . . . outweigh [its] benefits." Compl. ¶ 178.

These policy justifications apply with even greater force in the context of a communications service. The complaint seeks to hold Meta strictly liable for developing a social media service used by billions of people on which some users communicated, among other things, "hate speech and misinformation." Compl. ¶ 174. Analyzing the claim under a products liability framework—as the struggle in the complaint to identify the supposed product reveals, *see id.* ¶¶ 170–180—is next to impossible. It makes little sense to extend products liability beyond "tangible items" to "ideas and expression"—even when the "pure thought and

16

expression" is embodied in a physical object like a book. *Winter*, 938 F.2d at 1034, 1036. "The purposes served by products liability law are focused on the tangible world and do not take into consideration the unique characteristics of ideas and expressions." *Id*. at 1034. And the "transmission of words is not the same as selling items with physical properties." *Id.* at 1036 n.6. Just as telephone companies are not liable if callers spread "defamatory messages" on their wires, *Anderson v. N.Y. Tel. Co.*, 320 N.E. 2d 647, 649 (N.Y. 1974), a communications service does not become inherently defective if users spread "extreme and outrageous hate speech, misinformation, and conspiracy theories," Compl. ¶ 172. Any attempt to devise "objectively measurable" standards for intangible "defect[s]" in communications platforms, *Pierson*, 264 Cal. Rptr. at 676, "could seriously inhibit those who wish to share thoughts and theories," *Winter*, 938 F.2d at 1035; *see also Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 239 (Tex. App. 1993) ("ideas and information contained in the magazine [that] encouraged children to engage in activities that were dangerous" were "intangible characteristics, not tangible properties"). In short, Facebook is not a product; rather, it is a service.

### b.    The Complaint Does Not Allege that Plaintiff was a "User or Consumer" of Facebook

Even if Facebook were a product, and its design had somehow caused Plaintiff's injuries, Plaintiff's strict products liability claim (Count I) and negligent design claims (Counts II & III) would not be cognizable under South Carolina law because Plaintiff is a bystander who is not alleged to have used Facebook. The relevant South Carolina statute provides that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm caused *to the ultimate user or consumer*." S.C. Code Ann. § 15–73–10(1) (emphasis added). Thus, only the "ultimate user who is injured by" the unreasonably dangerous product can bring a claim for strict products liability. *Brooks*, 750 F.2d

at 1230.  "Casual bystanders, and others who may come in contact with the product, as in the case of employees of the retailer, or a passer-by injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery" on strict liability theories.  *Lawing v. Univar, USA, Inc.*, 781 S.E.2d 548, 555 (S.C. 2015) (quoting Restatement (Second) of Torts § 402A cmt. o).  This basic requirement reflects the legislature's intent to extend no-fault liability only to the "primary and direct victim of the product defect," *Bray*, 588 S.E.2d at 95, and not to those "much farther removed from the product," *Lawing*, 781 S.E.2d at 556.

Plaintiff has not alleged that she ever visited Facebook, much less that she is the ultimate user or consumer under the law who was injured by Facebook.  At most, Plaintiff alleges in conclusory fashion that it was "foreseeable" that "online radicalization" of third-party users, such as Roof, could lead to "offline violence" against non-users.  Compl. ¶¶ 7, 15, 90.  But the South Carolina Supreme Court has expressly rejected an "expansive definition" of "user" to embrace "all persons who could foreseeably come into contact with the dangerous nature of a product." *Lawing*, 781 S.E.2d at 556 (citation omitted).  That is at best what Plaintiff alleges here.  Her strict products liability claim—and consequently, her negligent design claims, *see Marshall*, 2016 WL 4208090, at *25—therefore fail as a matter of law.

### 3.    Plaintiff Does Not and Cannot Allege Duty

Additionally, Plaintiff's negligence and negligent infliction of emotional distress claims (Counts II & III) fail because South Carolina law does not impose a legal duty on social media companies to protect victims from harms committed by third parties.

To plead negligence claims, Plaintiff must allege that Meta owed her a legal duty of care. *Huggins v. Citibank, N.A.*, 585 S.E.2d 275, 276–77 (S.C. 2003).  "Whether the law recognizes a particular duty is an issue of law to be determined by the court." *Oulla v. Velazques*, 831 S.E.2d 450, 455 (S.C. Ct. App. 2019) (citation omitted).  Existence of a duty depends upon "the

relationship between the alleged tortfeasor and the injured party." *Huggins*, 585 S.E.2d at 277. "Foreseeability of injury . . . itself does not give rise to a duty." *Oulla*, 831 S.E.2d at 444 (citation omitted). "It is the relationship between the parties, not the potential foreseeability of injury, that determines whether the law will recognize a duty in a given context." *In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d 667, 680 (D.S.C. 2021) (citation omitted). "The concept of duty in tort liability will not be extended beyond reasonable limits." *Huggins*, 585 S.E.2d at 277.

There is no support in South Carolina law for imposing a legal duty on social media companies to prevent harm that is committed by third parties. South Carolina courts have specifically "rejected the idea that one who undertakes a duty to render services to another should recognize a duty to third persons." *Oulla*, 831 S.E.2d at 458. Thus, in *Oulla*, the court held that a loader who puts pallets on a customer's trailer owes no duty to other drivers on the highway to stack the pallets safely. *See id.* Similarly, Meta here did not assume any duty to third parties, including Plaintiff, just because Roof used Facebook.

South Carolina courts have recognized an exception to the rule that there is "no general duty to control the conduct of another" when "the defendant negligently . . . creates the risk." *See Edwards v. Lexington Cnty. Sheriff's Dep't*, 688 S.E.2d 125, 128 (S.C. 2010). But in cases applying that exception, the defendant has typically engaged in some affirmative act of negligence that obviously *created* a risk. *See, e.g., Montgomery v. Nat'l Convoy & Trucking Co.*, 195 S.E. 247, 250 (S.C. 1938) (negligent creation of risk when defendants' trucks entirely blocked highway but they "failed to warn travelers approaching"). Thus, in *Edwards*, the defendant sheriff's department "arranged [a] bond revocation hearing" for the plaintiff's ex-boyfriend, "strongly encouraged" the plaintiff to attend, and provided no security, even though

they knew of the ex-boyfriend's "violent tendencies toward" the plaintiff.  688 S.E.2d at 130.  In those circumstances, the department "*created* a situation that they knew or should have known posed a substantial risk of injury to [the plaintiff]."  *Id.* (emphasis added).  And they owed her a duty because of their "knowledge of [the ex-boyfriend's] demonstrated threats against [the plaintiff]."  *Id.*[7]

A general arms-length business relationship does not suffice, even if the defendant's actions made the tort possible.  *See, e.g.*, *Big Red Box, LLC v. Square, Inc.*, 2020 WL 465928, at *12 (D.S.C. Jan. 22, 2020) (no duty where the only relationship between the third party and defendant, Square, Inc., was "one generally found between a business and its customer").  In *Big Red Box*, for example, a third party used Square to "charg[e] Plaintiff's credit card 79 times" and Square allegedly "ignor[ed] its own procedures at least 58 of those times."  *Id.* at *13.  Square's alleged negligence may have made the third party's credit card fraud possible—or even increased the risk to the plaintiff—but "[t]he relationship between Square and Plaintiff [was] too attenuated to rise to the level of a duty between them."  *Id.* (citation omitted).

No court has applied that exception to a case like this, where the criminal act of a third party with no special relationship to the defendant harms a plaintiff who has no relationship to the defendant.  *Cf. Doe 2 v. Citadel*, 805 S.E.2d 578, 583–84 (S.C. Ct. App. 2017) (no duty where defendant's employee assaulted plaintiff because defendant had no knowledge of the

---

[7]    Courts have typically found negligent creation of risk alongside a special relationship or statutory mandate creating an independent duty.  *See, e.g.*, *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 638 S.E.2d 650, 656–57 (S.C. 2006) (disability treatment center had special relationship with client creating duty of care and negligently created a risk "by not properly supervising her"); *cf. Sanders v. United States*, 2017 WL 1102612, at *6 (D.S.C. Mar. 23, 2017) (potential for negligent creation of risk where government was statutorily obligated to conduct a background check on Roof but failed to conduct adequate screening).

employee's tendencies and was not "even aware of [plaintiff's] very existence"). The complaint alleges no relationship—let alone a special one—between Meta and Plaintiff. *Cf. Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1101 (9th Cir. 2019) (there is "no special relationship between Facebook and its users" (citing *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359–60 (D.C. Cir. 2014))). So Meta owed Plaintiff no duty of care. *See Huggins*, 585 S.E.2d at 277 ("The relationship, if any, between credit card issuers and potential victims of identity theft is far too attenuated to rise to the level of a duty between them."). Courts have repeatedly held that a website owes no duty to non-users who might be harmed by third parties. *See, e.g., Doe v. GTE Corp.*, 347 F.3d 655, 661 (7th Cir. 2003); *Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 326 & n.4 (D.N.J. 2015).

Recognizing a duty in this context would push tort liability beyond any reasonable limit. As explained above, it was not at all foreseeable that Roof would carry out mass murder as a result of his limited Facebook usage. The complaint's theory effectively would throw open the courthouse doors to *any* victim of *any* criminal act committed by *any* of the 3.59 billion people who use Facebook or other social media services. *See* Compl. ¶ 164. As the Sixth Circuit recently recognized, accepting such allegations would make social media companies potentially "liable for seemingly endless acts of modern violence." *Crosby*, 921 F.3d at 625; *see Fields v. Twitter, Inc.*, 881 F.3d 739, 749 (9th Cir. 2018). Such exposure would place an "intolerable burden" on Meta and other social media companies, which South Carolina courts have cautioned against. *Morris v. Mooney*, 343 S.E.2d 442, 443 (S.C. 1986); *see also Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 715 (S.C. 2003) (recognizing duty between educational advisors and students would be "unwise, considering the great potential for embroiling schools in litigation that such recognition would create").

It thus would be inappropriate for this Court to overtake the South Carolina Supreme Court by recognizing a duty in this "relatively undeveloped area of law," *Delaney v. United States*, 260 F. Supp. 3d 505, 513 (D.S.C. 2017), especially given that court's "reluctance" to extend duty principles to new contexts, *Johnson v. Robert E. Lee Acad., Inc.*, 737 S.E.2d 512, 515 (S.C. Ct. App. 2012). A federal court sitting in diversity must "rule upon state law as it presently exists" and not "surmise or suggest its expansion." *Ball v. Joy Techs., Inc.*, 958 F.2d 36, 39 (4th Cir. 1991) (citation omitted). Because Meta owed Plaintiff no legal duty of care under the facts alleged, Plaintiff's negligence claims fail as a matter of law.

### 4. Plaintiff Does Not Allege a Conspiracy Under 42 U.S.C. § 1985

In addition to its causation flaws, Plaintiff's civil conspiracy claim must be dismissed because the complaint fails to allege that Meta reached any agreement with the Russian Defendants *at all*, much less an agreement based on racial animus to deprive any individuals of their civil rights.[8] To establish a claim under § 1985(3), a plaintiff must allege, among other things, "a conspiracy of two or more persons" who "are motivated by a specific class-based, invidiously discriminatory animus." *Strickland v. United States*, 32 F.4th 311, 360 (4th Cir. 2022) (citation omitted). That means "a claimant must show an agreement or a 'meeting of the minds' by defendants" to violate constitutional rights. *Id.* at 361 (citation omitted). Specifically, there must be "a single plan, the essential nature and general scope of which was known to each person" the Plaintiff seeks to hold responsible. *Id.* (citation omitted). The Fourth Circuit has

---

[8]   Not only are the allegations that Meta conspired with the Russian Defendants conclusory and wholly lacking in specificity—it is outrageous and irresponsible to contend that "[t]he Defendants *worked together* to . . . promot[e] violence against African Americans." Compl. ¶ 51 (emphasis added).

consistently "rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Id.* (citation omitted).

The complaint does not plausibly allege that Meta conspired with the Russian Defendants. It includes only the conclusory assertion that "[t]he Conspirators"—a term it does not define—"carried out a clandestine operation for the purpose of depriving, either directly or indirectly, African Americans of the equal protection of the laws, or of equal privileges and immunities under the laws." Compl. ¶ 209. But that allegation is nothing more than a "[t]hreadbare recita[l]" of the statutory language and therefore does "not suffice" to state a claim. *Iqbal*, 556 U.S. at 678.

And the complaint's factual allegations affirmatively refute that conclusory allegation: The complaint asserts—"[u]pon information and belief"—that Meta "participated in the conspiracy" because it had "direct knowledge of and/or wilfully blinded [it]sel[f] to" the Russian Defendants' actions. Compl. ¶ 207; *see also id.* ¶¶ 19, 51, 63. *But see id.* ¶ 149 (alleging that Meta "shared its findings with US authorities investigating these issues" (brackets omitted)). That is manifestly insufficient to show the required agreement. The Fourth Circuit has specifically rejected civil conspiracy liability under § 1985(3) based on "alleged deliberate indifference," *Strickland*, 32 F.4th at 362, and "wil[l]ful blindness," *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995) (citation omitted).

The complaint further alleges that Meta and the Russian Defendants took various acts to further the asserted agreement. *See* Compl. ¶ 210 (alleging, for example, that Defendants "allow[ed] fictitious social media accounts to stoke racial tensions"). But *none* of those alleged actions supports the inference that Meta and the Russian Defendants agreed to a single plan in the first place. "[P]arallel conduct and a bare assertion of a conspiracy" will not do. *A Soc'y*

*Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556).

Further, even if the complaint properly alleged some kind of abstract agreement between Meta and the Russian Defendants, it refutes any suggestion that Meta shared the Russian Defendants' discriminatory racial animus. Plaintiff's complaint attributes to "all Russian Defendants as co-conspirators" the "purpose of causing racial unrest and violence in the United States." Compl. ¶ 208; *see id.* ¶ 19 ("The Russian Defendants were actively and purposefully seeking to cause an increase in racial tension to cause civil unrest"); *see also id.* ¶¶ 9, 11, 146. In stark contrast, the complaint never alleges—and never could—that Meta acted with that same purpose.[9] Quite the opposite: Meta's "Community Standards," which the complaint incorporates by reference, *id.* ¶¶ 63, 82, "prohibit hate speech, harassment, and attempts to incite violence through the platform."[10] And the complaint expressly concedes that Meta does not "have *any* animus toward people of color." Compl. ¶ 81 (emphasis added); *see also id.* ¶ 82 ("I am not asserting nefarious intent."). Instead, the complaint consistently alleges that Meta acted with very different motives: growth, increased engagement, and profit. *E.g.*, *id.* ¶¶ 12, 52, 86, 98, 152, 164, 168.

In short, Plaintiff's complaint does not plead "affirmative adherence to a single plan of discriminatory animus." *Strickland*, 32 F.4th at 362. The Fourth Circuit "has rarely, if ever,

---

[9] The Complaint generically pleads that Meta "conspired with the Russian Defendants" to "knowingly and recklessly *produc[e]* racial animus," Compl. ¶ 51 (emphasis added), but that is different from *acting with* racial animus.

[10] Facebook Civil Rights Audit – Final Report 42 (July 8, 2020), https://about.fb.com/wp-content/uploads/2020/07/Civil-Rights-Audit-Final-Report.pdf.

found that a plaintiff has set forth sufficient facts to establish" a civil conspiracy under
§ 1985(3). *Id.* at 361. The facts alleged here do not even come close.

**B.     Section 230 Bars All of Plaintiff's Claims**

Even if the complaint otherwise stated a claim for relief, Section 230 of the
Communications Decency Act, 47 U.S.C. § 230, would bar Plaintiff's claims. Section 230
provides immunity to interactive computer service providers such as Meta from any claim
seeking to hold them liable for third-party content or the editorial decisions they make with
respect to such content. Plaintiff's claims attempt to impose liability on Meta for the alleged
effects of content that other users posted on Facebook and challenge how Meta presented,
recommended, aggregated, or monitored that content. As a result, these claims are barred by
Section 230, providing yet another reason why the case must be dismissed.

Congress enacted Section 230 to address the "specter of tort liability" on the internet and
its "obvious chilling effect." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).
Section 230 provides that "[n]o provider or user of an interactive computer service shall be
treated as the publisher or speaker of any information provided by another information content
provider." 47 U.S.C. § 230(c)(1). Further, "[n]o cause of action may be brought and no liability
may be imposed" under any state law "inconsistent with" Section 230. *Id.* § 230(e)(3). As the
Fourth Circuit has held, read together, these provisions "ba[r]" "lawsuits seeking to hold a
service provider liable for its exercise of a publisher's traditional editorial functions—such as
deciding whether to publish, withdraw, postpone or alter content." *Zeran*, 129 F.3d at 330.

Section 230 thus establishes a "broad immunity" to "any cause of action that would make
service providers liable for information originating with a third-party user of the service." *Nemet
Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 n.4, 258 (4th Cir. 2009). And
because Section 230 "protects websites not only from 'ultimate liability,' but also from 'having

to fight costly and protracted legal battles,'" "the question of § 230 immunity [should be resolved] at the earliest possible stage of the case." *Id.* at 255 (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc)).

By its plain terms, Section 230 mandates dismissal when (1) the defendant is a "provider . . . of an interactive computer service"; (2) the allegedly harmful content was "provided by another information content provider" and not the defendant; and (3) the claim seeks to hold the defendant liable as a "publisher or speaker" of that content. 47 U.S.C. § 230(c)(1). There is no question that Meta is a provider of an "interactive computer service"—here, Facebook. *See Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019); *Klayman*, 753 F.3d at 1357–58. And each of the other elements is satisfied as well.

### 1.    The Claims Arise from Third-Party Content

The second element of Section 230 asks whether allegedly harmful content was "provided by another information content provider," which is a person or entity "that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(c)(1), (f)(3). As the Fourth Circuit has explained, "Congress . . . established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them." *Nemet Chevrolet*, 591 F.3d at 254.

Here, all of the complaint's claims turn on content provided by third-party users, not Meta. The complaint alleges that "Roof radicalized online," Compl. ¶ 62, beginning with "a Google search for 'black on white crime' which took him to the website of . . . the Council of Conservative Citizens," *id.* ¶ 166. And he purportedly reached the conclusion that "no one was really doing anything but talking." *Id.* ¶ 60. The complaint acknowledges that "Roof did not spend that much time on Facebook," but alleges that the limited "time spent on Facebook served

as an affirmation of beliefs and thoughts that first entered Roof's mind via a Google search." *Id.* ¶ 167. And it asserts vaguely that "racially based hate on Facebook," *id.*, was "a factor" in Roof's online radicalization, *id.* ¶ 62.

Although the complaint does not identify *any* specific extremist or hateful content that Roof saw on Facebook, the complaint concedes that Meta did not create or develop any of the content Roof might have seen. For example, the complaint alleges that foreign governments shared "messages and video content," Compl. ¶ 64, and that "users" posted "inflammatory and divisive content," *id.* ¶ 88. And although it mentions "ads" purportedly "purchased by foreign governments" to "inflam[e] racial tensions," *id.* ¶ 64—without alleging that Roof saw any of those ads—it concedes that Facebook was "*not* a content provider of the individual ads themselves," *id.* ¶ 70 (emphasis added).

The complaint cannot plead around Section 230 by framing Facebook's display features, including its algorithms, as Meta's own "content." *Dyroff*, 934 F.3d at 1098; *see* Compl. ¶ 127. The "proliferation and dissemination of content does not equal creation or development of content." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1271 (9th Cir. 2016). And the complaint does not, and could not, allege that Facebook designed its algorithms to specifically promote white nationalist or racist content. Compl. ¶ 81 (Facebook makes "decisions in the name of being neutral"). Because "users ultimately determine what content to post," *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1197 (N.D. Cal. 2009) (citation omitted), Facebook's algorithms operate on "voluntary inputs," and do not "amount to content development or creation," *Kimzey*, 836 F.3d at 1270 (citation omitted).

The complaint further points to various features such as "likes," "comments," and the "share" function, which it alleges encourage users to post racist and white supremacist content.

Compl. ¶¶ 78, 80, 104. But a website does not create or develop content merely because it provides users with tools to express themselves. *Dyroff*, 934 F.3d at 1098. Section 230 protects these "features," which "are part and parcel of the overall design and operation of the website." *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (citation omitted). A provider is responsible for the "development" of content *only* if the provider "materially contribut[es]" to the content's "alleged unlawfulness." *Nemet Chevrolet*, 591 F.3d at 257 (quoting *Roommates.com*, 521 F.3d at 1168). Under that test, a provider does not become responsible for the development of third-party content unless it "require[s] users to input illegal content as a necessary condition of use," which the complaint, of course, does not allege. *Id.*; *see also id.* at 256–57 (Section 230 protects website's "structure and design" where it does not contribute to alleged illegality of content); *Kimzey*, 836 F.3d at 1269–70 (no liability for users' starred reviews even though Yelp provided the feature allowing users to select a star rating).

## 2.    The Complaint Seeks to Treat Meta As a Publisher

Finally, the complaint seeks to hold Meta liable as the "publisher" of allegedly harmful third-party content within the meaning of Section 230, because all of its claims involve Meta's "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 127 (4th Cir. 2022); *see also Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) ("decisions relating to the monitoring, screening, and deletion of content from its network— actions quintessentially related to a publisher's role"—are immune (citation omitted)).

Although the complaint attempts to "disclai[m]" its reliance on claims "hold[ing] the Meta Defendants liable as the publisher or speaker" of third-party content, Compl. ¶ 54, that disclaimer cannot be reconciled with its actual allegations. At its core, the complaint faults Meta for the decisions and manner in which it allegedly displayed content. *Id.* ¶ 89. For example, the

complaint alleges that Meta promotes content that will "maximize [user] engagement," in part by notifying users of "likes" and "comments," and that "provocative content helps to accomplish this goal." *Id.* ¶¶ 12, 78, 104.  The complaint further alleges that Facebook failed to prevent Roof from "consum[ing] evil propaganda" and "toxic content."  *Id.* ¶¶ 55, 80.  But decisions about whether and how to display, alter, promote, monitor, or delete content are all "traditional editorial functions" protected by Section 230.  *Zeran*, 129 F.3d at 330; *see also Dyroff*, 934 F.3d at 1098 (Section 230 barred claim based on "emails and push notifications" of third-party content); *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352, 355 (6th Cir. 2016) (Section 230 barred claim for failure to remove search results).

The complaint's allegations that Meta performed these traditional editorial functions through "algorithms" makes no difference.  An "automated system" that filters content is protected by Section 230 because such activity "constitute[s] [a] traditional editorial functio[n]." *See Westlake Legal Grp. v. Yelp, Inc.*, 599 F. App'x 481, 485 (4th Cir. 2015); *see also Force*, 934 F.3d at 67 (algorithmic editorial decisions protected by Section 230); *Dyroff*, 934 F.3d at 1098 (same); *Chukwurah v. Google, LLC*, 2020 WL 510158, at *1–2 (D. Md. Jan. 31, 2020) ("automated search engine" results protected by Section 230).

Nor can the complaint plead around Section 230 by recasting its claims against Meta as purported product design defects or a "failure to warn" that its social media app was "unreasonably dangerous."  Compl. ¶¶ 16–17.  Courts consistently reject such attempts to evade Section 230.  For example, in *MySpace*, the Fifth Circuit held that "failure to warn" claims are barred by Section 230; the plaintiff's allegations that MySpace "failed to implement basic safety measures" to prevent harmful third-party communications were "merely another way of claiming that MySpace was liable for publishing the communication."  528 F.3d at 416, 420; *see also*

*Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019) (failure to warn claim barred by Section 230 because it was "inextricably linked to Grindr's alleged failure to edit, monitor, or remove . . . offensive content"). Products liability claims are also barred by Section 230 where, as here, "the nature of the alleged design flaw" and "the harm that is alleged to flow from that flaw" are "directly related to the posting of third-party content." *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 930 (N.D. Cal. 2021); *see also*, *e.g.*, *Doe ex rel. Roe v. Snap, Inc.*, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022) (negligent design claim barred because a "lack of safety features" was only relevant if the features would have blocked "wrongful communication[s]" (citation omitted)); *Anderson v. TikTok, Inc.*, --- F. Supp. 3d ---, 2022 WL 14742788, at *4 (E.D. Pa. Oct. 25, 2022) (design defect of publishing "dangerous content" was "'inextricably linked' to the manner in which [TikTok] choose[s] to publish third party user content").

"[W]hat matters" for Section 230 is not the "labe[l]" placed on the claim but "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101–02, 1103 (9th Cir. 2009). If "the duty" allegedly violated "derives from the defendant's status or conduct as a 'publisher or speaker,'" that ends the analysis, and Section 230 "precludes liability." *Id.* at 1102. And this is necessarily the case where, as here, the complaint's theory of causation turns on the dissemination of third-party content. *See*, *e.g.*, *Igbonwa v. Facebook, Inc.*, 2018 WL 4907632, at *6 (N.D. Cal. Oct. 9, 2018) (Section 230 "covers . . . claims where causation depends on the content itself"); *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 157 (E.D.N.Y. 2017) (plaintiffs' claims impermissibly "rely on content to establish causation and, by extension, Facebook's liability"); *Force v. Facebook, Inc.*, 304 F. Supp. 3d 315, 329 (E.D.N.Y. 2018) (same). As the

complaint itself alleges: "[u]ltimately, *the question the jury will have to answer* is whether Facebook should be held accountable for creating an algorithm *that fed increasingly violent and provocative content to its users*."   Compl. ¶ 168 (emphasis added).   Thus, Section 230 bars Plaintiff's claims, no matter how they are couched.  *See Zeran*, 129 F.3d at 330.

Finally, the complaint's civil rights conspiracy count is based entirely on Facebook's purported failure to prevent and remove accounts and content generated by the Russian Defendants.  *See*, *e.g.*, Compl. ¶ 210 (alleging that Meta conspired with Russian Defendants by "allowing fictitious social media accounts to stoke racial tensions and disseminate white supremacist propaganda, ideology, and hate speech").   But failure to remove content, even content that the provider is aware of, does not strip a provider of Section 230 immunity.  *See Zeran*, 129 F.3d at 327.  Further, as other judges in this District have explained, "the decision to furnish an account, or prohibit a particular user from obtaining an account, is itself publishing activity" protected by Section 230.  *Cox v. Twitter, Inc.*, 2019 WL 2513963, at * 3 (D.S.C. Feb. 8, 2019) (quoting *Fields*, 217 F. Supp. 3d at 1124–25).

## CONCLUSION

Because Plaintiff fails to state a claim on which relief could be granted, Meta respectfully requests that the complaint be dismissed with prejudice.

31

Dated: February 21, 2023                Respectfully submitted,

/s/ Joshua S. Whitley
Joshua S. Whitley, Esquire
Federal Bar No.: 10829
SMYTH WHITLEY, LLC
126 Seven Farms Drive #260
Charleston, SC 29492
jwhitley@smythwhitley.com
843-606-5635

/s/ Richard A. Harpootlian
Richard A. Harpootlian, Esquire
Federal Bar No.: 1730
Phillip D. Barber, Esquire
Federal Bar No.: 12816
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Columbia, SC 29202
rah@harpootlianlaw.com
pdb@harpootlianlaw.com
803-252-4848

Helgi C. Walker (*pro hac vice* pending)
Jacob T. Spencer (*pro hac vice* pending)
Jessica L. Wagner (*pro hac vice* pending)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C.  20036
HWalker@gibsondunn.com
JSpencer@gibsondunn.com
JWagner@gibsondunn.com
202-955-8500

Rosemarie T. Ring (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105
RRing@gibsondunn.com
415-393-8200

*Attorneys for Defendants Meta Platforms, Inc.; Facebook Holding, LLC; Facebook Payments, Inc.; Facebook Technologies LLC; Instagram, LLC; and Siculus, Inc.*