# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | |
|---|---|
| M.P., a minor, by and through, Jennifer Pinckney, as Parent, Natural Guardian, and Next Friend, | ) Civil Action No.: 2:22-cv-3830-RMG ) ) |
| Plaintiff, | ) |
| vs. | ) Judge: Richard M. Gergel ) |
| Meta Platforms, Inc. (f/k/a Facebook, Inc., a Delaware Corp.); Facebook Holdings, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; Internet Research Agency, LLC (a/k/a Mediasintez LLC a/k/a Glavset LLC a/k/a Mixinfo LLC a/k/a Azimut LLC a/k/a Novinfo LLC); Concord Management and Consulting LLC; Concord Catering & Yevgeniy Viktorovich Prigozhin, | ) ) **PLAINTIFF'S OPPOSITION TO THE** ) **META DEFENDANTS' MOTION TO** ) **DISMISS** ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Plaintiff respectfully submits this Opposition to the Motion to Dismiss filed by the Meta

Defendants (hereinafter, collectively, "Facebook").

## TABLE OF CONTENTS

*TABLE OF CONTENTS* ................................................................................................................*i*

*TABLE OF AUTHORITIES* ......................................................................................................... *ii*

*FACTS/ALLEGATIONS SUPPORTING ALL CLAIMS AGAINST FACEBOOK* ...........................*1*

*LAW AND ARGUMENT* ...............................................................................................................*4*

    I.    Plaintiff Has Plausibly Alleged Proximate (Cause-in-Fact & Legal) Causation.............................5

    II.   Social Media Products *Are* Products ...............................................................................11

    III.   There Is No Requirement Plaintiff Be a "User or Consumer" (as Facebook Defines These Terms) to Recover.....................................................................................................................20

    IV.   Plaintiff Has Plausibly Alleged A Duty of Care Owed to Her by Facebook .............................23

    V.   Plaintiff's Well-Pled Product Liability Action Does Not Run Afoul of § 230 .............................25

    VI.   Plaintiff Has Plausibly Alleged A Knowing and Intentional Conspiracy Between Facebook and the Russian Defendants .................................................................................................32

*CONCLUSION* ........................................................................................................................*35*

i

## TABLE OF AUTHORITIES

**Cases**

*A.M. v. Omegle.com, LLC*, 2022 WL 2713721 (D. Or. 2022) ......................................16
*Anderson v. TikTok, Inc.,* 2022 WL 14742788 (E.D. Pa. 2022)...............................31
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).................................................5
*Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 502 S.E.2d 78 (1998)................10
*Bray v. Marathon Corp.,* 356 S.C. 111 (2003)............................................20, 21, 22
*Chi. Laws. Comm. for C.R. v. Craigslist*, 519 F.3d 666 (7th Cir. 2008) ....................32
*Comm. of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, 2021 Wl 5908758
    (D.S.C. 2021)...................................................................................21
*Cox v. Twitter, Inc.*, 2019 WL 2513963 (D.S.C. 2019)......................................26
*Delaney v. Towmotor Corp.*, 339 F.2d 4 (2d Cir. 1964) ...................................22
*DeLoach v. Whitney*, 273 S.E.2d 768 (S.C. 1981) .........................................14
*Doe through Next Friend Roe v. Snap, Inc.*, 2022 WL 2528615 (S.D. Tex. 2022) ...........30
*Doe v. Backpage.com, LLC*, 817 F.3d 12 (1st 2016).......................................17
*Doe v. Mindgeek USA Inc.*, 574 F. Supp. 3d 760 (C.D. Cal. 2021), *abrog. by Does 1-6 v. Reddit,
    Inc.*, 51 F.4th 1137 (9th Cir. 2022).........................................................30
*Dorrell v. S.C. Dep't of Transp.*, 361 S.C. 312, 605 S.E.2d 12 (2004) ....................23
*Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093 (9th Cir. 2019)....................29
*Erie Ins. Co. v. Amazon.com, Inc.,* 925 F.3d 135 (4th Cir. 2019) .....................26, 28
*Ervin v. Cont'l Conveyor & Equip. Co.*, Inc., 2009, 674 F.Supp.2d 709....................23
*Escola v. Coca Cola Bottling Co.,* 24 Cal. 2d 453 (1944) .................................18
*Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701 (N.D. Cal. 2022)......................15, 16
*Fields v. Twitter, Inc.*, 217 F.Supp. 3d 1116 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018)
    ...............................................................................................30
*Fisher v. Pelstring*, 817 F. Supp 2d 791 (D.S.C. 2011) ...............................22, 28
*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019)...................................17, 32
*Funchess v. Blitz USA, Inc.*, 2010 WL 4780357 (D.S.C. 2010)..............................29
*Gonzalez v. Google, LLC*, 2 F.4th 871 (9th Cir. 2021) ................................17, 31
*Hardin v. PDX, Inc.*, 227 Cal.App. 4th 159 (2014).......................................14
*Henderson v. Gould, Inc.*, 288 S.C. 261, 341 S.E.2d 806 (Ct. App. 1986)..................21
*Henderson v. Source for Pub. Data, LP*, 53 F.4th 110 (4th Cir. 2022)...................27, 28
*Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103 (Tex. App. 2000) ....................16
*In re Breast Implant Prod. Liab. Litig.*, 503 S.E.2d 445 (S.C. 1998) .....................14
*Jolly v. Gen. Elec. Co.*, 435 S.C. 607, 869 S.E.2d 819 (Ct. App. 2011) ..................8, 11
*Lawing v. Univar, USA, Inc.*, 415 S.C. 209, 781 S.E.2d 548 (S.C. 2015) ..................20
*Lemmon v. Snap, Inc*, 995 F.3d 1085 (9th Cir. 2021) ...............................14, 29, 30
*Lenard v. Argento*, 699 F.2d 874 (7th Cir. 1983)........................................34
*Little v. Brown & Williamson Tobacco Corp.,* 243 F. Supp. 2d 480 (D.S.C. 2001)..........6, 7
*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S.Ct. 13 (2020) ............17, 31
*Maynard v. Snapchat, Inc.*, 816 S.E.2d 77 (Ga. Ct. App. 2018)...........................16
*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) ........26
*Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 309 S.C. 313, 422 S.E.2d 128 (1992).......9, 11
*Priest v. Brown*, 302 S.C. 405, 396 S.E.2d 638 (Ct. App. 1990) ......................14, 21

*Puglise v. Cobb Cnty., Ga.*, 4 F.Supp. 2d 1172 (N.D. Ga. 1998) ...................................................34

*Rife v. Hitachi Const. Machinery Co., Ltd.* (S.C.App. 2005) 363 S.C. 209, 609 S.E.2d 565 .......23

*Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587 (E.D. La. 2007)............................16

*Simmons v. Poe*, 47 F.3d 1370 (4th Cir. 1995)...............................................................................34

*Simulados Software, Ltd v. Photon Infotech Priv., Ltd.*, 40 F.Supp. 3d 1191 (N.D. Cal. 2014)...15

*South Carolina Ins. Co. v. James C. Greene and Co.*, 290 S.C. 171, 348 S.E.2d 617 (1986).......7

*Stone v. Bethea*, 251 S.C. 157, 161 S.E.2d 171 (1968) .................................................................10

*Strickland v. U.S.*, 32 F.4th 311 (4th Cir. 2022).............................................................................34

*Stroman v. Town of Santee*, 2005 WL 8164996 (D.S.C. 2005) ....................................................10

*U.S. v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422 (E.D.N.Y. 2007) ...................................5

*Vaughan v. Town of Lyman*, 370 S.C. 436, 635 S.E.2d 631 (2006)...............................................23

*Wallace v. Owens-Illinois, Inc.*, 300 S.C. 518, 389 S.E.2d 155 (Ct. App. 1989).................8, 9, 21

*Westlake Legal Grp. v. Yelp, Inc.*, 559 F. App'x 481 (4th Cir. 2015)............................................26

*Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036 (9th Cir. 1991).....................................15, 16

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) .............................................................26

## Statutes

42 U.S.C. § 1985 ..............................................................................................................................33

47 U.S.C. § 230 ..........................................................................................................................passim

Fed. R. Civ. P. 8 ................................................................................................................................5

S.C. Code Ann. § 15-73-10 ...........................................................................................13, 20, 21, 28

S.C. Code Ann. § 15-73-30 .....................................................................................................13, 20

## Other Authorities

164 Cong. Rec. S1849, 1860 ...........................................................................................................32

Restatement (Second) of Torts § 323 (1965) ............................................................................23, 24

Restatement (Second) of Torts § 402A ................................................................................13, 16, 18

Restatement (Third) of Torts: Prod. Liab. § 19 (1998) ...................................................................16

## Treatises

Bergman, *Assaulting the Citadel of Section 230 Immunity: Products Liability, Social Media, and the Youth Mental Health Crisis*, 26 Lewis & Clark Law Rev. 1159 (2023) ......................passim

Citron & Wittes, *The Internet Will Not Break: Denying Bad Samaritans § 230 Immunity*, 86 Fordham L. Rev. 401 (2017) ...............................................................................................31

Citron & Wittes, *The Problem Isn't Just Backpage: Revising Section 230 Immunity*, 2 Geo. L. Tech. Rev. 453 (2018) .........................................................................................................32

Daniela C. Manzi, *Managing the Misinformation Marketplace: The First Amendment and the Fight Against Fake News*, 87 Fordham L. Rev. 2623 (2019)...................................................32

*Fields v. J. Haynes Waters Builders, Inc.*, 376 S.C. 545, 658 S.E.2d 80 (2008) .........................13

Landes & Posner, *A Positive Econ. Analysis of Products Liability*, 14 J. Legal Stud. 535 (1985) ..........................................................................................................................................19

Zakon, *Optimized for Addiction: Extending Prod. Liab. Concepts to Defectively Designed Social Media Algorithms…*, 2020 Wis. L. Rev. 1107 (2020)................................................19

## FACTS/ALLEGATIONS SUPPORTING ALL CLAIMS AGAINST FACEBOOK

Facebook, of course, asserts everything Plaintiff alleges is but a façade to mask that her claims attempt to hold it liable for its activity as a "publisher or speaker" of third-party content. Facebook further asserts Plaintiff failed to plead anything more than conclusory allegations as to its involvement in or contribution to Dylan Roof's radicalization and the massacre that ensued. Its arguments cherry-pick pieces of allegations in attempt to redraft the Complaint to thereby pierce the pleading and obtain a summary judgment posing as a dismissal *on the pleadings*.

Roof was not radicalized or made a white supremacist by his family or upbringing–no one in his family made him this way. *See* Compl. at ¶¶ 5 & 58. Instead, his radicalization was, in part, the result of targeted action by Facebook to exploit his susceptibility to "online engagement with the kind of white supremacist propaganda and ideology that leads to offline violence, including the white replacement theory" – materials which convinced Roof his actions were necessary to save the white race. *See id.* at ¶¶ 6-7. The Russian Defendants merely exploited the defective tools Facebook developed. *See id*. at ¶¶ 8-9. Facebook was a "substantial factor" in Roof's radicalization because Facebook "exposed [its] users to a defective product that caused psychological injury and *substantially increased the risk* both of online radicalization and of offline violence resulting from it." *Id*. at ¶¶ 10, 15-16.

Proliferating provocative, extreme, outrage-inducing content, over ethical protest within Facebook, was the result of "[d]ecisions made at the highest executive level … to develop social media *products* [designed to] maximize user engagement … without regard for the mental health and wellbeing of the users." *Id*. at ¶ 12, 15-16. Because of the "Facebook Papers," Frances Haugen and other former insiders, we know "[Facebook] understood [its] … products can and do cause

1

significant psychological and behavioral harm to [its] users."[1] Facebook ignores the vast majority of Plaintiff's allegations because they clearly show Plaintiff faults Facebook for product design decisions, *not* publishing or editorial activity.[2] Former Facebook Director of Monetization, Tim Kendall, confirmed not only this is by product design but also how easy an alternative safer design would be when he described Facebook's ability to dial up or down the type of emotional response it wants to produce as if this was as simple as adjusting the volume on a stereo. *Id*. at ¶ 178.

Evidence of Roof's own online radicalization supports, *inter alia*, he used Facebook, consumed harmful material on it, affirmed his world views through connections on and was active on it in the months leading up to his vicious attack. *Id*. at ¶ 13. It is also properly alleged Facebook knew how to manipulate Roof because it collected data on him (including regarding his Google use) and used it to "individually tailor" his Facebook experience "in a way best designed to modify [his] behavior." *Id*. at ¶¶ 14 & 96-97 (Facebook is designed to synergize with other platforms *via* shared learned user data). Plaintiff also adequately alleges Roof consumed harmful and radicalizing content fed to him by Facebook, Google and YouTube. *Id*. at ¶ 55.

---

[1] *See* Compl. at ¶¶ 17, 48 ("[Facebook] knew at least by 2014 that online radicalization leads to offline violence"), 49, 52 ("[Facebook] … knowingly exploited [the individual interests of its users] through highly-engineered, algorithm-driven behavioral and psychological manipulation" for profit), 94 (Per Haugen: "[Facebook's] leadership knows how to make Facebook … safer but won't … because they have put their astronomical profits before people").

[2] *See id*. at ¶¶ 98-164 & 170-186 (these paragraphs are replete with specific references to insider accounts of how Facebook designed its product to amplify hate, extremism and polarization and train and manipulate user thinking and behavior; based on its own internal research, it knew "[its] algorithms [*i.e.*, its product design] exploit the human brain's attraction to divisiveness" and because this has been completely unchecked (both by law and by lack of a moral compass on Facebook's part) "[fed users] more and more divisive content in an effort to … increase time on the platform"; Tim Kendall likened its product design to Big Tobacco's in its purposeful attempt to addict/harm; its design also relentlessly exploits black-white racial divide; Zuckerberg rejected "proposed changes to curb the tendency of the overhauled algorithm to reward outrage and lies"; Facebook has "long known its algorithms and recommendation systems [*i.e.*, its design] push some users to extremes"- it's product pushed "a barrage of extreme, conspiratorial, and graphic content" even to a fictitious account it created that had never expressed interest in same; Roger McNamee: "[t]he architecture and business model that make Facebook successful also make it dangerous" and make it "align … with extremists"; Chamath Palihapitiya (former VP for User Growth): "we have created tools that are ripping apart the social fabric of how society works"; Dipayan Ghosh (former Facebook privacy expert): "[t]he design of Facebook trained users to unlock their emotions, react without critical thought … [and] enable emotional contagion … that leads to violence"; "[its] defective algorithms… purposefully exploited hate and racial issues").

2

Attempting to distance itself and redraw the Complaint, Facebook conveniently ignores the allegations that while Roof's radicalization did start with a Google search, it was honed by his exposure to extremist groups on Facebook, including the "Council of Conservative Citizens" page that *Facebook*, not the CCC, created – Roof himself credits the world these products created in his mind as his reason for "taking action." *Id*. at ¶ 60, fn. 3, 62-63 (this was at a time Facebook chose to re-tune its algorithms to amplify these divisive/extreme messages). Again, its product design was intended to stoke tribalism and racial tension, exactly what moved Roof to violence.[3]

Per Roof's attorney: "[E]very bit of [his] motivation came from things he saw on the internet… that he downloaded from the internet directly into his brain." *Id*. at ¶ 69. Attorney General Lynch similarly concluded Roofs' ideology came directly from what he consumed on the internet. *Id*. at ¶ 73. And his sentiments grew in the months before the attack (in tandem with his visibility on and use of Facebook increasing). Per experts, Roof's *rapid* progression to extremism and violent real-world action was atypical and is explained by the power of the design of platforms, including Facebook, to psychologically manipulate users. *Id*. at ¶ 75. As alleged, Facebook either fails to understand (or feigns ignorance) Facebook was engineered to amplify the extremist beliefs that first entered Roof's mind through his now infamous Google search. *Id*. at ¶ 167.

Also since Facebook's argument amounts to 'there's not enough meat on the bone' to allege Facebook use was a causal factor in Roof's radicalization, it must be viewed with great

---

[3] *Id*. at ¶¶ 63-64 ("Facebook deliberately created the inherently racially biased tool chest that made [Russian & white supremacist radicalization efforts] possible"), 66 ("Online radicalization involves a systematic progression … *Heavily impacting the progression is Facebook's Ad recommendation algorithm*… typically responsible for more than 70% of all time spent on the site. Facebook *algorithms* created a business model that rewarded provocative content … while *those algorithms* also guided users down personalized paths meant to keep them coming back for more."), 71 (McNamee: Facebook deliberately tuned its algorithms to amplify extreme and hate-filled content where it would be most behaviorally influential), 76-82 (Haugen: Facebook learned negative-emotion-inducing content more effectively fostered user engagement and consciously made design decisions to increase its product's ability and propensity to amplify hate and control and modify user behavior, and knew as far back as 2014, its product disproportionately harmed minorities and race relations in general), 83-84 (Facebook essentially admits it designed its product this way for profit; it was not a bug in the system but a design feature in the face of mounting evidence, known to Facebook, that its product was directly fostering real world hate crimes and violence).

skepticism because Facebook jealously hides any further information than Plaintiff has pled about its own internal studies, its user-specific data, the inner-workings of its algorithms, and how (and why) its products were designed. *See id*. at ¶¶ 85-86, 120-21. Only Facebook is privy to the more intimate details of how its product targeted Roof and for that reason alone it would be unjust to dismiss Plaintiff's claims for lack of any more specific facts alleged than have been.

We know enough from Haugen and others, and have pled enough, to establish Facebook's "substantial factor" causation is at the very least plausible. That is, we know enough to plausibly allege Facebook made conscious *design* decisions *highly probably to drive users like Roof to racial violence*. *Id*. at ¶ 120-22. At the very least, limited discovery should be allowed before the Court could determine whether Facebook's role was "substantial" or "*de minimis*." It must be accepted as true at this stage: "Roof did not just find but was directed by Facebook, based on its algorithms' knowledge of [his] engagement on the internet (both on and off of Facebook), to groups or communities in which his views were cultivated, developed and made more extreme, ultimately taking Roof off of the internet and into the real world to commit violence (an eminently foreseeable result from Facebook's perspective, just one [it] was willing to tolerate/risk)." *Id*. at ¶ 89. Roof did not go straight from his Google search to committing mass murder–years of internet grooming in the interim, including on Facebook, are responsible for his gradual, albeit relatively rapid, progression from agitated internet user to violent criminal.

## LAW AND ARGUMENT

Facebook's arguments try to pierce the pleadings and have all inferences and conclusions drawn in its favor. This is particularly true regarding its proximate cause arguments wherein it relies heavily on what it views as a paucity of alleged facts of Roof's actual Facebook use. A fairer characterization would be a relatively lesser amount of detail regarding *specific* Facebook use that is impossible, without discovery, for Plaintiff to obtain. *See supra*.

4

The plaintiff's burden at the pleading stage is "relatively light." *U.S. v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 466 (E.D.N.Y. 2007) (citing F.R.C.P. 8(a), which requires only "a short and plain statement of the claim showing the pleader is entitled to relief")). In ruling on a motion to dismiss, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Id.* at 457-58. The complaint must "contain either direct *or inferential* allegations respecting all the material elements … under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007). The claims pled need only be "plausible *on [their] face*," meaning Plaintiff must plead sufficient factual allegations to "allow the court to draw *the reasonable inference* the defendant is liable for the misconduct alleged." *Twombly* at 570.

Plaintiff has alleged sufficient facts to justify *an inference* Facebook played a "substantial factor" in cultivating Roof's online radicalization. Discovery is imperative before anyone could draw *a conclusion* either way on the "substantial" part (as well as whether this determination must be made by the fact finder) because any further detail about Roof's Facebook use is in the sole possession of Facebook, which jealously conceals this data. Plaintiff has, adequately and to the fullest extent possible, pled sufficient allegations to raise Facebook's potential product liability for contributing to Roof's massacre in Charleston beyond the realm of mere speculation and should be allowed discovery and evidentiary briefing before the allegations are tested on their facts.

## I.     Plaintiff Has Plausibly Alleged Proximate (Cause-in-Fact & Legal) Causation

Facebook would have this Court ignore the concepts, well established under S.C. law, of "concurrent" and "substantial factor" causation in determining whether its fault was a *cause-in-fact* of Plaintiff's harm. As its argument goes, Roof's manifesto references a Google search as the start of his journey to mass racial murder (years later) and white supremacist websites (which, notably, have Facebook presences, as do their acolytes) as having further moved his thinking to

extremist action, so our platforms cannot be considered the "but for" cause of Roof's radicalization and actions. *See* Facebook brief at pp. 7-9. Facebook does at least admit Roof connected with like-minded white supremacists on Facebook and even curated the number of friends he kept to be a white supremacist dog-whistle. *See id*. at fn. 5. But the thrust of its argument is that because Roof referenced these other sources, Facebook cannot be considered the "but for" cause of the awful violence he committed in 2015 (even though it was after he had connected with other white supremacists on Facebook and likely affirmed ideas amplified by its algorithms – all reasonable inferences from Roof's known internet/Facebook activity, as pled; *see* Facts section, *supra*.).

But putting aside *how* the evidence (which Plaintiff is due in discovery before the well-pled claims can be tested on the facts) will connect the dots in the radicalization of Roof, the critical legal proposition Facebook ignores is Plaintiff need not plead Facebook was the sole (but for) cause of Roof's actions to survive the pleading stage. Plaintiff need only plead, and has sufficiently pled, Facebook played a critical role and how it played a critical role in Roof's radicalization and the foreseeable and grave harm it caused to Plaintiff and countless others. *See* Facts section, *supra*.

In a product liability action in South Carolina, a plaintiff must allege "the product defect proximately caused [her] injuries." *Little v. Brown & Williamson Tobacco Corp.,* 243 F. Supp. 2d 480, 498 (D.S.C. 2001). In turn, "[p]roximate cause requires proof of (1) causation in fact and (2) legal cause." *Id*. "Typically, a plaintiff may prove causation in fact by establishing that the injury would not have occurred 'but for' the defendant's negligence." *Id.* Facebook would have the analysis stop there such that maybe one of these other entities was *the* "but for" cause of Roof's actions, but that precludes the Court from finding any use of Facebook could bear a causal connection to Roof's actions. But South Carolina law does not stop there. Per *Little*:

> However, "[w]here several causes combine to produce injury, a person is not relieved from liability for negligence because he is responsible for only one of them. It is sufficient that his negligence is an efficient cause without which the

injury would not have resulted to as great an extent.... Consequently, if a person's negligence is a proximate cause of an injury to another, the fact that the negligence of a third party concurred with his own negligence to produce the harm does not relieve him of liability.... In such cases, both tortfeasors are in breach of a duty of care owed to the plaintiff and, because the negligence of both concurred to produce the injury, both are liable to the full extent of the plaintiff's damages."[4]

Stated otherwise, "[w]hen the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event." *Id*. "Thus… the defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury" and "a plaintiff … must show that it is more likely than not that the conduct of the defendant was a *substantial factor* in bringing about the result." *Id*.

In *Little*, the issue was whether the use of the defendant's brand cigarettes was either a "substantial factor" or a "*de minimis*" contributor to the plaintiff's lung cancer from cumulative exposure over time. *Id*. at 500. There is factual similarity here as Roof's radicalization was a gradual progression from cumulative exposure to sources of information (including Facebook) over time. Thus it is notable *Little* was decided on a full factual record establishing use of the defendant's brand constituted 1% or less of the plaintiff's cigarette consumption over decades. For pleading purposes, it is sufficient to allege use of the defendant's product was a contributing factor and it is generally an evidentiary (and factual) question whether the contribution was great enough "the injury would not have resulted to as great an extent" but for that defendant's conduct.

It must be inferred from Plaintiff's well pled allegations Facebook *could be* determined a substantial contributing factor to Roof's process of violent radicalization, which involved seeing concepts or "facts," affirming them through what was fed to him on other sites, connecting with

---

[4] 243 F. Supp. 2d at 498 (quoting *South Carolina Ins. Co. v. James C. Greene and Co.,* 290 S.C. 171, 348 S.E.2d 617, 620 (1986).

others and further confirming or enhancing beliefs (including on Facebook), and ultimately feeling the need to act since the online communities he had been led to were all talk and no action).

As to its "legal cause" argument, Facebook would have this Court term, *as a matter of law*, Roof's heinous actions as a completely unforeseeable and, therefore, "superceding" (as opposed to "intervening") cause of Plaintiff's harm. But it has been well pled and must be accepted as true Facebook was and had been well aware of its algorithms' dangerous propensity to radicalize users (particularly white supremacists) online and thereby directly spark offline violence (particularly racial violence). *See* Facts section, *supra*. The magnitude of the violence, the particular underlying animus for it, or the particular heinousness of the crime does not make it unforeseeable as a matter of law. Nor is Plaintiff required to prove Facebook should have foreseen the particular harm or type of harm that occurred for "legal" causation purposes. Finally, this question is particularly unsuitable for decision at the pleading stage, especially in light of the facts pled here.

The touchstone of this analysis is foreseeability: "For an act to be a proximate cause … the injury must be a foreseeable consequence of the act." *Wallace v. Owens-Illinois, Inc.*, 300 S.C. 518, 520, 389 S.E.2d 155, 156 (Ct. App. 1989); *see also Jolly v. Gen. Elec. Co.*, 435 S.C. 607, 624, 869 S.E.2d 819, 828 (Ct. App. 2011) ("legal cause [is] proved by establishing foreseeability"). "The test of foreseeability is whether some injury to another is [a] natural and probable consequence of the complained of act." *Id*. at 521. "Intervening" acts do not break this chain:

> On the contrary, the general rule is that one who does a wrongful act is answerable for all consequences that may ensue in the normal course of events. Any number of causes and effects may intervene between the original wrongful act and the final injurious consequence. **If the intervening acts are (1) set in motion by the original wrongful act and (2) are the normal and foreseeable result of the original act, the final result, as well as every intermediate cause, is considered in law to be the proximate result of the first wrongful cause**. The law focuses on the probable injurious consequences which were to be anticipated, not the number of subsequent acts which might intervene. *Id*. at 521-22.

"In other words, an intervening act does not break the chain of causation if it is a normal response

8

to the situation created by the original wrongful act." *Id*. The wrongful act alleged here is the design of a product, purposefully, to addict users and, as part of that, to drive extreme and negative emotional responses of the user which foster that addiction. Whistleblowers have testified under oath, and Plaintiff has properly pled, Facebook was aware this was occurring and consciously and willfully *enhanced its product to promote it further*. *See* Facts section, *supra*.

"Online radicalization" that results in offline violence is an eminently foreseeable result of designing a product as such *and for such purposes–i.e.*, this is exactly what happens when you design a product to psychologically manipulate and drive users to extremes. For Facebook to argue otherwise is a slap in the face to victims who have now heard under oath before Congress Facebook knew what it was doing and did it anyway (in many different ways and with many, varying, and foreseeable harmful results to millions, including victims of terrorist violence the world over). "[I]f the character of the intervening act … was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrongdoer, the causal connection is not broken …" *Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 309 S.C. 313, 317, 422 S.E.2d 128, 131 (1992). Facebook "can and should do more"–it can start by dropping the act it does not know the power of its own technology to cause good *and evil* on massive scales.

Moreover, while Facebook aims to convince the Court intervening *criminal* acts (especially those as appalling as Roof's) are, as a matter of law, "superceding" events that break the causal chain from any prior events that may have played a role in setting those events in motion, this is not South Carolina law. First, as a general proposition, "it is not necessary for the [defendant] to have been able to foresee the *particular* event which occurred"; rather, "[i]t is enough [he] should have contemplated the probable happening of some accident of this kind … and … **cannot shelter himself behind the defense that the <u>actual</u> consequence was one that <u>rarely</u> follows from that particular act**." *Oliver*, 309 S.C. at 317 (emphasis added).

9

Second, there is no *per se* intentional or criminal act exception to the intervening cause rule. Subsequent *negligence* of a third-party is almost always deemed foreseeable. *See, e.g., Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 89, 502 S.E.2d 78, 83 (1998). But the rule in South Carolina for intervening *willful, malicious or criminal* acts is tested the same way as "subsequent negligence" just worded differently: "The general rule of law is that when, between negligence and the occurrence of an injury, there intervenes a willful, malicious, and criminal act of a third person producing the injury, but that such was not intended by the negligent person **and could not have been foreseen by him**, the causal chain between the negligence and the accident is broken. *Stone v. Bethea*, 251 S.C. 157, 162, 161 S.E.2d 171, 173-74 (1968) (emphasis added). As detailed above, Facebook knows the power of its technology and that technology's global reach and capacity for social contagion and radicalization of users, such that it would be an injustice to say here, *as a matter of law*, Roof's actions were not a foreseeable result of design flaws Facebook knew could cause extreme emotional reactions and resulting extreme real-world violence.

Also, this case is emphatically not one where the "*occasional*" exception intervening conduct so "extraordinarily outrageous or appalling" proximate cause is broken "even if the result was foreseeable" should apply. *See Stroman v. Town of Santee*, 2005 WL 8164996, at *6 (D.S.C. 2005). Facebook argues otherwise mirroring this "appalling," "extraordinary," and "outrageous" language in its argument. It further terms *Stroman* a hard and fast exception to the intervening cause rule, but it is not. The 2005 <u>unpublished</u> decision <u>has never been cited or relied upon</u> in its nearly 20 year existence. This is not the case for its resurgence. The simple fact is Facebook is not a normal defendant and its platform is not a normal product—both Facebook's and its product's power and reach place Facebook in a category of defendants that should be held liable for global-scale or mass-violence scenarios foreseeably attributable to the social contagion and polarization they have knowingly and intentionally fostered (as pled). *See* Facts section, *supra*. (Facebook has

10

even acknowledged, albeit in mealy-mouthed fashion, its product has facilitated genocide and catastrophic violence). With great power comes great responsibility and one would be hard-pressed to find a defendant with more power that has taken less responsibility than Facebook. This Court should not provide Facebook further shelter.

Finally, "[o]rdinarily, the question of proximate cause is one of fact for the jury[,] and the [circuit court's] sole function regarding the issue is to inquire whether particular conclusions are *the only* reasonable inferences that can be drawn from the evidence." *See Jolly*, 435 S.C. at 624; and *Oliver*, 309 S.C. at 317 ("[L]egal cause is ordinarily a question of fact for the jury. Only when the evidence is susceptible to only one inference does it become a matter of law for the court."). At the very least, the jury should decide (1) whether Facebook should have foreseen mass violence from online radicalization resulting from its product design, and (2) whether notwithstanding same, it should get a pass because the violence committed was just too extraordinarily outrageous and appalling. It is a public insult for Facebook to boast its extraordinary global reach and power yet here argue 'we can't be held liable for violence this extraordinary even if we could have foreseen it.' What is extraordinary for the average person is business as usual for Facebook.

## II.     Social Media Products *Are* Products

In the past (outside of litigation), Facebook has always called its products, interchangeably, social media "platforms" or "products" and described its business as the creation of social media "products" for public consumption. It used the term "products" 513 times in its 10-K annual report to the SEC to refer to Facebook and its other *products*.[5] But since its § 230 "liability shield" has faced increasing attack, it has sought to redefine its products as "communication services." The

---

[5] Meta Platforms, Inc. Form 10-K Annual Rep. (Feb. 2, 2023) (*see, e.g.*, p. 3: "The term 'Family' refers to our Facebook, Instagram, Messenger, and WhatsApp **products**."), available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/e574646c-c642-42d9-9229-3892b13aabfb.pdf

purpose of this seemingly lawyer-driven self-reinvention is to try to take advantage of what it sees (or its lawyers see) as a strict legal dividing line between "tangible" and "intangible" things for purposes of application of product liability law. Even self-serving semantics aside, Facebook's argument misstates the law and is totally misplaced.

First, the "services" in cases into which Facebook seeks to fit itself are markedly different. Facebook is not a surgeon incidentally providing surgical implants as part of medical care, nor a building contractor who provides primarily a service., etc. It is an algorithm *designer* that designed its software to be addictive and dangerous. It provides, to its users, finished social media **products.** And these products, though only *quasi*-tangible (they are software products downloaded as "apps" and, as such, *tangibly* exist within individual users' devices), are fully capable of causing and do foreseeably cause significant harm to users and other downstream victims. The harms also stem not merely from the content consumed (or intangible "ideas or expression"), but from the meticulously designed features of these products that make them highly sophisticated mind-control devices meant to addict users and manipulate their behavior. The cases Facebook cites for its "product vs. service" argument are really more about the provider and that provider's typical role (*e.g.*, mechanic, surgeon, pharmacist, other professional/skilled-*labor* roles that don't typically involve sale or "injection" into commerce of products *developed by them*); they have little, if anything, to do with the thing itself and whether that thing is a "product" (there was no question a breast implant, a tire assembly, a pharmaceutical drug, etc. were products, it was just the person/entity being sued was not "selling" those products). Facebook is readily distinguishable. Facebook is in the business of injecting its products (its social media platforms) into the global stream of commerce. It doesn't install its apps for users or otherwise provide professional services to which its products (its apps) are merely incidental. The products (the apps) are what Facebook does. It is a software product manufacturer at its core.

12

Second, Facebook is simply wrong, and misleading in the extreme, to suggest there is no measurable basis for determining its social media products were defectively designed or that, otherwise, the policy goals underlying products law do not apply. Deterrence, reliance and the superior ability of Facebook to insure and project financial losses from its product design defects and spread the costs/losses caused thereby are all present (and discussed further below).[6]

As Facebook correctly points out, South Carolina has adopted the Restatement (Second) of Torts § 402A and the comments thereto. *See* S.C. Code Ann. § 15-73-10; and S.C. Code Ann. § 15-73-30 ("Comments to § 402A … are incorporated herein ..."). Where Facebook gets it wrong: § 402A and the states that follow it have not strictly limited its application (and application of product liability law generally) to "tangible" things like lawnmowers and toasters. In particular, states that follow § 402A have recognized software or computer programs as "products" capable of causing harm, capable of being unreasonably dangerous, and thus subject to application of product liability law. Indeed, precedent across "402A states" is against Facebook, as is South Carolina precedent (bearing in mind out-of-state authority regarding 402A's proper application is oft-relied upon in this state, particularly California cases (where 402A was born)).[7]

The principal South Carolina authority cited by Facebook for its position South Carolina would treat Facebook as a service rather than product do not squarely address any such question. As noted, these cases are about categorizing the provider-defendant being sued, not defining the thing that caused harm and none of the defendants in these cases even slightly resemble Facebook.[8]

---

[6] *See* Bergman, *Assaulting the Citadel of Section 230 Immunity: Products Liability, Social Media, and the Youth Mental Health Crisis*, 26 Lewis & Clark Law Rev. 1159, 1172 (and fns. 85-92) & 1190-94 (2023).

[7] *See Fields v. J. Haynes Waters Builders, Inc.*, 376 S.C. 545, 565, 658 S.E.2d 80, 91 fn. 3 (2008) ("As this Court has noted, authority from other jurisdictions interpreting … § 402A is persuasive in this determination since the General Assembly, in adopting § 15–73–10, codified the Restatement section nearly verbatim.")

[8] *See Fields*, 376 S.C. 545 (holding a home building contractor, although he is hired to supply a finished, built home, is "*primarily*" a service provider and the primary object of the contractor-consumer agreement is one for a service);

On the other hand, that this "tangible" vs "intangible" distinction is not what Facebook makes it out to be is driven home by the fact that South Carolina considers electricity to be a product once it has been "injected into the stream of commerce." *Priest v. Brown*, 302 S.C. 405, 411, 396 S.E.2d 638, 641 (Ct. App. 1990). Certainly, Facebook (which is downloaded on users' devices, stores user information, and is actually seen, touched and interacted with by the user in the normal course of use – *i.e.*, the user clicks the app, opens it, physically does things within it) are more "tangible" than electricity, which is usually not touched or handled in any way by the user or consumer.

As to California, that computer "software"—including specifically social media platforms (which unlike South Carolina, California has directly addressed)—is a "product" subject to product liability law is arguably beyond dispute. *See Hardin v. PDX, Inc.*, 227 Cal.App. 4th 159, 171 (2014) (rejecting the contention "'information' is not a 'product'" because "[plaintiff's] theory is that *PDX's software program*, not the information it produces, is the defective product"); *Lemmon v. Snap, Inc*., 995 F.3d 1085, 1092-93 (9th Cir. 2021) (holding product liability claims against Snap were viable where "[Plaintiff's] negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently designing *a product (Snapchat)* with a defect[.]"); *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 929–30 (N.D. Cal. 2021), *abrogated on other grounds by Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137 (9th Cir. 2022) (endorsing *Lemmon's* holding social media *products* can be subject to product law, but dismissing on § 230 grounds because plaintiff's claims would have required Twitter to alter content posted by users in contrast to the design defect claims alleged in *Lemmon*); *Simulados Software, Ltd v. Photon Infotech Priv., Ltd.*, 40 F.Supp. 3d 1191, 1199 (N.D.

---

*In re Breast Implant Prod. Liab. Litig.*, 503 S.E.2d 445 (S.C. 1998) (holding the surgeon who inserts breast implants is *primarily* providing a service (surgery), even though the surgery incidentally involves the delivery of a third-party product (the breast implant)); and *DeLoach v. Whitney*, 273 S.E.2d 768 (S.C. 1981) (tire valve stem installer provided a service, not a product – he was not a seller of tires or their component parts, but a true service provider, like in all these cases, which involved surgeons, building contractors, mechanics and other *classic* service providers).

Cal. 2014) ("Generally, courts have found that mass-produced, standardized, or generally available <u>software, even with modifications and ancillary services included in the agreement</u>, is a good that is covered by the UCC."). Again we need only look to Facebook's own public statements: it describes its platforms as "products" that are both standardized and generally available.[9] As for mass production, it characterizes its corporate goal as "[t]o build a *product* that connects people *across continents and cultures*…"[10]

Facebook relies heavily on the Ninth Circuit case that created this 402A "product-vs-service" distinction (*Winter v. G.P. Putnam's Sons*), but glaringly omits from its argument that *Winter* explicitly excluded "computer software" from what it deemed "services" or "intangibles" not subject to product law. 938 F.2d 1033, 1036 (9th Cir. 1991). Discussing the difference between "intangibles" that can support a product liability claim and those that cannot (like the *ideas or expressions* contained in the book "The Encyclopedia of Mushrooms"), the *Winter* court stated:

> The best analogy to an aeronautical chart is a compass. Both may be used to guide an individual who is engaged in an activity requiring certain knowledge of natural features. **Computer software that fails to yield the result for which it was designed may be another**. In contrast, *The Encyclopedia of Mushrooms* is like a book on how to *use* a compass or an aeronautical chart. The chart itself is like a physical "product" while the "How to Use" book is pure thought and expression.

Facebook also cites *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. 2022). But Judge Gonzales-Rodgers, who decided *Netflix* and has been assigned the Social Media Adolescent Addiction MDL (MDL 3047) has already indicated she views the MDL allegations (defective algorithms causing addiction and related harms by design) as different from those that underpinned

---

[9] Rob Goldman, *Hard Questions: What Information Do Facebook Advertisers Know About Me?*, META (Apr. 23, 2018), https://about.fb.com/news/2018/04/data-and-advertising/.

[10] *Id.* (emphasis added).

her decision finding Netflix was not subject to product liability law *in that case*.[11] As she wrote in *Netflix*, "plaintiffs' strict liability claim fails because it is premised on the content and dissemination of the show [on Netflix's platform]." The decision does not stand for the proposition *Netflix*, as an intangible software program, could never be considered a "product." *Id*.

Oregon case law also affirms social media platform software in particular is a product. *A.M. v. Omegle.com, LLC*, 2022 WL 2713721 at *4 (D. Or. 2022) ("Plaintiff alleges that Omegle is defectively designed… **In order to meet the obligation A.M. seeks to impose on Omegle, Omegle would not have to alter the content posted by its users—it would only have to change _its design and warnings_**. In that way, this case is easily distinguished from *Doe* and analogous to *Lemmon*.") (emphasis added). Of course, absent from *Omegle* is any indication the "product" alleged to have caused harm being an "intangible" social media platform in any way presented an obstacle. Texas and Louisiana have also recognized computer software as "products" and Georgia, in a case almost identical to *Lemmon*, also applied 402A to a social media platform.[12]

While some courts may have been fooled by Facebook's semantic-game argument or perhaps were simply presented with completely distinguishable claims and their rulings are being used for propositions they just do not stand for, the simple fact is the idea sophisticated products like machine-learning, algorithm-driven social media platforms should be treated more like the provision of surgical services, mechanic services, or any other *professional* or *skilled-labor-type*

---

[11] The relevant portion of the transcript can be obtained and provided to the Court if so desired. As in the MDL, the claims here are premised on design defects (purposeful design defects) in Facebook's platform that caused harm.

[12] *See Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 107 fn. 2 (Tex. App. 2000) ("We accept that the SeisVision software is a product"; Texas is a 402A state); *Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 600–01 (E.D. La. 2007) ("A product is defined as 'a corporeal movable that is manufactured for placement into trade or commerce …' LA.REV.STAT. ANN. § 9:2800.53. **The Louisiana Supreme Court has held that computer software is a corporeal movable**. ... Moreover, other courts and legal scholars have suggested that defective computer software may give rise to strict products liability in tort. *See* Restatement (Third) of Torts: Prod. Liab. § 19 (1998); *see also Winter[*, 938 F.2d at 1035]") (Louisiana products law is a statutorily somewhat modified version of 402A); and *Maynard v. Snapchat, Inc.*, 816 S.E.2d 77 (Ga. Ct. App. 2018).

services than what they are (highly-engineered, purpose-driven products) does not pass the smell test. Decontextualizing commentary that product law *generally* deals with the "tangible" over the "intangible" cannot change the reality–Facebook engineers and delivers software *products* for public consumption that are now widely known to carry myriad unreasonable risks of harm.[13] As understanding of how these highly-engineered social media products operate has grown, the proposition they are not, should not or cannot be considered "products" has proven hollow.

Justice Clarence Thomas, in a dissent that precipitated the full Court's decision to review *Gonzalez v. Google, LLC*, 2 F.4th 871 (9th Cir. 2021), similarly opined *software* product design flaws can and should support proper product liability claims. *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S.Ct. 13, 17 (2020) (statement regarding denial of cert.).[14] Likewise, the strong dissent(s) to the Ninth Circuit's decision in *Gonzalez* (urging the Supreme Court to take it up),[15] particularly that of Judge Gould, recognized traditional products liability theory should be a viable avenue to hold social media companies liable for harms caused by design of their products. 2 F.4th at 938 (concurring in part, dissenting in part).[16] Notably, in *Gonzalez*, the plaintiffs similarly seek to hold Google liable for the role of *its product design* in causing real-world violence.

---

[13] And, again, as detailed in the Fact section of this brief, *supra*, Facebook misleads in the extreme by trying to couch Plaintiff's Complaint as alleging product liability on its part for dissemination of *ideas or expression*. The Complaint premises Facebook's liability on *its actions* in *designing a product* meant to addict and drive users to extremes beliefs.

[14] Justice Thomas wrote: "A common thread through all of these cases [referring to, *inter alia*, *Force v. Facebook, Inc.*, 934 F.3d 53, 57 (2d Cir. 2019); *Doe v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016)] is that the plaintiffs were not necessarily trying to hold the defendants liable 'as the publisher or speaker' of third-party content…. *Their claims rested instead on alleged product design flaws*—that is, the defendant's own misconduct."

[15] N.b., every member of the Ninth Circuit panel expressed misgivings about the increasing breadth with which § 230 has been construed by lower courts. In recent oral argument, the Supreme Court seemed to share similar concerns. § 230 "immunity" has also been raised as a defense by Facebook here and is addressed in full *infra*.

[16] Judge Gould wrote: "[M]anufacturers are responsible in tort if they make unreasonably dangerous products that cause individual or social harm. Section 402A states: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused" to the user or a third party. **Here and similarly, social media companies should be viewed as making and "selling" their social media products**…. **If social media companies use "neutral" algorithms that cause unreasonably dangerous consequences, under proper standards of law … they might be held responsible.**" (emphasis added).

Finally, even if this Court were operating on a clean slate, §402A's historical underpinnings support the application of products law.[17] Just as it did to Justice Traynor nearly 80 years ago in *Escola v. Coca Cola Bottling Co.* (out of which § 402A arose), in this new technology-driven world, "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market … the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business … [and] the public interest [is] to place the responsibility for whatever injury [such products] may cause upon the manufacturer, who … is responsible for its reaching the market." 24 Cal. 2d 453, 462 (1944) (Traynor, J., *concurring*). It is illogical to assert these policies have no application to Facebook (one of the richest companies in the world) simply because its products are meticulously designed software applications rather than lawnmowers or toaster ovens.

These platforms "operate on complex computer algorithms that are invisible and incomprehensible to ordinary users"–this "wide disparity of information" between the user and the manufacturer squarely brings into play the public policy imperative that liability be affixed "on the party in the best position to reduce the hazards to life and health posed by [the product]." Bergman at 1190 (citing *Escola*, 150 P.2d at 440). Additionally, "based on their design, operation, and monitoring algorithms that fuel consumers' use of their products, social media companies can anticipate many hazards and guard against the recurrence of others while the public cannot." *Id*. at 1191 (citing *Escola* at 440-41). The overwhelming cost of injury can also best be insured by social media product manufacturers "as a cost of doing business." *Id*. (citing *Escola* at 438). And the magnitude of the risk (spurring acts of terrorism and otherwise negatively affecting youth mental

---

[17] These bedrock principles must also be viewed in context of the profound impact a contrary ruling would have on product liability claims against the makers of, *e.g.*, applications for self-driving cars, autopilot for airplanes, or virtual reality programs. In revealing fashion, recognizing its product liability duties, Facebook discloses in its own warnings for its virtual reality headset that it creates the risk of "severe dizziness, seizures, epileptic seizures or blackouts."

health on a global scale) certainly merits the best protection the law can provide and which the Facebook is best positioned to provide. And the "insurance goal" or, more generally stated, "the interest of economic efficiency" would also be served by applying product law to social media products and thereby forcing the social media manufacturers to pay closer attention to the balance struck between harm risks and profit goals. *Id*. at 1191-92 (internal citations omitted).

The sheer and rising complexity of these products (and, hence, the disparity of knowledge regarding their operation between Facebook and users), only bolsters the need for products law to apply here. *Id*. at 1192 (citing Landes & Posner, *A Positive Econ. Analysis of Products Liability*, 14 J. Legal Stud. 535, 547-51 (1985)). And users have in no way assumed the risk: "because the nature of the product's inherent risk is not readily apparent to consumers—the harmful element of social media platforms, *i.e.*, the exploitation of human psychology to generate revenue, is part of their design—there is no reason to assume that users have accepted a known risk." *Id*. at 1193 (citing Zakon, *Optimized for Addiction: Extending Prod. Liab. Concepts to Defectively Designed Social Media Algorithms…*, 2020 Wis. L. Rev. 1107, 1129 (2020)). Manufacturers have a duty to test and inspect their products and keep abreast of scientific knowledge, discoveries and advances, such that subjecting Facebook to a product liability regime will ensure it does its duty rather than completely disregard any legal duty whatsoever. *Id*. (internal cit. omitted).

Whistleblowers have revealed Facebook meticulously tests and inspects its products, constantly tweaks them and also performs internal studies (using its users as lab rats) of their effects, and doesn't just disregard or disclaim any legal duty, but actually uses the learned information to make its products *ever more harmful and addictive*, showing complete disdain for any notion it has a duty to not create products that pose an unreasonable risk of harm to users. *See* Facts section, *supra*. The notion Facebook's social media platforms are not "products" subject to product liability law is just plain wrong as a matter of law and policy.

### III.     There Is No Requirement Plaintiff Be a "User or Consumer" (as Facebook Defines These Terms) to Recover

Under South Carolina law, the determination of who constitutes a "user" for purposes of imposing strict liability upon a product manufacturer or seller requires a case-by-case analysis. *Lawing v. Univar, USA, Inc.*, 415 S.C. 209, 781 S.E.2d 548 (S.C. 2015). S.C. Code Ann. § 15–73–10 (2005) provides "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer ... is subject to liability for physical harm caused to the ultimate user or consumer..." But it does not define "user" (or "consumer" for that matter). Instead, the General Assembly expressly adopted the comments to § 402A—which discuss the meaning of "user"—as the expression of legislative intent for that section. *See* S.C. Code Ann. § 15–73–30 (2005). Comment I to § 402A, titled "User or consumer," provides in pertinent part:

> In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller... **It is not even necessary that the consumer have purchased the product at all**. He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser. (emphasis added)

"User" under South Carolina product liability law clearly includes those in the zone of danger of the final purchaser, such as a family member, employee, guest, donee, or otherwise, and "consumer" also includes in its scope downstream victims beyond "those who in fact consume the product." *See id.* and cases *infra*. As the jurisprudence discussed below also shows, direct contact with the product (*i.e.*, actual use or consumption as Facebook argues) is not required either.

In *Bray*, the S.C. Supreme Court found an employee who suffered emotional distress after watching a trash compactor crush a coworker was a "user" of the compactor for purposes of § 15–73–10 because she was operating the controls of the defective trash compactor at the time of the accident. 356 S.C. at 116. Further, in line with comment O, The Court held a "bystander liability" analysis was not required because a "user of a defective product is not a mere bystander but a

primary and direct victim of the product defect." *Id.* at 117. The clear implication of this being

"bystanders" or foreseeable downstream victims are in the zone of danger (*i.e.*, considered "users

or consumers") for product liability purposes simply because anyone who comes into contact with

the harmful effects of a product – whether direct purchaser, downstream purchaser, user, or one

who happens to fall victim to the use of the defective product despite having not directly used it

nor having had any actual direct contact with it – is a *foreseeable* victim of a defectively designed

product that creates an unreasonable risk *of such harm*.[18]

      Just as the term "sale" or "seller" is "merely descriptive" and no actual sale is required (*see*

fn. 18), the merely descriptive terms "user or consumer" are similarly not so limiting with respect

to the scope of foreseeable product victims. In *Comm. of Pub. Works of City of Charleston v.

Costco Wholesale Corp.*, 2021 Wl 5908758, at *4-5 (D.S.C. 2021), not being a "user or consumer"

(as Facebook would define) did not bar the action. The plaintiff was the City Public Works

Department that had to deal with clogging of city pipelines by the flushing of defective wipes by

"users or consumers." The City did not purchase, use or consume the wipes but *foreseeably* came

into contact *with their harmful effects* on its sewer system. Likewise, in *Wallace v. Owens-Illinois,

Inc.*, the plaintiff was not a "user or consumer" (again, as per Facebook's *ipse dixit* definition) but

someone who happened to walk where a spill had been created by a defective glass bottle that

exploded. The fact he merely had contact with *the downstream effects* of the product defect and

not the product itself again was no bar to application of S.C. products law. 300 S.C. at 520-21.[19]

---

[18] Strict interpretations like Facebook urges with respect to "user or consumer" have been rejected with respect to other catch-all terms in S.C. products law. *E.g.*, no "sale" of any product *to anyone* is a prerequisite. *See Henderson v. Gould, Inc.*, 288 S.C. 261, 267-68, 341 S.E.2d 806, 810 (Ct. App. 1986) ("Although Section 402A and [] 15-73-10 use the terms 'sells' and 'seller,' these terms are merely descriptive and the doctrine of strict liability may be applied if the requirements for its application are otherwise met … 'the product need not be actually sold if it has been injected into the stream of commerce by other means' …]"); *see also Priest*, 302 S.C. at 411.

[19] *See also Funchess v. Blitz USA, Inc.*, 2010 WL 4780357, at *2 (D.S.C. 2010) ("15-73-10 provides that a seller of a defective product may be liable even if [t]he user or consumer has not bought the product from or entered into any

Since there is no S.C. precedent to the contrary upon which Facebook can rely, it must be assumed these cases simply heeded the "Caveat" to 402A (statutorily incorporated into S.C. law, as noted): "The Institute expresses no opinion as to whether the rules stated in this Section may not apply [] to harm to persons other than users or consumers[.]" § 402A, "Caveat" (1965). All in all, the three required elements of a S.C. product action do not include an element the victim be a "user or consumer" and South Carolina has recognized "[i]f a person is considered a 'direct victim' for the purposes of proximate cause analysis" this suffices for all types of product liability causes of action. *See Fisher v. Pelstring*, 817 F. Supp 2d 791, 817 (D.S.C. 2011). The three elements are: "(1) [the plaintiff] was injured by the product; (2) the injury occurred because the product was in a defective condition…; and (3) the product at the time of the accident was in essentially the same condition as when it left the hands of the defendant" – the terms "user or consumer" appear nowhere in that iteration of the basic elements a product liability plaintiff must allege. *Id*.

Plaintiff's exposure to harm from Facebook's product is not meaningfully distinguishable from the above cases. That radicalization of an individual through social media can and often does result in violent harm befalling those a step removed from actual, physical "use" of the product is foreseeable, and that such downstream harms can be remedied under S.C. product law is nothing new. Here, Plaintiff was a "primary and direct victim of the product defect." *Bray* at 117. The Complaint and the Facts section, *supra*, painstakingly detail how Facebook's product is defective in such a way as to foreseeably and directly cause the exact type of harm alleged. Under S.C. law, it is a question of fact for the jury whether Plaintiff suffered offline harm due to the unreasonably dangerous maximization of Roof's online engagement. *See  Ervin v. Cont'l Conveyor & Equip.*

---

contractual relation with the seller"); *Delaney v. Towmotor Corp.*, 339 F.2d 4 (2d Cir. 1964) (manufacturer of a forklift gave a demonstration to the plaintiff's employer; the plaintiff was neither a "user" or "consumer" of the forklift as Facebook would have those terms defined; the plaintiff was injured by it nonetheless; product liability attached).

*Co.*, Inc., 2009, 674 F.Supp.2d 709.[20] At the very least, the Complaint presents a valid jury question as to whether defects in the design of Facebook's product foreseeably and substantially contributed to Roof's massacre (and, thus, Plaintiff's harm). For these reasons, it has been plausibly alleged Plaintiff was a direct victim of the alleged product defect and thus a "user or consumer."

## IV.    Plaintiff Has Plausibly Alleged A Duty of Care Owed to Her by Facebook

In an action alleging negligence under South Carolina law, a plaintiff must show (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached the duty by a negligent act or omission, (3) the defendant's breach was an actual and proximate cause of the plaintiff's injury, and (4) the plaintiff suffered injury or damages. *Dorrell v. S.C. Dep't of Transp.*, 361 S.C. 312, 318, 605 S.E.2d 12, 15 (2004). Plaintiff being a foreseeable victim of a foreseeable type of harm caused by Facebook's defective product establishes a tort duty in negligence (negligence is but one form of a proper product liability action under South Carolina law).

But assuming for argument's sake Facebook's position it had no independent "duty to act" is not just Facebook's confusing the issues, the trier of fact could conclude Facebook *assumed* such a duty. "While there is generally no duty to act under the common law, a duty to use due care may arise where an act is voluntarily undertaken." *Vaughan v. Town of Lyman*, 370 S.C. 436, 446, 635 S.E.2d 631, 637 (2006). "The question of whether such a duty arises … may depend on the existence of particular facts. Where there are factual issues regarding whether the defendant was in fact a volunteer, the existence of a duty becomes a mixed question of law and fact to be resolved by the fact finder." *Id*. at 446-47. The recognition of a voluntarily assumed duty in S.C. jurisprudence is rooted in the Restatement (Second) of Torts § 323 (1965):

One who undertakes, gratuitously or for consideration, to render services to another

---

[20] It bears repeating plaintiff need not prove that the actor should have contemplated the particular event which occurred, it need only be a natural and probable consequence of the event, or in product cases, of the product's defective condition. *Rife v. Hitachi Const. Machinery Co., Ltd.* (S.C.App. 2005) 363 S.C. 209, 609 S.E.2d 565.

which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.

Thus, under § 323, the voluntary undertaking creates a duty when the undertaker fails to exercise reasonable care in performing the undertaking that increases the risk of harm to the plaintiff. State and federal courts in South Carolina have not decided whether § 323 applies to a social media company's undertaking of seeking to maximize user engagement in the unprotected hate speech context. It is logical though that if the social media company's failure to exercise due care in the undertaking of maximizing user engagement increases the risk of harm to a third person who is then injured, the company may be held liable under the common law of negligence for failing to exercise the duty of care owed under the circumstances of the undertaking.

Thus, while Facebook might not have an affirmative duty to prevent its users from carrying out offline violence against third parties, it can be held liable if its actions increase the risk such offline violence will occur. It has been plausibly alleged Facebook increased the risk Roof would commit offline violence. So the only question for the Court is whether it has been plausibly alleged Facebook *foreseeably* increased risk of harm *to Plaintiff* and thus owed a duty to be reasonably careful when seeking to maximize user engagement.[21] Plaintiff's Complaint plausibly alleges Facebook increased the foreseeable risk of direct harm to Plaintiff through this undertaking with full knowledge of the psychological impact its engagement maximization efforts have on users, full knowledge its product has a propensity to drive ever increasing online extremism that often leads to massive real-world violence, and full knowledge its algorithms prioritize hate speech and

---

[21] Again, Plaintiff does not allege any duties outside of the product liability context. As Plaintiff is a foreseeable victim of Facebook's defective product, this discussion of whether Facebook "assumed" an affirmative duty "to act" is really just an academic exercise. Plaintiff's negligence claim is a negligent product design claim. Facebook is merely trying to further give the impression the case against it here has to do with publishing activity. It does not.

misinformation. *See* Facts section, *supra*. Taken together, Plaintiff has plausibly alleged Facebook voluntarily undertook a duty to prevent offline harm to foreseeable parties.

## V.    Plaintiff's Well-Pled Product Liability Action Does Not Run Afoul of § 230

The three-prong analysis applied by the Fourth Circuit regarding the Communications Decency Act, 47 U.S.C. § 230 is not here contested. This dispute turns on only one of its required elements: whether Plaintiff's claims seek to treat Facebook as the "publisher or speaker" of content posted by third parties.[22] Despite Facebook's best attempts to couch Plaintiff's allegations as attempts to hold it liable *as the publisher or speaker* of third-party offending content, this is explicitly not the case. Throughout Plaintiff's Complaint, she painstakingly makes the case Facebook's substantial contribution to Roof's actions (that directly and proximately harmed her) is *not* any of Facebook's "publishing" activity nor inactivity (such as failing to remove content, failing to monitor posted content, etc.). *See* Facts section, *supra*. Rather, Plaintiff makes quite clear the basis of Facebook's liability–*i.e.*, the basis on which it was a substantial factor in radicalizing Roof to the point he committed mass murder–*is its own intentional and defective design of its own products* (*i.e.*, its own actions, not a failure to control or monitor anyone else's). *See* Facts section, *supra*.

As long as § 230 is overbroadly and improperly interpreted to insulate defendants like Facebook from product liability actions based not on their roles as "publishers" of third-party content but on their roles as developers of unreasonably dangerous products, Facebook will only go further in manipulating users for its own gain and at the users' and society's and terror victim's (like Plaintiff) expense. Luckily, neither current Fourth Circuit law, nor § 230's text, nor prevailing scholarly commentary (and more recent judicial opinions) stretch § 230's reach that far.

---

[22] Plaintiff does not contest Facebook is an "interactive computer service provider." And, *at least at this point*, without the benefit of discovery, Plaintiff does not assert the content Roof consumed was not wholly "third party content."

Facebook would have this Court begin and end its analysis (or at least intensely focus its analysis) on the much older Fourth Circuit authority regarding § 230 of *Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997);[23] and *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009),[24] both of which address classic § 230 "immunity" scenarios completely distinguishable from the facts alleged here. Specifically, both dealt with allegations the internet service provider failed to remove actionable third-party content and thus became liable for that content. *Zeran* at 328 ("AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter"); *Nemet* at 252 (same). This is clearly within the statutory language and purpose of § 230, which *does* immunize defendants like Facebook against claims seeking to hold them liable for third-party content. This is § 230's stock and trade.[25]

Facebook all but ignores more recent Fourth Circuit authority of *Erie Ins. Co. v. Amazon.com, Inc.* and *Henderson v. Source for Pub. Data, LP*, both of which not only set out to correct overbroad readings or applications of *Zeran* and *Nemet*, but also explicitly excluded from § 230's scope claims like those here, which do not seek to hold Facebook liable for third-party *content* but rather for its own *conduct* as the manufacturer of a defective product. *See Erie*, 925 F.3d 135, 139–40 (4th Cir. 2019) ("While the [CDA] protects interactive computer service

---

[23] The internet at the time of *Zeran* (1997), decided immediately after the CDA's passage in 1996, is unrecognizable to the modern internet world. This case predated algorithms like those at issue, predated the existence of Facebook, and certainly predated the sophisticated tools built into social media products to machine-learn, addict manipulate and modify users' thinking and behavior. *See* Bergman at 1178 ("The [CDA] was enacted in 1996 when just 7% of Americans had access to the internet, Netscape was the dominant search engine, Google did not exist, and Facebook's launch was eight years away.") (internal cit. omitted).

[24] *Nemet* relied for its decision on *Zeran*'s anachronistic precedent.

[25] The only other South Carolina precedent Facebook relies upon is similarly distinguishable. See *Westlake Legal Grp. v. Yelp, Inc.*, 559 F. App'x 481, 485 (4th Cir. 2015) (no product liability claims asserted; instead, the plaintiff was attempting to treat Yelp as a contributing "content provider" within the meaning of § 230). *See also Cox v. Twitter, Inc.*, 2019 WL 2513963, at *3 (D.S.C. 2019) (also no product liability claims asserted; the plaintiff explicitly sought to hold Twitter liable for banning/censoring his account).

providers from liability *as a publisher of speech*, **it does not protect them from liability as the seller of a defective product**.") (bold emphasis added).

In *Henderson*, the Fourth Circuit explained publisher liability has two requirements. First, a publisher is someone who disseminates information to third parties. But information dissemination is "not enough." A claim does not treat the defendant "as the publisher or speaker" of that information unless it, second, "seeks to impose liability based on that information's improper content." 53 F.4th at 121; *see also id.* at 129 ("Section 230(c)(1)… does not insulate a company from liability for all conduct that happens to be transmitted through the internet. Instead, [it] extends only to bar certain claims, in specific circumstances, against particular types of parties."). *Henderson* went even further insofar as it dispelled the notion Facebook has doggedly maintained that § 230 applies in all cases where the harm would not have occurred "but for" the content published. *See* 53 F.4th 110, 122-23 (4th Cir. 2022) (citing and quoting *Erie* at 139-40):

> This improper-content requirement helps dispel Public Data's notion that a claim holds a defendant liable as a publisher anytime there is a "but-for" causal relationship between the act of publication and liability.... **This "but-for" publication test would say a claim treats an entity as a "publisher" under § 230 (c)(1) if liability hinges in any way on the act of publishing. This but-for test bears little relation to publisher liability at common law. To be held liable for information "as the publisher or speaker" means more than that the publication of information was a but-for cause of the harm.**

In short, Fourth Circuit law fully countenances claims like those alleged here are viable from a 230 standpoint because § 230 prohibits derivative liability for third-party speech. It does not prevent claims that seek to hold a social media defendant liable *in its role as product manufacturer*). In such a situation, "[t]o make this determination [whether the claim treats the defendant as "publisher or speaker"], we look to see what the plaintiff in [the] case must prove." *Henderson*, 53 F.4th at 124. Nowhere in the elements of a South Carolina product liability claim is there any necessity Plaintiff prove Facebook was the publisher or speaker of content, let alone

improper content. *See* S.C. Code Ann. § 15-73-10; *Fisher*, 817 F.Supp. 2d at 817 ("In a products liability action, regardless of the theory on which the plaintiff seeks recovery, he must establish three elements: (1) he was injured *by the product*; (2) the injury occurred because *the product* was in a defective condition, unreasonably dangerous…; and (3) *the product* … was in essentially the same condition as when it left the hands of the defendant.").

Likewise, Plaintiff does not allege Facebook's product is unreasonably dangerous because of any particular content or, for that matter, because of any publishing activity by Facebook. In the parlance of the above case law, to meet its duty as alleged by Plaintiff, Facebook would not need to remove, censor, better monitor, or otherwise alter or do anything with respect to "publishing" certain content (or, on the other hand, deciding not to "publish" certain content). Rather, to meet its duty (again, as alleged by Plaintiff), Facebook would only have to re-design its own products to reduce the unreasonable risk of addiction and psychological manipulation of users these products–independent of any particular content–are designed to foster. As *Henderson* and *Erie* reflect, § 230 does not touch such claims. In fact, state-law product liability actions were probably among the many claims Congress had in mind when it included § 230(e)(3)'s "savings" clause: "Nothing in this section shall be construed to prevent any State from enforcing any State law *that is consistent with* this section." If the defendant's liability does not hinge on publication of another's speech, but rather its own independent conduct (*e.g.,* designing its product), a state law action so premised "is consistent with" § 230 and not precluded.

To the extent Facebook relies on extra-circuit cases that do not comport with *Henderson*, *Henderson* is controlling and contrary extra-circuit precedent must be disregarded. But Facebook similarly paints these extra-circuit cases with a broad brush and ignores decisions that agree with *Henderson* in rejecting Facebook's central premise, which is: if Plaintiff would not have been harmed "but for" the content, the claim against the internet platform (no matter how styled) is one

that treats it as "publisher or speaker." Not just as a matter of logic, but as a matter of more refined reading of these cases, this is not the prevailing extra-circuit law. *E.g.*, with respect to § 230 law in the Ninth Circuit, Facebook centrally relies on *Dyroff v. Ultimate Software Grp., Inc.* for the broad legal stance 'algorithms are protected' and 'algorithm design'-based product claims are barred by § 230 if the content consumed was a proximate cause of the harm. *See* Facebook's Brief at p. 29 (discussing 934 F.3d 1093 (9th Cir. 2019)). But Facebook ignores that *Lemmon* (decided *two years later*) rejects the notion content being a proximate cause prevents product claims asserting the design of a social media platform independently contributed to the harm. *See* 995 F.3d at 1092-93:

> To the extent Snap maintains that CDA immunity is appropriate because the Parents' claim claim depends on the ability of Snapchat's users to use Snapchat to communicate their speed to others, it disregards our decision in *Internet Brands*. **That Snap allows its users to transmit user-generated content to one another does not detract from the fact that the Parents seek to hold Snap liable for its role in violating its distinct duty to design a reasonably safe product. As in *Internet Brands*, Snap "acted as the 'publisher or speaker' of user content by" transmitting Landen's snap, "and that action could be described as a 'but-for' cause of [the boys'] injuries."** 824 F.3d at 853. This is unsurprising: Snap "is an internet publishing business. Without publishing user content, it would not exist." *Id.* <u>**But though publishing content is "a but-for cause of just about everything" Snap is involved in, that does not mean that the Parents' claim, specifically, seeks to hold Snap responsible in its capacity as a "publisher or speaker."**</u> *Id.* <u>**The duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content**</u>. (emphasis added).

Facebook similarly disregards *Doe v. Mindgeek USA Inc.* (abrogated on other grounds concerning a statute not relevant nor pled here), which rejected broad readings of *Dyroff* like Facebook's). This later case, as well, observed claims based on defective design of an internet platform that make it unreasonably dangerous (in *Mindgeek* – by designing it to facilitate/promote child sex trafficking; here – by designing it to facilitate/promote addiction and harmful user behavior) survive notwithstanding the fact third-party actions on the platform were a necessary, "but for" cause of the ultimate harm. *See Doe v. Mindgeek USA Inc.*, 574 F. Supp. 3d 760, 771

(C.D. Cal. 2021), *abrog. by Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137 (9th Cir. 2022).[26]

Likewise, cases like *Fields v. Twitter* (also relied upon by Facebook) are not inapposite. *See* 217 F.Supp. 3d 1116, 1121 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018) ("courts must ask whether **the duty that the plaintiff alleges** the defendant violated derives from the defendant's status or conduct as a publisher or speaker"). The duty Plaintiff asserts Facebook violated is the duty to design reasonably safe social media products that do not foreseeably cause users to engage in behavior harmful to both self and others; this duty has absolutely zero to do with Facebook's "status or conduct as a publisher or speaker," again, it invokes Facebook's duty as a *product manufacturer*. It is of no moment the product designed is one with a purpose of allowing third-party content sharing. Under Fourth Circuit law and prevailing Ninth Circuit law, that the content on the platform contributed to the harm does not and cannot insulate the platform's independent product design decisions from scrutiny under generally applicable product liability law, which is, notably, not "inconsistent" with § 230 as a matter of law and logic.

Facebook also relies upon *Doe through Next Friend Roe v. Snap, Inc.*, 2022 WL 2528615 (S.D. Tex. 2022). But this case cited approvingly to *Lemmon's* basic premise that product design decisions can support liability claims against social media platforms (even when content plays a role in the harm) notwithstanding § 230. *See id*. at *14. The simple fact is–as *Doe through Roe* observed–the claims before it were just "distinguishable from those in *Lemmon*" because they "all [sought] to hold Snap liable for messages and photos sent by [a third-party child predator.]" *Id*. Plaintiff's allegations here mirror those in *Lemmon*–of course, the content played a causal role in

---

[26] As quoted from *Mindgeek* at 771: "However, *Gonzalez* clearly requires that a court evaluate the purpose and design behind the defendants' platform and whether it was created for an unlawful purpose. … While Plaintiff's allegations evaluated independently of each other may not amount to a situation in which Section 230 immunity is vitiated, the allegations considered together, **including that the Defendants' business model** would be devastated by simple tools such as age verification, indicate otherwise. … Read in the light most favorable to Plaintiff, the allegations establish that part of Defendants' **operating model** depends upon the development and creation of child pornography and that **their tools are designed** to elicit that exact content." (emphasis added).

radicalizing Roof, but that does not detract from Facebook's design having played an independent role in manipulating and driving him to extreme thinking and behavior. *See* Facts section, *supra*.

Finally, the Eastern District of Pennsylvania decision of *Anderson v. TikTok, Inc.*, which of course is not controlling, is at odds with *Henderson* and should not be followed. 2022 WL 14742788 (E.D. Pa. 2022). It represents what Plaintiff would call the high-water mark of overbroad decisions interpreting § 230 in that it completely immunizes algorithm (product) design decisions in claims styled much like Plaintiff's from liability.[27] The Fourth Circuit, many Ninth Circuit judges, and Justice Thomas have indicated this takes § 230 way beyond its language and intent. So this extra-circuit, district-level decision (which is on appeal and will be directly impacted by *Gonzalez* – discussed *infra*) should certainly not be the basis of dismissal at this stage.

**Gonzalez and U.S. Supreme Court Foreshadowing**. The 'overwhelming' cross-circuit authority Facebook claims supports its position must be viewed with great skepticism in light of the fact the U.S. Supreme Court, first through Justice Thomas' statement in *Malwarebytes* and later in its decision to confront the issue of overbroad interpretations of 230 head on in *Gonzalez*[28] (per J. Thomas' recommendation), is now in the process of deciding where along the spectrum of cases like *Lemmon*, *Henderson*, *Force*, etc. the true scope § 230 "immunity" falls.

The above portion of this brief asserting Facebook's products are "products" discusses the

---

[27] Views such as this, as scholars have observed, "have 'produced an immunity from liability that is far more sweeping than anything the law's words, context and history support.'" Bergman at 1182 (quoting Citron & Wittes, *The Internet Will Not Break: Denying Bad Samaritans § 230 Immunity*, 86 Fordham L. Rev. 401, 408 (2017). For full discussion of *Gonzalez*'s potential impact on this and other cases as well as the manner in which the Ninth Circuit justices decried previous interpretations of § 230 by which it found itself bound, *see id.* at 1186-1190 & 1200-1201.

[28] 2 F.4th 871 (9th Cir. 2021). The Supreme Court granted review of *Gonzalez* on October 3, 2022 and just heard oral arguments on February 22, 2023. This Ninth Circuit decision, discussed above, concerns the scope of § 230 – the issue in the case is whether 230 immunizes interactive computer services when they make targeted recommendations of information provided by another information content provider, or only limits the liability of ICS's when they engage in traditional editorial functions (such as deciding whether to display or withdraw) with regard to such information. This will be the first time the High Court opines on 230's contours and will shape litigation such as this. And, as Justice Thomas previously indicated in *Malwarebytes*, the Supreme Court is more likely to narrow immunity under § 230 than maintain current overbroad and statutorily-ungrounded viewpoints.

Ninth Circuit's views in the underlying *Gonzalez* decision that motivated all the judges to question the broad readings § 230 has been given and many of them to also implore the Supreme Court to take up the case and clarify things such as whether, *inter alia*, state product liability causes of action fall outside of § 230's scope. By all indications, the Supreme Court is poised to rein in *to some extent* the so-called "prevailing" authority that effectively provides internet or social media companies "blanket immunity" from nearly all types of lawsuits or causes of action. Notably, the litigants in the Gonzalez appeal agreed Henderson was correctly decided.[29]

Even non-legal observers (and political bodies) are now privy to the hotly debated topic of § 230 and how it has been interpreted, improperly, in ways that "declare 'a general immunity from liability deriving from third-party content'" and in so doing "create a lawless no-man's-land on the Internet" Congress did not intend and the statute does not support. *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852-53 (9th Cir. 2016) ("Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet..."). There is "growing recognition among leading jurists, legal scholars, public commentators and government officials that broad interpretations of § 230 accorded by courts contravene its legislative intent and public policy."[30]

## VI.    Plaintiff Has Plausibly Alleged A Knowing and Intentional Conspiracy Between Facebook and the Russian Defendants

---

[29] *See* Oral Arg. Tr. 3, *available at* https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/21-1333_p8k0.pdf (petitioners' counsel stating "Henderson correctly interprets the statute"); *id.* at 144 (respondent's counsel stating Henderson's "test is correct"); U.S. Br. 16, *available at:* https://www.supremecourt.gov/DocketPDF/21/21-1333/249441/20221207203557042_21-1333tsacUnitedStates.pdf (discussing *Henderson* with approval).

[30] *See* Bergman at 1184 and fns. 176-79 (citing 164 Cong. Rec. S1849, 1860; Citron & Wittes, *The Problem Isn't Just Backpage: Revising Section 230 Immunity*, 2 Geo. L. Tech. Rev. 453, 461 (2018) (discussing C.J. Easterbrook's majority opinion in *Chi. Laws. Comm. for C.R. v. Craigslist*, 519 F.3d 666 (7th Cir. 2008); Daniela C. Manzi, *Managing the Misinformation Marketplace: The First Amendment and the Fight Against Fake News*, 87 Fordham L. Rev. 2623, 2642-43 (2019); specific citations to the litany of investigative news articles illustrating this point are omitted for brevity's sake). *See also* C.J. Katzmann's partial dissent in *Force*, 934 F.3d at 76-83 (wherein he observed there is no basis for concluding algorithmic content recommendations constituted "publishing activity" that Congress sought to protect) (discussed at length in Bergman at 1184-85 and favorably invoked by J. Thomas in *Malwarebytes* at 17.

Facebook contends Plaintiff's allegations it conspired with the Russian Defendants are not only conclusory but "outrageous and irresponsible." *See* its Brief at p. 22, fn. 8. The undersigned probably echoes the feelings of the global Facebook consuming public in saying: spare me. What is outrageous, and *properly and adequately pled*, is Facebook *knew* of these coordinated Russian accounts' infiltration of its platform for purposes of causing racial animus (and general social unrest) and participated and implicitly conspired therein by continuing to sell ads to them so that they could further stoke racial animus (which, as Haugen and others have revealed, is highly profitable and engagement-driving for Facebook). *See* Facts section, *supra*; and Compl. at ¶¶ 18, 51, 138-150, 204-216 (Facebook built its algorithms to exploit racial divides, animus and hate, increasingly and purposefully so following the tragedies of Trayvon Martin in 2012 and Ferguson, MO in 2014; Facebook knew of the Russian's actions, including that 55% of ads they purchased addressed racial issues and instigated racial animus). That Facebook knew of such coordinated, inauthentic activity and its disproportionate harm to minorities and their civil rights, and yet chose (agreed) to allow it for profit is not merely Plaintiff's account, but that of Haugen and others and is supported by the findings of the U.S. Senate and the Mueller Reports on Russian Interference in U.S. politics in 2014-15 and beyond (both cited in Plaintiff's Compl.). *See id*.[31]

So Facebook's indignation aside, its arguments Plaintiff's 42 U.S.C. § 1985(3) allegations are insufficiently plausible are: (1) Plaintiff fails to allege an express agreement or meeting of the minds between the Russians and Facebook to violate civil rights; and (2) Plaintiff actually alleges the opposite of racial animus on Facebook's part, instead attributing Facebook's participation in

---

[31] The Report of the U.S. Senate Select Committee on Intelligence on Russia's Use of Social Media (Volume #2) concluded "no single group of Americans was targeted by the Internet Research Agency (IRA) more than African-Americans" and that "by far, race and related issues were the preferred target of the information warfare campaign designed to divide the country." The Mueller report also concluded the Russian Defendants efforts were focused on stoking and amplifying social discord especially focused on racial animus.

the conspiracy to its profit motive. The former argument overstates pleading requirements in this or any context–if adequate allegation (or proof) of a conspiracy required a "smoking gun" like an express agreement to pursue a common purpose, conspiracy claims would be little more than words on paper. *See Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995) ("an express agreement is not necessary"); *see also Puglise v. Cobb Cnty., Ga.*, 4 F.Supp. 2d 1172, 1181 (N.D. Ga. 1998).

The latter argument oversimplifies Plaintiff's allegations which are Facebook purposefully exploited racial divides and allowed foreign infiltrators, including the Russians, to do so; the fact that the Russians did so for their own reasons and Facebook for its own (to drive engagement and profit) is of no moment to the analysis, which does not require the conspirators share the exact same goals, only that they conspired to cause the same harms. *See Strickland v. U.S.*, 32 F.4th 311, 360-61 (4th Cir. 2022) (the elements require "a single plan, the essential nature and general scope of which was known to each person who is to be held responsible" but not a single purpose behind the "plan" for each conspirator); *Simmons* at 1378 (the alleged participants in the conspiracy need only share the same "*general* conspiratorial objective"); *Lenard v. Argento*, 699 F.2d 874, 882 (7th Cir. 1983) ("The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result.") (emphasis added).

Facebook also conveniently ignores Section 1986 claims, which are "derivative of § 1985 violations" and "provide a cause of action against anyone who has knowledge of a § 1985 conspiracy and who, 'having the power to prevent or aid in preventing the commission of' acts pursuant [thereto], 'neglects or refuses so to do.'" *See Strickland* at 360 (emphasis added). At the very least, Plaintiff's well-pled allegations support: (1) Facebook knew of the Russian Defendants' conspiracy to violate civil rights for purposes of their election interference activities, (2) had the power to prevent it, and yet (3) neglected or refused to do so because what the Russians were doing

34

was engagement-driving and profitable for Facebook. A fair reading of Plaintiff's allegations also plausibly supports Facebook knew and implicitly agreed to participate in the conspiracy by turning up its hate algorithms with knowledge these Russian actors, among others, were exploiting same to drive racial animus. Simply put, Facebook made a business decision to monetize hate, and part of that business decision included consciously allowing and implicitly supporting the efforts of the Russian Defendants to drive racial animus and violate civil rights of African Americans.

Indeed, in contrast to Facebook's cited cases, Plaintiff alleges, and plausibly so, both Facebook and the Russian Defendants were motivated by a specific racially-motivated and invidiously discriminatory objective (albeit, again, each for different purposes). As a direct consequence of multiple well-pled "overt acts" in furtherance of this implicit conspiracy, Plaintiff suffered grave harm. For Facebook's part, these included: (1) it knowingly accepted money from the Russian Defendants for them to post and direct ads in furtherance of their racially-motivated 'societal discord' attack on specific southern states including South Carolina; (2) at this same time, it made deliberate design changes regarding its algorithms it knew would amplify racial hate and discord because it knew these actions by foreign disruptors would increase engagement and profit. Facebook was not just "willfully blind" to these actions but took actions from which the reasonable inference can be drawn they chose to amplify their effect (*i.e.*, chose to participate in the conspiracy). This alleged knowledge and these alleged acts are sufficient at the pleading stage.

## **CONCLUSION**

For all of the foregoing reasons, Facebook's Motion to Dismiss must be denied. Plaintiff has raised a right to relief that is plausible on its face and based on adequate, detailed, evidence-based, and non-conclusory allegations of fact. Moreover, neither of Facebook's purely legal arguments (Facebook is not a "product" and, regardless, Section 230 immunizes Facebook from product liability claims premised on its platform's design and architecture) holds water.

35

Respectfully Submitted:
March 21, 2023

SOUTHERN MED LAW

*/s/ Marc J. Mandich.*
Francois M. Blaudeau (ASB-7722-D32F)
(*pro hac vice* pending)
Evan T. Rosemore (ASB-3760-N10B)
Marc J. Mandich (ASB-9346-H48E)
2762 B M Montgomery St, Suite 101
Homewood, AL 35209
Office: 205.564.2741
Fax: 205.649.6386
francois@southernmedlaw.com
evan@southernmedlaw.com
marc@southernmedlaw.com

*Lead Counsel for the Plaintiff*


HODGE & LANGLEY LAW FIRM, P.C.

*/s/ Ryan Langley*
Ryan Langley
SC Federal Bar No.: 10047
229 Magnolia St. (29306)
P.O. Box 2765
Spartanburg, SC 29304
rlangley@hodgelawfirm.com

MALLOY LAW FIRM
Gerald Malloy
108 Cargill Way
Hartsville, SC 29550
gmalloy@bellsouth.net

*Co-Counsel for the Plaintiff*