# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| M.P., a minor, by and through, Jennifer Pinckney, as Parent, Natural Guardian, and Next Friend, | Case No. 2:22-cv-3830-RMG |
| Plaintiff, | **ORDER AND OPINION** |
| v. | |
| Meta Platforms, Inc. (f/k/a Facebook, Inc., a Delaware Corp.); Facebook Holdings, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; Internet Research Agency, LLC (a/k/a Mediasintez LLC a/k/a Glavset LLC a/k/a Mixinfo LLC a/k/a Azimut LLC a/k/a Novinfo LLC); Concord Management and Consulting LLC; Concord Catering & Yevgeniy Viktorovich Prigozhin, | |
| Defendants. | |

This matter is before the Court on Meta Defendants'[1] Motion to Dismiss (Dkt. No. 27). Plaintiff has responded in opposition (Dkt. No. 32), and Meta Defendants have replied (Dkt. No. 36). For the reasons set forth below, the Meta Defendants' motion is granted.

**I.   Background**

The Meta Defendants, who own and/or operate the interactive computer service Facebook, have moved to dismiss Plaintiff's complaint which seeks to hold them liable for the July 15, 2015 racially inspired murderous assault by Dylann Roof on parishioners attending a bible study class at Emanuel AME Church, one of the most notorious incidents of racial violence in modern American history. Plaintiff is the daughter of Reverend Clementa Pinckney, one of the nine victims

---

[1] Meta Defendants are Meta Platforms, Inc. Facebook Holdings, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC, Siculus, Inc.

1

of that tragic assault on Emanuel AME Church and among South Carolina's most revered political and religious leaders.

Plaintiff alleges claims against the Meta Defendants under state common law causes of action of strict liability (Count I), negligence (Count II), and negligent infliction of emotional distress (Count III). Additionally, Plaintiff alleges under Count IV that the Meta Defendants and various Russian bad actors conspired to deprive her of privileges as an American citizen under 42 U.S.C. § 1985(3), commonly referred to as the Ku Klux Klan Act. The Meta Defendants assert that Plaintiff's state common law claims are barred by Section 230 of the Communications Decency Act, which provides as follows:

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider. . . . No cause of action may be brough and no liability may be imposed under any State or local law that is inconsistent with this section.

47 U.S.C. § 230(c)(1) and (e)(3).

The Meta Defendants further assert the Plaintiffs claim under the Ku Klux Klan Act fails to satisfy the elements of a § 1985(3) and lacks any specificity regarding the allegations that the "Meta Defendants conspired with the Russian Defendants to deprive African Americans of their fundamental right to vote and equal protection of the laws" and "knowingly conspired with the Russians to sow discord by using online radicalization to deprive African Americans of their fundamental right to vote and equal protection of the law." (Dkt. No. 1, ¶¶ 51, 52).

The essence of Plaintiff's common law claims is that Facebook's "design and architecture," which includes algorithms allegedly designed to maximize engagement without regard to the social harm, takes Facebook out of the safe harbor of Section 230 provided to interactive computer services acting as publishers of the product of third parties. (*Id*., ¶¶ 98-137). Plaintiff alleges that

Facebook's algorithms directed Dylann Roof to material of "white supremacists/nationalists and Russian state operatives" and aided and abetted "these evil actors in their brainwashing and radicalizing of users." (*Id.*, ¶ 137). The Meta Defendants assert that their structure and design of Facebook perform the traditional work of a publisher of third parties' materials and that Section 230 provides immunity from state common law claims such as those asserted by Plaintiff.

**II.     Standard**

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "'challenges the legal sufficiency of a complaint.'" *S.C. Elec. & Gas Co. v. Whitfield*, Civil Action No.: 3:18-cv-1795-JMC, 2018 WL 3587055, *4 (July 26, 2018) (quoting *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.")). To be legally sufficient, a pleading must contain a "'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

A Rule 12(b)(6) motion should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support her claim and would entitle her to relief. *Id.* (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). When considering a Rule 12(b)(6) motion, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff. *Id.* (citing *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999); *Mylan Labs., Inc.*, 7 F.3d at 1134.). "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

**III.   Discussion**

    **A.  Counts I, II and III:**

This Court does not address the scope and application of Section 230 on a blank slate. Indeed, there is a quarter of a century of case law since the adoption of Section 230 in 1996 that has addressed highly analogous claims by victims of terrorist violence and other wrongful conduct inflicted by actors who accessed and consumed hate material on social media sites. The very first appellate court case which addressed the scope of Section 230 immunity was the Fourth Circuit's decision in *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997). The *Zeran* court held:

> By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional functions—such as deciding whether to publish, withdraw postpone, or alter content—are barred.

*Id.* at 330.

Since *Zeran*, other circuit courts have been in general agreement that that the text of Section 230 should be construed broadly in favor of immunity. *See, e.g.*, *Force v. Facebook*, 934 F.3d 53, 64 (2d Cir. 2019); *Federal Trade Commission v. LeadClick Media, LLC*. 838 F.3d 158, 173 (2d Cir. 2016); *Jane Doe 1 v. Backpage,com LLC*, 817 F.3d 12, 18 (1st Cir. 2016); *Jones v. Dirty World Entertainment Recordings, LLC*, 755 F.3d 398, 408 (6th Cir. 2014); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *Almeida v. Amazon, Inc*. 456 F.3d 1316, 1321 (11th Cir. 2006); *Carafano v. Metrosplash.com, LLC*, 339 F.3d 1119, 1123 (9th Cir. 2003).

The *Zeran* court viewed Section 230 as a policy choice by Congress, weighing the potential benefits of a robust forum for "true diversity of political discourse" unfettered by potential tort liability of the internet service providers, against the potential harm associated with unregulated speech accessible to all. 129 F.3d at 330-331. Having determined that "tort based lawsuits" posed a threat "to freedom of speech in the new and burgeoning internet medium," Congress opted to provide broad immunity to service providers which published the materials of third parties. *Id*. at 330.

In recent years, plaintiffs have sought to plead around Section 230 immunity by asserting product liability claims based on the theory that the algorithms and internal architecture of social media sites direct hate speech to persons inclined to violence and inflict harm on minorities and other victims of random acts of violence. They argue that the algorithms are well beyond the function of traditional publishers and that the social media sites themselves are a defective product.

In *Force*, the plaintiffs, American citizens who were injured by terrorist attacks by Hamas in Israel, asserted that Facebook facilitated and abetted a terrorist organization whose members utilized its services. *Force*, 934 F.3d at 53. By making its forum open to terrorists and "actively bringing Hamas' message to interested parties" through its algorithms, plaintiffs argued that the design of Facebook rendered it a non-publisher outside the umbrella of Section 230. The Second Circuit rejected this argument:

> We disagree with plaintiffs' contention that Facebook's algorithms renders it a non-publisher . . . . [A]rranging and distributing third party information inherently forms "connections" and "matches" among speakers, content, and viewers of content, whether in interactive internet forums or in more traditional media. That is an essential result of publishing. Accepting plaintiffs' argument would eviscerate Section 230(c)(1); a defendant interactive computer service would be ineligible for Section 230(c)(1) immunity by virtue of simply organizing and displaying content exclusively provided

> by third parties.

*Id.* at 66.

The Ninth Circuit, in *Dyroff v. Ultimate Softweare Group, Inc*., 934 F.3d 1093 (9th Cir. 2019), recently took the same approach regarding a claim that a service provider's algorithms facilitated a communication between a drug seeker and a drug dealer, which ultimately resulted in the drug seeker's overdose death. In rejecting the plaintiff's product defect claim, the Ninth Circuit explained:

> It is true that Ultimate Software used features and functions, including algorithms, to analyze user posts on Experience Project and recommended other user groups. This includes the heroin-related discussion group to which [the drug seeker] posted and (through emails and push notifications) to the drug dealer who sold him the fentanyl laced heroin. Plaintiff, however, cannot plead around Section 230 immunity by framing these website features as content. We have held that what matters is whether the claims inherently require the court to treat the defendant as a publisher or speaker of content provided by another. If they do, then Section 230(c)(1) provides immunity from liability.

*Id.* at 1098.

Plaintiff here, just as the plaintiffs in other cases where they or their loved ones suffered injury or death following a wrongdoer accessing and using a social media website, argue that enormous harm has been inflicted on them and others by Congress' policy decision to provide Section 230 immunity to interactive computer services. Courts, having made a textual reading of the broad language of Section 230, have consistently interpreted the statute to bar claims seeking to hold internet service providers liable for the content produced by third parties. The balancing of the broad societal benefits of a robust internet against the social harm associated with bad actors utilizing these services is quintessentially the function of Congress, not the courts.

The Court finds that Section 230 bars Plaintiff's state common law claims asserted in Counts I, II, and III. The Meta Defendants' motion to dismiss Counts I, II, and III is granted.

**B. Count IV:**

Plaintiff further asserts a claim under 42 U.S.C. § 1985(3) asserting that the Meta Defendants conspired with various Russian bad actors[2] to deny her rights as an American citizen. To assert a claim under § 1985(3), a plaintiff must plausibly allege:

> (1) a conspiracy of two or more persons (2) who are motivated b a specific class-based, invidiously discriminatory animus to (3) deprive plaintiff of the equal enjoyment of rights secured by the law to all, (4) and results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Strickland v. United States*, 32 F.4th 311, 360 (4th Cir. 2022).

A plaintiff asserting a § 1985(3) claim must "show an agreement or 'meeting of the minds' by defendants to violate [plaintiff's] constitutional rights." *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995). This requires a showing that there was a "single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Id.* at 1378. General conclusory statements regarding a conspiracy are insufficient, even at the pleading stage, to survive a motion to dismiss. This requires allegations identifying "the persons who agreed to the alleged conspiracy, the specific communications amongst the coconspirators, or the manner in which any such communications were made." *A Society Without a Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011).

Measured by these standards, Count IV plainly does not plead a plausible claim under

---

[2] Russian Defendants are Internet Research Agency, LLC; Concord Management and Conuslting LLC; Concord Catering & Yevgeniy Viktorovich Prigozhin. There is no evidence that any of the Russian Defendants have been served and they have made no appearance in this case.

§ 1985(3). The complaint alleges that the "Meta Defendants conspired with the Russian Defendants to deprive African Americans of their fundamental right to vote and equal protection of the law . . . and worked together to use Facebook's algorithms to proliferate race-based hate and amplify lies promoting violence against African Americans and discouraging them from voting." (Dkt. No. 1, ¶ 51). The Complaint is bereft of any details of such an alleged conspiracy, including which specific individuals conspired, how they communicated, the details of any meetings, and the substance, purpose, or scope of the alleged conspiracy.

The Supreme Court recently addressed a similar case that asserted a cause of action under the Justice Against Sponsors of Terrorism Act, 18 U.S.C. § 2333(a), (d)(2), which authorizes United States nationals to sue anyone who conspires with international terrorists to commit acts of terrorism or aids and abets such acts. A unanimous United States Supreme Court held in *Twitter v. Taamneh*, 143 S. Ct. 1206 (2023), that a social media provider can be held liable under the Terrorism Act only upon a showing that it "consciously, voluntarily and culpably" participated in the terrorist act. *Id.* at 1230. The Court rejected the argument that a social media company's algorithms could constitute substantial assistance to terrorists:

> To be sure, plaintiffs assert that the defendants' "recommendations" algorithms go beyond passive aid and constitute active, substantial assistance . . . . As present here, the algorithms appear as to the nature of the content, matching any content (including ISIS' content) with any user who is more likely to view that content. The fact that these algorithms matched some ISIS content with some users does not convert defendants' passive assistance into active abetting.

*Id.* at 1226-27.

The Court finds that Count IV fails to plausibly allege a claim under § 1985(3) that meets the well-established standards of *Strickland* and other Fourth Circuit case law. The Court grants the Meta Defendants' motion to dismiss Count IV.

IV.     Conclusion

For the reasons above, the Court **GRANTS** Meta Defendants Motion to Dismiss (Dkt. No. 27) and **DISMISSES** Plaintiff's Complaint.

    s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

July 24, 2023
Charleston, South Carolina